# EXHIBIT 5

96TH CONGRESS } HOUSE OF REPRESENTATIVES { REPORT
2d Session No. 96-865

# FAIR HOUSING AMENDMENTS ACT OF 1980

APRIL 1, 1980.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. EDWARDS of California, from the Committee on the Judiciary, submitted the following

# R E P O R T

together with

## SUPPLEMENTAL VIEWS

[To accompany H.R. 5200]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 5200) to amend title VIII of the Act commonly called the Civil Rights Act of 1968 to revise the procedures for the enforcement of fair housing, and for other purposes, having considered the same, report favorably thereon with an amendment and recommends that the bill as amended do pass.

The amendment strikes out all after the enacting clause of the bill and inserts a new text which appears in italic type in the reported bill.

## EXPLANATION OF THE AMENDMENT IN THE NATURE OF A SUBSTITUTE

The amendment in the nature of a substitute differs from the introduced bill primarily in the following respects: the procedure and court of review for administrative decisions is changed; the protections afforded the handicapped are clarified and narrowed; a legislative veto of title VIII rules is added; violations of the title on the grounds of minimum lot size must be supported by a showing of intent; time limits for the administrative process are inserted;

Case 4:07-cv-03255-SBA   Document 74-6   Filed 02/19/2008   Page 3 of 36

venues for administrative hearings and judicial review are restricted; referrals to certified State and local agencies are made mandatory.

## PURPOSE OF THE BILL AS AMENDED BY THE COMMITTEE

The purposes of H.R. 5200, as amended, are twofold. One is to fulfill the promise made to the American people twelve years ago by the enactment of title VIII of the Civil Rights Act of 1968. That law effectively proscribed housing practices with the intent or effect of discriminating on account of race, color, national origin or religion, but it failed to provide an effective enforcement system to make that promise a reality. This bill seeks to fill that void by creating an administrative enforcement system (subject to judicial review) within the Department of Housing and Urban Development, and by improvements lessening barriers to the use of court enforcement by private litigants and the Department of Justice. Secondly, H.R. 5200 extends the principle of equal housing opportunity to handicapped persons, who, like the other classes protected by title VIII, have been the victims of unfair and discriminatory housing practices.

## HISTORY

The Subcommittee on Civil and Constitutional Rights began hearings on the federal government's role in the achievement of equal opportunity in housing in the 92nd Congress. Nine days of hearings, which included the testimony of over 15 witnesses, lent support to the conclusion that serious inadequacies were present in the law and in the agencies' efforts.[2]

In the 93rd Congress, the United States Commission on Civil Rights presented to the Subcommittee its findings on "Equal Opportunity in Suburbia,"[3] documenting the increasingly segregated housing patterns, and attributing that to the forces of both the private sector (real estate practices, such as steering, discrimination in financing, shift of employment location to the suburbs) and to the public sector (land use practices imposed by local governments, and the variety of Federal government practices which foster segregation).

In the 94th Congress, 5 days of hearings on "Equal Opportunity in Housing"[4] further confirmed that massive problems of discrimination continued despite the 1968 Act and that enforcement authority in the Department of Housing and Urban Development was so inadequate as to invite noncompliance.

Also in the 94th Congress, the Subcommittee focused oversight hearings on the problems of equal opportunity in rural housing[5] and in housing programs administered by the Veterans Adminis-

[1] And, as amended in 1974, on account of sex. Public Law 93-383.
[2] Federal Government's Role in the Achievement of Equal Opportunity in Housing: Hearings before the Civil Rights Oversight Subcommittee of the House Committee on the Judiciary, First and Second Sessions, 92nd Congress, Serial No. 34.
[3] Equal Opportunity in Housing: Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 94th Congress, Second Session, Serial No. 57.
[4] Problems of Equal Opportunity in Rural Housing: Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 94th Congress, Second Session, Serial No. 40 (parts 1 and 2).
[5] Equal Opportunity in Rural Housing: Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 94th Congress, Serial No. 51.

tration.[6] Those five days of hearings confirmed that housing discrimination is national in scope and that discrimination in the private market is supported by government agencies.

As a result of the evidence acquired in those hearings, in the 95th Congress H.R. 3504[7] and H.R. 7787[8] were introduced. The former bill contained an administrative enforcement system similar to that contained in H.R. 5200. The latter bill proposed to improve enforcement by vesting the Department of Housing and Urban Development with the authority to sue on behalf of individual title VIII complainants. The Subcommittee held 7 days of hearings on those measures; 17 witnesses testified and over 54 comprehensive additional written comments were received.[9]

Based upon the comments and suggestions from the preceding hearings, in the 96th Congress, the sponsors refined and redrafted H.R. 3504, and introduced H.R. 2540. That bill was the subject of 8 days of hearings (including 32 witnesses).[10] Like its predecessor, H.R. 2540 provided for the creation of administrative enforcement authority within the Department of Housing and Urban Development, and the inclusion of the handicapped as a protected class under title VIII.

Following 2 days of mark-up, on August 1, 1979, the Subcommittee, by a vote of 7 yeas and 2 nays ordered H.R. 2540 reported as a clean bill (subsequently introduced as H.R. 5200) to the full Committee on the Judiciary. The full Committee considered H.R. 5200 for four days, and on March 5, 1980, by a vote of 24 yeas to 6 nays ordered it favorably reported to the House, with a single amendment in the nature of a substitute.

## BACKGROUND AND NEED

On April 11, 1968, title VIII of the Civil Rights Act of 1968 was approved. While this was not the first Federal law to require equality of housing[11] opportunity for all Americans, it was the first comprehensive statutory framework guaranteeing this most basic of human rights.

That law was the product almost entirely of action taken on the Senate floor in 1968, in which the House of Representatives subsequently concurred. The result of this effort was the establishment of a clear national policy against housing discrimination, but little attention was paid to the details of implementation, resulting in what this Committee, in light of experience, now views as shortcomings.

[6] Equal Opportunity in Veterans Administration Housing Programs: Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 94th Congress, Second Session, Serial No. 571.
[7] Introduced by Congressman Don Edwards and Robert Drinan.
[8] Introduced by Congresswoman Gladys Spellman.
[9] Fair Housing Act: Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 95th Congress, First Session, Serial No. 46 (hereinafter, Fair Housing Act: Hearings before—)
[10] Fair Housing Amendments Act of 1979: Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 96th Congress, First Session, Serial No. 17 (hereinafter, Fair Housing Act of 1979: Hearings before—)
[11] See for example, 42 U.S.C. §1982 (1982) (prohibiting racial discrimination in the purchase, sale, lease, etc. of real and personal property (Until Jones v. Alfred Mayer, 392 U.S. 400, this was believed to be applicable only to state action); Executive Order 11063 (1962) and title IV of the Civil Rights Act of 1964, prohibiting race discrimination in housing receiving federal assistance, but explicitly excluding assistance in the form of loan insurance or guaranty.

5

A similar study, measuring discrimination against Mexican-Americans in the Dallas rental housing market, produced even more alarming results, i.e., that a dark-skinned Mexican-American has a 96 percent chance of experiencing discrimination when seeking a rental.[16]

The nature of discriminatory housing practices is relevant to the question of how best to remedy the apparent enforcement deficiencies. The aforementioned surveys, the title VIII charges filed with HUD, and the private suits filed under title VIII all lend support to the conclusion that most fair housing cases involve relatively simple questions of law and fact that could be best resolved in an administrative forum. For example, the survey cited above found that the usual forms of discrimination in marketing practices are subjecting minorities to higher sales or rental prices, larger down payment, longer waiting periods, higher interest rates, showing fewer homes or listings, requiring more credit information than similarly situated non-minority home seekers; false statements that no premises were available, and so forth. While these practices may be difficult to uncover, (in that the victim may not even realize that the illegal discrimination has occurred), once that evidence is acquired, the proof necessary to establish a violation is not complex.[17]

An administrative alternative will also respond to the high costs of such litigation and the inordinate length of time involved before final resolution of these cases.[18] Despite the possibility of an award of attorneys fees for prevailing plaintiffs, few private lawyers have been willing to take on such cases.[19] These factors tend to discourage all but those most persistent and steadfast in their determination to exercise rights guaranteed by the statutes.

The advantages of an administrative enforcement system over judicial enforcement render this an appropriate alternative for most fair housing cases. The simplicity of the administrative process (including the simplified rules of evidence and pre-hearing proceedings) permit the layman to participate in the proceedings without the assistance of counsel. Speed—especially important in housing cases, when the goal is often to obtain a needed dwelling unit—is

Footnotes continued from last page

showing overt racism in white or blacks or other groups in any manner designed to perpetuate and extend residential concentration by such groups. Thus, the data may underestimate the true extent of discrimination.

[16] "Light-skinned Mexican-Americans were found to be subject to a 85 percent chance of encountering discrimination. U.S. Department of Housing and Urban Development, Office of Policy Development and Research, *Discrimination Against Chicanos in the Dallas Rental Housing Market: An Experimental Extension of the Housing Market Practices Survey*, August 1979.

[17] Cases presented for litigation are also fairly simple. In a report prepared for HUD, Office of Fair Housing and Equal Opportunity, entitled *Remedies Obtained Through Litigation of Fair Housing and Equal Opportunity*, a study of representative cases from 1964 to 1978 randomly selected samples of such cases showed that, "(m)ost of the lawsuits alleged discrimination based on race for refusal to sell, rent, lease, or finance." (at page 2).

See, for example, the testimony of former HUD Secretary Robert Weaver, *Fair Housing Amendments Act of 1979: Hearings before* . . . supra, at page 175. The analysis cited above, *Remedies Obtained Through Litigation* . . ., supra at page 19, found that the time period for bringing the cases to an end from the time of the court's final order was approximately 21 months. Furthermore, the difficulties in obtaining counsel and funds for litigation may have been responsible for an additional average delay of two months before the case was filed.

[18] *Remedies Obtained Through Litigation* . . ., supra, at page 48. "As the report indicates, most successful fair housing litigants live . . . in limited . . . in large urban areas . . . Fair housing cases are being handled by a handful of attorneys." In nearly half the cases, the plaintiff's attorney was associated with a fair housing group or a civil rights organization. The relatively low award of damages ($2,913) and attorneys fees ($1,844), as well as the present law's indigency proviso regarding attorneys fees, may not account for this phenomenon.

4

# ENFORCEMENT

The primary weakness in the existing law derives from the almost total dependence upon private efforts to enforce its provisions. For financially capable victims of housing discrimination, the Act has provided litigation remedies. For the vast majority of victims, however, this course of action is not feasible. Alternative enforcement under title VIII is limited to "pattern and practice" cases brought by the Attorney General. While these cases have dealt with virtually every important type of discrimination, and have had a significant impact on the state of the law, relief for individual victims of housing discrimination has not been readily available through this avenue.[12]

The present law, while giving the Department of Housing and Urban Development (HUD) the responsibility to receive and investigate complaints of housing discrimination, and while giving the agency adequate powers to investigate, gives HUD no real power to remedy the housing violations that its investigations reveal. If HUD fails to achieve a remedy for the violation through conciliation, aggrieved individuals are left to seek redress through private civil actions.

Without any power to back up its conciliation efforts, HUD has been unable to get respondents to take the process seriously. Many refuse to consider conciliation at all; fewer still agree to any kind of settlement that rectifies an act of discrimination.[13] In the words of former HUD Secretary Carla Hills, " * * * the most serious obstacle to an effective title VIII program is the lack of adequate enforcement powers * * * [The present law, in relying upon conciliation, is an invitation to intransigence."[14]

The consequence of HUD's powerlessness is that victims, too, do not perceive the conciliation process as offering any real hope of relief. In the entire country, not more than 4,000 complaints have ever been filed with HUD under title VIII in any given year, despite the objective evidence that discrimination is widespread and pervasive.

In addition to the visibly segregated housing patterns evident across the nation, recent studies confirm that minorities are more often than not subject to discriminatory housing practices whenever they seek housing. For example, one recent survey of the practices of nearly 3,200 real estate sales firms and rental agencies in 40 metropolitan areas found that the probability of a black homeseeker encountering discrimination would be 75 percent in the rental market and 62 percent in the sales market.[15]

[12] Since the enactment of the Fair Housing Act, only about 300 suits have been brought by the Department of Justice.

[13] In 1977, for example, about 3,891 complaints were filed with HUD. Of these, 277 were successfully conciliated, and of those, in only about a fourth of the cases was the contested housing obtained by the victim of discrimination. U.S. Commission on Civil Rights, *The Federal Fair Housing Enforcement Effort* (March 1979) at page 29 and 32. See also General Accounting Office, *Stronger Federal Enforcement Needed to Uphold Fair Housing Laws* (February 1979) at page 27. Both the Civil Rights Commission and the GAO recommended that HUD be granted administrative enforcement authority.

[14] *Equal Opportunity in Housing: Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary*, 94th Congress, Second Session, Serial No. 40, part . . . supra, at 46.

[15] *Fair Housing Act: Hearings before* . . . supra, at 46. These percentages do not take into account the possibility of encountering discrimination in other phases of the housing process—such as in financing, nor do they account for the illegal process of "steering," i.e. the selective Footnotes continued on next page

more easily obtainable. The flexibility of holding hearings and conciliation meetings in locations close to the parties also makes the process more convenient. The relative simplicity of the process reduces the cost for all sides, particularly for the victim of discrimination, on whose behalf HUD will gather and present evidence at the hearings. Most important, the process of conciliation will be given a vitality that is lacking when sanctions are absent. Under the present enforcement system, the conciliation process not only fails to produce results when used, but may simply be exploited as a means of delaying any ultimate resolution.[20] With an administrative remedy, the expectation is that in the vast majority of cases where reasonable cause is found, resolution will be reached without resort to orders or hearings. This has been the experience under state law where the agency has authority comparable to that given to HUD under this bill.[21] Finally, the creation of administrative authority to enforce title VIII demonstrates a commitment on the part of the government to enforce this public right.[22]

At the same time, however, the Committee recognizes the strengths of judicial enforcement, and the need to continue this avenue of redress. Court proceedings, for example, are more suited to managing complexity and to interpreting the law as it applies to emerging variations of discrimination. Futhermore, as one witness stated, "[While government enforcement is essential for broad coverage, private suit remains important also as a cutting edge, to assure that government does its job effectively and to give confidence to the minority community that, if necessary, it can rely on its own resources—private lawyers."

To render judicial enforcement a more accessible alternative, the Committee reviewed the procedural difficulties encountered by private litigants and the Department of Justice when proceeding under title VIII.

The relatively short statute of limitations,[23] the procedural ambiguities in the present law,[24] the inhibitions on the award of attorneys fees,[25] all create barriers to litigation under title VIII. For racial minorities who can assert a cause of action under alternative statutes (e.g. 42 U.S.C. § 1982), many of these problems may be avoided.[26] For other protected persons, however, such barriers may effectively preclude any form of relief.

[20] See Fair Housing Act: Hearings before . . . supra, Statement of Assistant Attorney General Drew Days III, p. 66.

[21] In Connecticut, for example, last year, out of 116 complaints, reasonable cause was found in 41; in 39 cases, conciliation was obtained. Only 1 hearing was held. Likewise, last year the State of Michigan [Department of Civil Rights] issued only one order, but successfully adjusted 103 of its 177 complaints.

[22] For further discussion of the advantages of administrative enforcement, see the memorandum prepared by the Congressional Research Service, "Arguments for and against granting HUD cease and desist authority in the area of Fair Housing reprinted in Fair Housing amendments Act of 1979: Hearings before . . . supra, at page 647 et seq.

[23] See for example, testimony Fair Housing Amendments Act of 1979: Hearings before. . . supra, at page 6 and 8.

[24] Title VIII is the only civil rights attorneys fee provision, which contains a limitation that attorney fees be awarded to plaintiffs who are financially unable to assume such fees.

[25] See for Example, Brown v. Ballas, 331 F. Supp. 1033 (N.D. Texas, 1971) wherein a statute of limitations problem was avoided by relying on the Civil War statute.

The second category of improvements in title VIII relates to the desirability of greater specificity in substantive coverage. Consistent with case law interpretation of provisions of the present law, and in the interest of providing improved notice to affected persons, certain clarifications were deemed appropriate, among these the explicit citation of mortgage redlining, discrimination in the providing of hazard insurance and in the making of appraisals as prohibited practices.

There are sound reasons for covering each link in the real estate chain. Discrimination by one participant can itself lead to the outright denial of housing, and also can provide the impetus for adverse or discriminatory decisions by other and subsequent participants in the process. For example, with respect to appraisals, reliance upon racial or ethnic factors may produce an under-valuation that prompts a financial institution to deny a loan, or to offer financing on less advantageous terms,[27] thereby providing the primary device by which redlining is accomplished. While the practices and policies of appraisers may produce an under-valuation,[28] the Committee agreed that the law ought to be clear that racial and ethnic factors should not influence the decision-making process of any participant in the selling or renting of dwellings—whether it be brokers, sellers, landlords, financial institutions, or appraisers. To the extent a dwelling's value may be affected by an increase or decrease in demand generated by the racial or ethnic composition of a neighborhood, that change will be reflected in the objective, non-racial indicators of value that appraisers have always relied upon in determining value—factors such as comparable sales prices, employment stability, marketing time, rent levels, vacancy rates, and level of municipal services.

The explicit inclusion of appraisers under title VIII does not change existing law. Since the holding in United States v. American Institute of Real Estate Appraisers, 442 F. Supp. 1072 (N.D. Ill. 1977) it has been clear that the Fair Housing Act reaches the activities of the appraisal industry.[29]

Likewise, since Dunn v. Midwestern Indemnity, 472 F. Supp. 1106 (S.D. Ohio 1979), title VIII has been viewed as covering hazard insurance. In finding that a discriminatory failure or refusal to provide property insurance on a dwelling is a violation of Section

[27] The assumption upon which appraisers and underwriters relied for years was that racial integration had an adverse effect on property values. See Fair Housing Amendments Act of 1979: Hearings before . . . supra, at page 387, wherein teaching materials of two major appraiser organizations, (the American Institute of Real Estate Appraisers and the Society of Real Estate Appraisers) are quoted. These teachings tended to perpetuate this presumption. See also the report of the US Civil Rights Commission, quoted, at page 430, Id. which confirms the adverse and discriminatory impact of appraisal practices.

[28] As a condition of the dismissal of a title VIII suit, against them, the appraisal groups (noted above) have themselves issued policy statements which refute these assumptions. See policy statement of AIREA and SREA, quoted, in part, at pages 427-429, Ibid.
The district court noted: "It is clear from the plain language of the provisions that appraisers are not exempt from the scope of the Act, nor are restricted with respect to the class of persons subject to their prohibition. The 'otherwise make unavailable' language of section 804(a) has been applied to a variety of conduct to prohibit all practices which have the effect of denying dwellings on prohibited grounds . . . The 'or interferes with' language of section 818 has been broadly applied to reach all practices which have the effect of interfering with the exercise of rights. . . . The Act and its liberal construction if the statute is to prohibit effectively 'all forms of discrimination, sophisticated as well as simpleminded.'" United States v. AIREA, supra, at 1079.

804(a) of the Act, the court noted the interdependence of this phase of the housing process upon other phases:

[The] availability of appropriate insurance is a necessary predicate to the availability of financing, and financial assistance is a precondition to securing the availability of adequate housing. Id. at 1109.

Recent independent studies have documented the fact that discriminatory home insurance decisions are being made despite state insurance anti-discrimination laws.[30] While some state insurance commissions operate under laws that provide adequate anti-discrimination coverage and tools of enforcement, many do not.[31] In any case, the need to provide comprehensive federal coverage of all aspects of the housing process militates against exclusion for this industry, or any segment of the housing chain.

## COVERAGE OF HANDICAPPED PERSONS

The third significant improvement sought by this bill is the expansion of federal fair housing protections to handicapped persons. The enactment of the Rehabilitation Act of 1973 (29 U.S.C. 701 et seq.) was the first federal effort to extend anti-discrimination laws to the handicapped. However, housing discrimination was prohibited only to the extent the affected programs and activities receive federal financial assistance. The federal nondiscrimination policy does not now extend to the private market place.

Discrimination against handicapped individuals is rooted in the same myths and misconceptions which traditionally have resulted in discrimination against the historically recognized minorities and women who find protection in title VIII. The discrimination which handicapped individuals encounter arises from stereotyped notions which are frequently ill-founded. Where fears and prejudices are the justification for an act of housing discrimination, it is appropriate to include proscriptions against these actions within the framework of existing civil rights statutes.[32]

Housing discrimination against the handicapped often takes the form of simply refusing to rent, requiring an increased security de-

[30] See, for example, the report of the United States Commission on Civil Rights, *Insurance Redlining: Fact Not Fiction*, which found that "[d]espite industry claims that its underwriting practices are based on loss experience and other objective, empirical data, the [Midwestern] committees find that marketing decisions are frequently made on the basis of subjectivity and unfairly discriminatory factors." Similar conclusions were reached in studies of insurance redlining in Detroit, Illinois, New York, and Michigan, among others. See the Federal Insurance Administration Report issued by the Federal Insurance Administration. In that report, FIA concluded that "... redlining is a kind of arbitrary, guilt-by-association indictment of an entire neighborhood or even cities that excludes many decent risks from access to a free insurance market. It is by indirection the denying of credit to many persons who seek to maintain healthy core urban areas today in the Nation. Even in areas where FAIR plans provide redlining at affordable rates, redlining has stigmatized healthy neighborhoods as second class areas. This impacts negatively on investment and reinvestment opportunities for these areas."

[31] The Federal Emergency Management Agency, for example, found that a legal review of many state statutes indicates a lack of both sufficient substantive coverage and adequate administrative tools. See Congressman Don Edwards, October 19, 1979, from Gloria M. Jimenez, Federal Insurance Administrator.

[32] Likewise, extending the Fair Housing Act to cover the handicapped constitutes a permissible congressional enactment under both the 14th Amendment and the Commerce Clause. See Memorandum prepared by the Congressional Research Service, reprinted in *Fair Housing Amendments Act of 1979: Hearings before ... supra*, pages 663–681.

posit or a higher rent, because it is presumed that a handicapped person is more likely to cause damage.[33]

In other situations, the dwelling may not be accessible or useable by the prospective handicapped occupant unless some physical modifications are made. These may range from the major (e.g., widening a door to permit wheelchair access) to the minor (e.g., installation of lights in lieu of a doorbell).[34] Under existing law, there is no legal compulsion for a landlord to permit any such change, even if the change increases value and utility for non-disabled persons, and even if there is an agreement to restore the premises to their original condition.

The cost of making these modifications also ranges from the insubstantial to major expenditures. However, in the view of the Committee, this bill should not place the responsibility should not be placed upon the private property owner, particularly since H.R. 5200 provides no federal financial assistance for those changes.

When the disabled tenant or buyer is willing to assume that financial burden, arbitrary refusals which thwart that effort to render a dwelling accessible should be prohibited.

The Committee recognizes, however, that although this will be important in principle, in reality, relatively few disabled persons are in a position to afford major architectural modifications. The isolation and dependence resulting from a handicap often are the cause of limited job opportunities and resources. Assistance—by the government or the private housing industry—therefore may be warranted to achieve an acceptable degree of accessibility for the 36 million Americans who are disabled. However, before proceeding with any such approach, the extent of the problem and the probable cost of its solution should be analyzed. Accordingly, the bill provides that the Architectural and Transportation Barriers Compliance Board undertake a study on these and related issues.

## CONCLUSION

The effects of housing discrimination on both the individual and the society are truly pervasive; because free access to housing is basic to the enjoyment of many other liberties and opportunities, discrimination against minorities, women, and the handicapped has far reaching consequences. To the individual it means economic hardship, loss of job opportunities, humiliation, and alienation. To the society, it has meant the creation of the massive problems we now face, including the trauma of school busing to compensate for segregated housing patterns. As the Mayor of Indianapolis, William Hudnut III testified:

[I]f we can stabilize housing throughout the communities we live in and effectively combat discrimination and segregation through the adoption of nondiscriminatory housing * * * and financing practices, then the necessity for busing would be greatly reduced, if not eliminated.

[33] *Fair Housing Act: Hearings before ... supra*, pages 244–299, submitted comments at pages 573–588 and *Fair Housing Amendments Act of 1979: Hearings before ... supra*, pages 515–523 and 663–681.

[34] See, for example, the report prepared for the Office of Policy Development and Research, U.S. Department of Housing and Urban Development, entitled *Adaptable Dwellings*, which describes a variety of adaptive devices and architectural/interior design features that can be used to make a home usable for disabled people.

For the handicapped, housing discrimination has meant poverty and social isolation; for the society, it has necessitated the creation and support of expensive and dehumanizing institutions for the care of persons capable of living in the community.

There is, Mayor Hudnut continued, "a moral as well as a legal obligation to establish mechanisms in government that can assure people of those rights when they are trampled upon and when they are denied."

## SECTION-BY-SECTION ANALYSIS

### SHORT TITLES

*Section 1.*—Provides that the short title of this Act will be the Fair Housing Amendments Act of 1980.

*Section 2.*—Provides that the short title of the 1968 Act (which is being amended) will be the Civil Rights Act of 1968. This simply establishes in the law itself the short title which is usually used when referring to the 1968 Act.

*Section 3.*—Provides that the short title of title VIII of the 1968 Act shall be the Fair Housing Act. Again, this simply establishes in the law a title normally used when referring to title VIII.

### AMENDMENTS TO DEFINITION SECTION

*Section 4(a).*—Broadens the definition of "discriminatory housing practice" to include any violation under the Act and not merely those made illegal under Section 804, 805, or 806. Non-compliance with any provision of the Fair Housing Act which creates substantive obligations is therefore actionable under Section 8 of the bill. This amendment recognizes that the obligation of federal agencies under subsection 808 of the Act (to administer their programs affirmatively to further the purposes of fair housing) should be actionable under title VIII. Several circuits have already held that violation of subsection 808 gives rise to a claim for relief on the part of aggrieved persons. See, *Shannon v. U.S. Department of Housing and Urban Development* 436 F2d 809 (3rd Cir 1970) and *Otero v. New York Housing Authority* 484 F2d 1122, 1133 (2d Cir. 1973).

To achieve the ends of title VIII, case-by-case resolution of fair housing complaints must be supplemented by a concerted effort by all federal agencies with housing program obligations. On the other hand, the amendment is not intended to create a new cause of action based upon the failure of individual subordinate federal agency employees to take steps to "affirmatively administer" housing programs. Rather, it is institutional non-feasance and malfeasance which may be challenged and for which judicial review may be obtained under the Administrative Procedure Act. The amendment is also not intended to effectuate *de novo* judicial review of HUD actions taken pursuant to its title VIII administrative enforcement responsibility.

This change also is intended to codify case law interpretations of Section 817 which have held that a violation of Section 817 constitutes a separate and distinct violation of title VIII. See *Smith v.*

10

*Steckel* 510 F2d 1162 (CA Cal. 1975) and *Laufman v. Oakley Building and Loan Company* 408 F Supp 487 (DC Ohio 1976).

*Section 4(b).*—Provides a definition of handicap to be used under the Act. The language is similar to that contained in other federal law (see, Rehabilitation Act of 1973 (29 U.S.C. 701 *et. seq.*) and it is intended that the definition be interpreted consistently with regulations clarifying the meaning of the similar provision found in subsection 504 of the Rehabilitation Act.[35]

However, the definition adopted by the Committee makes it clear that such impairments do not include current drug or alcohol abuse, or any other impairment that would constitute a direct threat to the safety or property of others. This definitional limitation reaffirms the limits placed on the scope of coverage afforded to the handicapped under new section 804(g). That is, to the extent a handicap manifests itself in behavior which would violate generally applicable rules, policies, practices, or be incompatible with services or facilities, and accommodation of any of those items would result in unreasonable inconvenience to other affected persons, then coverage is not afforded. (See discussion, *infra*).

*Section 4(b).*—Also provides a definition of "aggrieved person" which is applicable to the entire title. In *Gladstone Realtors v. Village of Bellwood* 441 U.S. 91 (1979), the Supreme Court affirmed that standing requirements for judicial and administrative review are identical under title VIII. The bill adopts as its definition the language contained in subsection 810 of title VIII and thereby retains the court's interpretation of standing under title VIII. See, *Trafficante v. Metropolitan Life Insurance Co.* 409 U.S. 205, 209 (1972), and in *Bellwood, supra.*

### MODIFICATION OF EXEMPTION

*Section 5.*—Narrows the exemption which excludes from coverage of subsection 804 certain sales and rental transactions. The current exemption applies both to owner-occupied dwellings (section 803(b)(2)) and to sales and rentals where the owner no longer occupies the dwelling (subsection 803(b)(1)). The amendment preserves that part of the exemption which seeks to protect legitimate privacy interests by applying only when the exemption-seeker continues to reside in the dwelling. It also retains the policy excluding from exemption transactions that rely on sales or rental agents, brokers, or salesman, or discriminatory advertising. Thus, an

---

[35] See, for example, Regulation S. 84.3(j)(2) of the Department of Health, Education and Welfare which provides as follows:

(i) "Physical or mental impairment" means (A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

(ii) "Major life activities" means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

(iii) "Has a record of such an impairment" means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(iv) "Is regarded as having an impairment" means (A) has a physical or mental impairment that does not substantially limit major life activities but that is treated by a recipient as constituting such a limitation; (B) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; but is treated by a recipient as having such an impairment.

11

cial institution would be required to make credit judgments on an individual basis, and could not simply deny credit to a person because of generalized attitudes about the ability of particular classes of handicapped persons to sustain loan payments. Similar analyses should be made for new section 804(f).

Section 6(e).—Amends section 805 of the Act by deleting the present language and inserting language which is intended to remove possible ambiguity regarding the original version of this section. That language made it unclear whether the section's coverage was limited to discrimination involving the race or other characteristics solely of the applicant and specific classes of persons related to the applicant. This amendment makes clear that section 805, like section 804(a), is intended to eliminate all practices with the purpose or effect of denying loans on account of prohibited bases, or which contribute to or perpetuate a segregated housing market. This is consistent with current interpretation of the Fair Housing Act. See, Laufman v. Oakley Building and Loan Co., supra, and United States v. American Institute of Real Estate Appraisers, (AIREA) supra. It is also consistent with Regulation B under the Equal Credit Opportunity Act (12 CFR 202). So-called redlining practices would be prohibited under the amended language which, like subsection 804(a), proscribes all conduct which "makes housing unavailable" on account of race, etc.

By listing appraisers, sellers and brokers, this amendment recognizes the roles they play in the loan decision-making process. For example, sellers and brokers frequently arrange financing, direct clients and customers to sources of financing, pre-qualify applicants, give information about loan forms, or otherwise participate in the lending process. Appraisers, because their appraisals are relied upon by lenders in determining whether and upon what terms to loan, are also an important part of this process.

By referring to the purchasing and insuring of loans for residential property, this amendment recognizes the important direct and indirect roles often played by secondary market entities and mortgage insurance and guarantee agencies and firms in affecting the available funds in the primary market. The policies and practices of these categories of organizations can translate directly into terms and conditions of loans to borrowers.

It has been recognized that current language of the Act prohibits racial redlining; that is, the basing of any aspect of a loan decision on factors relating to race or ethnicity of persons residing or expecting to reside in the vicinity of a dwelling. See Laufman, supra and AIREA, supra; see also FHLBB regulations 12 CFR part 528 and 531.8. This amendment is intended to remove any possible ambiguity regarding the intention of Congress to eliminate redlining practices predicated on a prohibited basis.

Section 6(f) amends section 807 of the Act by providing a limited exception to the so-called "effects test" enunciated in United States v. City of Black Jack, supra, Metropolitan Housing Development Corporation v. Arlington Heights, 588 F. 2d. 1283 (7th Cir. 1977, on remand from the United States Supreme Court), and Resident Advisory Board v. Rizzo, 564 F. 2d. 126 (3rd Cir. 1977). With respect to zoning and land use practices which impose "minimum lot size for residences," there is no violation of title VIII unless an "intent to discriminate against a class protected by this title" is proven.

## FUNCTIONS OF SECRETARY

Section 7(a)(1).—Requires the Secretary to delegate the function of presiding over administrative hearings to administrative law judges, appointed pursuant to the requirements of the Administrative Procedure Act. Therefore, neither the Secretary nor any designee other than a duly appointed Administrative Law Judge may preside over hearings conducted pursuant to this title. Further, subsection 7(a)(4) has the effect of eliminating administrative appeals of the hearing decisions. The decision of the Administrative Law Judge may be appealed only pursuant to section 8 of the bill (new section 811(c) of title VIII as amended by this bill).

Section 7(a)(2) conforms in title VIII the numeration change made in Public Law 95-454.

Section 7(a)(3) provides that administrative hearings, as well as conciliation meetings, "[i]nsofar as possible, shall be held in the cities or other localities where the discriminatory housing practices allegedly occurred."

Section 7(c).—Amends section 808(e)(3) of the Act by clarifying HUD's authority to provide financial as well as technical assistance to public and private organizations seeking to remedy housing discrimination.

This provision does not require funding; it merely permits it. The authorization was deemed appropriate for several reasons. Most states, as well as HUD, rely on local, public and private organizations for information and research. Violations occur in many areas where public fair housing agencies may not be located. Under existing authority, funds appropriated to HUD for enforcement of title VIII, cannot be used to reimburse these local groups; only "technical" assistance can now be rendered. This new authorization will permit the Secretary to make use of private fair housing resources as part of a coordinated and comprehensive title VIII enforcement effort. Furthermore, the authorization will permit assistance to state and local fair housing agencies that desire to upgrade their performance to reach the standard of "substantial equivalency."

## CONGRESSIONAL REVIEW OF RULES

Section 7(d) provides for a legislative veto procedure with respect to any proposed or existing rule promulgated by any agency under the authority of title VIII.

The analysis below refers to the new section 808(f) of title VIII as amended by this bill.

Section 808(f)(1)(A)(i) provides the methods by which Congress may render a proposed rule ineffective.

This provision applies to any "rule" being promulgated or repromulgated by any "agency," when that rule is related to compliance with title VIII. The rule must be submitted to the House and Senate Committees on the Judiciary. The rule does not become effective if either

(i) both Houses of Congress, within 90 days of the promulgation, adopt the concurrent resolution of disapproval set forth in this subsection or

14

cial institution would be required to make credit judgments on an individual basis, and could not simply deny credit to a person because of generalized attitudes about the ability of particular classes of handicapped persons to sustain loan payments. Similar analyses should be used for new section 804(f).

Section 6(e).—Amends section 805 of the Act by deleting the present language and inserting language which is intended to remove possible ambiguity regarding the original version of this section. That language made it unclear whether the section's coverage was limited to discrimination involving the race or other characteristics solely of the applicant and specific classes of persons related to the applicant. This amendment makes clear that section 805, like section 804(a), is intended to eliminate all practices with the purpose or effect of denying loans on account of prohibited bases, or which contribute to or perpetuate a segregated housing market. This is consistent with current interpretation of the Fair Housing Act. See, Laufman v. Oakley Building and Loan Co., supra, and United States v. American Institute of Real Estate Appraisers. (AIREA.) supra. It is also consistent with Regulation B under the Equal Credit Opportunity Act (12 CFR 202). So-called redlining practices would be prohibited under the amended language which, like subsection 804(a), proscribes all conduct which "makes housing unavailable" on account of race, etc.

By listing appraisers, sellers and brokers, this amendment recognizes the roles they play in the loan decision-making process. For example, sellers and brokers frequently arrange financing, direct clients and customers to sources of financing, pre-qualify applicants, give information about loan forms, or otherwise participate in the lending process. Appraisers, because their appraisals are relied upon by lenders in determining whether and upon what terms to loan, are also an important part of this process.

By referring to the purchasing and insuring of loans for residential property, this amendment recognizes the important direct and indirect roles often played by secondary market entities and mortgage insurance and guarantee agencies and firms in affecting the available funds in the primary market. The policies and practices of these categories of organizations can translate directly into terms and conditions of loans to borrowers.

It has been recognized that current language of the Act prohibits racial redlining; that is, the basing of any aspect of a loan decision on factors relating to race or ethnicity of persons residing or expecting to reside in the vicinity of a dwelling. See Laufman, supra and AIREA, supra; see also FHLBB regulations 12 CFR part 528 and 531.8. This amendment is intended to remove any possible redlining practices predicated on a prohibited basis.

Section 6(f) amends section 807 of the Act by providing a limited exception to the so-called "effects test" enunciated in United States v. City of Black Jack, supra, Metropolitan Housing Development Corporation v. Arlington Heights, 588 F. 2d. 1283 (7th Cir. 1977, on remand from the United States Supreme Court), and Resident Advisory Board v. Rizzo, 564 F. 2d. 126 (3rd Cir. 1977). With respect to residences," there is no violation of title VIII unless an "intent to discriminate against a class protected by this title" is proven.

15

## FUNCTIONS OF SECRETARY

Section 7(a)(1).—Requires the Secretary to delegate the function of presiding over administrative hearings to administrative law judges, appointed pursuant to the requirements of the Administrative Procedure Act. Therefore, neither the Secretary nor any designee other than a duly appointed Administrative Law Judge may preside over hearings conducted pursuant to this title. Further, subsection 7(a)(4) has the effect of eliminating administrative appeals of the hearing decisions. The decision of the Administrative Law Judge may be appealed only pursuant to section 8 of the bill (new section 81(c) of title VIII as amended by this bill).

Section 7(a)(2) conforms in title VIII the numeration change made in Public Law 95-454.

Section 7(a)(3) provides that administrative hearings, as well as conciliation meetings, "[i]nsofar as possible, shall be held in the cities or other localities where the discriminatory housing practices allegedly occurred."

Section 7(c).—Amends section 808(e)(3) of the Act by clarifying HUD's authority to provide financial as well as technical assistance to public and private organizations seeking to remedy housing discrimination.

This provision does not require funding; it merely permits it. The authorization was deemed appropriate for several reasons. Most states, as well as HUD, rely on local, public and private organizations for information and research. Violations occur in many areas where public fair housing agencies may not be located. Under existing authority, funds appropriated to HUD for enforcement of title VIII cannot be used to reimburse these local groups; only "technical" assistance can now be rendered. This new authorization will permit the Secretary to make use of private fair housing resources as part of a coordinated and comprehensive title VIII enforcement effort. Furthermore, the authorization will permit assistance to state and local fair housing agencies that desire to upgrade their performance to reach the standard of "substantial equivalency."

## CONGRESSIONAL REVIEW OF RULES

Section 7(d) provides for a legislative veto procedure with respect to any proposed or existing rule promulgated by any agency under the authority of title VIII.

The analysis below refers to the new section 808(f) of title VIII as amended by this bill.

Section 808(f)(1)(A)(i) provides the methods by which Congress may render a proposed rule ineffective.

This provision applies to any "rule" being promulgated or repromulgated by any "agency," when that rule is related to compliance with title VIII. The rule must be submitted to the House and Senate Committees on the Judiciary. The rule does not become effective if either

(I) both Houses of Congress, within 90 days of the promulgation, adopt the concurrent resolution of disapproval set forth in this subsection or

16

(II) one House adopts the resolution within 60 days, and the other House does not disapprove that resolution within 30 days.

*Section 808(f)(1)(A)(ii).*—A proposed rule becomes effective within 60 days if:

1. No committee of Congress has reported a concurrent resolution of disapproval of the rule.

2. No committee has been discharged from considering such a resolution.

3. Neither House adopts such a resolution.

If any of the above occurs, the rule may not become effective until at least 90 days from the time the rule was promulgated, in order to permit either process of disapproval as set forth in clause (i) to be completed.

*Section 808(f)(1)(B)(i).*—Where a rule has been disapproved, the indentical rule may not be subsequently promulgated, unless an Act of Congress changes the agency's powers with respect to the subject matter of the rule.

*Section 808(f)(1)(B)(ii).*—Following a disapproval, if a new rule is promulgated within 12 months, pertaining to the same subject matter, only the parts of the rule being changed must go through the procedures described above for new rules. If more than a year has elapsed, the entire proposed rule is subject to that procedure.

*Section 808(f)(2)(A).*—As an alternate to disapproval, either House may adopt a resolution directing an agency to reconsider a rule.

*Section 808(f)(2)(B)(i).*—Where a resolution for reconsideration has been adopted by either House within 90 days of a rule's promulgation, that rule does not go into effect. The agency then must reconsider the rule, and, within 60 days, either withdraw or repromulgate the rule with changes. The agency shall determine what public participation in the reconsideration process is appropriate. If the agency takes no action within 60 days of the resolution of reconsideration, the rule lapses. If a rule is issued, the procedure set forth above for congressional review of new rules is applicable.

*Section 808(f)(2)(B)(ii).*—repeats the provisions found in (1)(A)(ii) with respect to a resolution of reconsideration.

*Section 808(f)(2)(C).*—authorizes resolutions of reconsideration regarding rules already in effect. Such rules would lapse 180 days after passage of such a resolution unless the agency repromulgates that same rule. If the agency intends to repromulgate the rule, it must give notice of a proceeding to consider its repromulgation, and that notice must be made at least 60 days before the repromulgation. Provisions of the Administrative Procedure Act relating to rulemaking (5 U.S.C. 553 (a), (b) and (o)) are specifically made applicable, except that an opportunity for oral presentation must be given, and the exceptions following section 553(b)(3) are not available to the agency.

When a rule has been repromulgated within 180 days of the resolution for reconsideration, it is subject to the same congressional review as provided under paragraph (1)(A) (described above). However, during that time of congressional review, the rule remains in effect.

*Section 808(f)(2)(D).*—A concurrent resolution of disapproval supersedes a resolution for reconsideration of the same rule or part thereof.

17

*Section 808(f)(3).*—When a rule has been the subject of solution of disapproval or reconsideration, any statutory time limits for rulemaking begin to run from the date of the adoption of the resolution.

*Section 808(f)(4)* provides the way in which time is calculated for purposes of congressional review of rules under these provisions.

*Section 808(f)(5)(A)* describes the authority of the Congress to enact this congressional review procedure i.e. as an exercise of rulemaking power of each House.

*Section 808(f)(5)(B)(i).*—When a resolution of disapproval or reconsideration is introduced or received from the other House, it must be referred only to the Standing Committee with legislative and oversight responsibility over the title i.e. the Committees on the Judiciary.

*Section 808(f)(5)(B)(ii).*—When a resolution of disapproval or reconsideration has not been adopted by the other House, the committee to which the resolution has been referred is subject to a motion to discharge within the following time periods: 45 days, when the rule is considered under subsections (1)(A) or (2)(B) (i.e. proposed rules); 90 days, when the rule is considered under subsection (2)(C) (i.e. existing rules).

*Section 808(f)(5)(B)(iii).*—If a resolution of disapproval or reconsideration has been adopted by the other House, the Committee to which the resolution was referred is subject to a discharge motion if no action is taken with 15 days.

*Section 808(f)(5)(B)(iv).*—The motion for discharge must be supported by only one-fifth of the Members of the House involved; it is highly privileged; no amendments are allowed; floor debate on the motion is limited to one hour which is to be equally divided between opponents and proponents.

*Section 808(f)(5)(C)(i).*—Consideration of resolutions of disapproval or reconsideration are subject to the usual rules of each House except as provided below.

*Section 808(f)(5)(C)(ii).*—When a Committee has been discharged from considering a resolution, it is always in order to move to consider the resolution on the floor.

*Section 808(f)(5)(C)(iii).*—Debate on the resolution is limited to 2 hours, equally divided between opponents and proponents.

*Section 808(f)(6).*—Congressional inaction or rejection of a disapproval or reconsideration resolution shall not be deemed approval of the subject rule by the courts judicially reviewing the rule.

## ENFORCEMENT CHANGES

*Section 8.*—Amends title VIII by striking all the provisions relating to enforcement in existing title VIII and replacing them with an improved system for civil action by private parties and the Attorney General, supplemented by a complementary system of administratve enforcement within the Department of Housing and Urban Development (HUD). The analysis below refers to the new sections 810–815 of title VIII, as amended by this bill.

18

ADMINISTRATIVE ENFORCEMENT: PRELIMINARY MATTERS

*Section 810(a)(1)* provides for the investigation of alleged discriminatory housing practices at the initiative either of the Secretary or an "aggrieved person", as defined above. The Secretary is required to notify the party charged (the respondent) of the existence and nature of the charge. It is intended that such notice be sufficiently detailed so as to put the respondent on notice as to both the particular allegations and the administrative process as it will affect the respondent. With respect to the Secretary's duty in this subsection to provide notice to the aggrieved person, the bill specifically requires that this notice both acknowledge receipt of the charge and advise the aggrieved "of the time limits and choice of forums provided under this title."

These notice requirements underscore the roles to be played by HUD in the administrative process. Both the aggrieved person and the respondent may rely on HUD for information and advice, although parties may engage their own legal representatives to assist them.

In this subsection, and elsewhere, provisions relating to the process of conference, conciliation and persuasion are included and are intended to emphasize the desirability of this means of resolution of charges. To ensure a candid exchange of information and opinions in this process, those provisions in existing law prohibiting nonconsensual disclosure of the content of these discussions are retained.

The time limit for filing an administrative complaint is one year from the time the alleged discrimination occurred or terminated. The latter term is intended to encompass the concept of continuing violations. The one year statute of limitation marks an increase from the present law's limit of 180 days, but is shorter than the 2 year statute of limitations permitted for court actions. The subsection also clarifies that the Secretary's authority to investigate includes gathering information relevant to the initiation of charges by HUD and the promulgation of new title VIII rules.

*Sections 810(a)(2)(A)–E)* provide the Secretary's authority to utilize various discovery measures, including the issuance of subpenas and interrogatories, obtaining and copying information, providing respondents with subpenas, paying witness and mileage fees, enforcing subpenas, and ordering remedies for disobeying such authority. These provisions are intended to continue without change the authority now provided pursuant to section 811 of the present law. One substantive change is effectuated—disobedience of this authority may no longer be punished by imprisonment.

*Section 810(a)(3)* provides the requirements for referring charges to state or local agencies for investigation and enforcement. The provisions continue the policy of encouraging the participation of state and local agencies in the resolution of housing discrimination charges filed originally with HUD. Those state and local agencies that effectively administer laws which are substantially equivalent to title VIII coverage must be certified for referrals.

When an agency administers a law that provides substantial equivalency in procedures and remedies, but which pertains to only part of the substantive coverage of title VIII, certification may be made when the charge pertains to that particular coverage. Thus,

19

when a charge pertains solely to discrimination in haz.. - insurance, that charge should be referred to a state insurance commission if the substantive coverage under the state law is at least as inclusive as new subsection 804(f) of title VIII, and the procedures and remedies are substantially equivalent to Section 8 of the bill.

The provisions differ from existing law pertaining to referrals in the following respects: the elements of substantial equivalency are described and certain time limits are changed or provided; to wit, the agency to which referral is made is given a minimum of 90 days (rather than 30) to commence proceedings and carry forward "with reasonable promptness;" the determination as to "substantial equivalency" must be made (or is deemed made) within 90 days of the time the agency requests such a decision; referrals must be made to certified agencies within 30 days. Furthermore, the Secretary is no longer permitted to recall referrals on the grounds that "the protection of the rights of the parties or the interests of the parties or the interest of justice require such action." Finally, the Secretary's decision on "substantial equivalency" is explicitly made judicially reviewable.

*Section 810(a)(4)* provides for cooperation, avoidance of duplication, and notification among all the federal agencies with fair housing responsibilities. It is anticipated that the particulars of these arrangements will be established through Memoranda of Understanding between the appropriate agencies. By this provision the Committee intends that the dual functions of regulation and investigation of individual complaints be coordinated. When a charge is received by HUD pertaining to discrimination by a financial institution, for example, it may be appropriate for the agency responsible for regulating that member institution to initiate a compliance review, based upon information generated in the HUD investigation on behalf of the individual complainant. Likewise, duplication of effort, and its attendant detrimental effects upon respondents, can be minimized when information is appropriately shared by federal agencies. For example, information acquired by a financial regulatory agency may be pertinent to HUD investigation of a particular complaint. Subject to the Privacy Act and other existing statutory restraints on inter-agency exchange of information, it is in the interests of justice that this information be shared.

*Section 810(b)* provides authority for temporary or preliminary relief to be obtained in the appropriate federal district court. Prior to such a request, a preliminary investigation by the Secretary must establish that prompt judicial action is necessary and that voluntary compliance will not achieve the same result. The Attorney General will conduct all litigation (including that pertaining to this provision) in which the Secretary participates as a party, unless the Attorney General specifically delegates that authority to the Secretary.

This provision specifically mandates that the requirements of the Federal Rules of Civil Procedure pertaining to temporary and preliminary relief (FRCP 65) apply. Thus, there must be a showing that the petitioner is likely to succeed and that irreparable harm will be incurred without the temporary relief. Further, the court should consider the potential harm to the public interest and to other parties interested in the proceeding.

20

*Section 810(c)* provides that if an investigation supports a finding of reasonable cause, the Secretary shall either refer the matter to the Attorney General for civil action (under section 813(b)) or file an administrative complaint (under section 811(a)). That decision must be made within 270 days of the filing of the charge. It is intended that this choice of forums will provide the Secretary with the flexibility necessary to most effectively and efficiently resolve the individual's interests may not always be identical to those of the larger society. Thus, this subsection also provides that the aggrieved may intervene as a separate party, with the right to obtain subpoenas and present testimony. Such intervention, however, is at the discretion of the administrative law judge.

An aggrieved person's right to file a civil action, pursuant to section 812, does not require exhaustion of administrative remedies under this title. Consequently, a finding of no probable cause or no finding at all within the prescribed period in no way precludes the availability of judicial relief under sections 812 and 813. (However, as discussed below, if reasonable cause is found, an administrative complaint issued, and an administrative hearing begun, the aggrieved person has elected to forgo a civil action under section 812.)

After an investigation is completed by the Secretary (and a finding relative to reasonable cause issued), the Secretary must provide each aggrieved person and respondent a statement of findings of such investigation. This requirement is designed to put those persons on notice as to the content and adequacy of the case the Secretary is prepared to present at a hearing (if one is to be held). This is particularly important for the aggrieved person, whose right to change forums and pursue a claim in court (under section 812) will be cut off once an administrative hearing is begun.

This provision is not intended to provide the full scope of prehearing discovery rights available to the parties to an administrative hearing. It is expected that the Secretary, through rules, will provide for appropriate access to relevant investigatory documents when an administrative hearing is to be held.

### ADMINISTRATIVE ENFORCEMENT: HEARING PROCESS

*Section 811(a)* describes the procedure to be utilized in the "hearing which the respondent may request if an administrative complaint has been issued. Since the hearing is "on the record," the relevant provisions of the Administrative Procedure Act, 5 U.S.C. 551 *et seq.*, also apply except that the adjudicatory function must be delegated to administrative law judges, and administrative appeals are barred. Furthermore, this subsection specifically prohibits the Secretary from modifying any order or any decision of an administrative law judge issued under this title.

Conciliation—referred to throughout section 8—may occur at anytime during the administrative process. If an agreement is reached prior to the issuance of an administrative complaint, the approval of the Secretary is not required. If, however, reasonable cause has been found, then the Secretary must also approve the agreement. The requirement that—at this stage—both HUD and the aggrieved person consent to the conciliation is meant to underscore the goal of protecting both the interests of the individual victim of discrimination and the society. Title VIII violations in-

spondents, but matters of national policy. When the Secretary issues an administrative complaint, such official is proceeding "in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact." *Atlas Roofing Co. v. Occupational Safety and Health Review Commission,* 430 U.S. 442, at 450 (1977). Thus, the Secretary has an interest in assuring that a private agreement between the aggrieved and the respondent does not permit the perpetration of a violation of that public right.

On the other hand, the individual's interests may not always be tended that this choice of forums will provide the Secretary with cases. Some cases, (such as those involving complex or novel issues of law or fact, multiple parties from several jurisdictions, or other complicating factors) may be best handled in court, where procedures are better suited for handling complexity.

It is intended that the procedures to be utilized at the hearing be controlled by the Administrative Procedure Act and rules promulgated by the Secretary. In addition, the subsection specifically provides the respondent with a minimum of 30 days to prepare for the hearing.

Subsequent to the hearing, the administrative law judge is required to issue findings of fact and conclusions of law. If an order is issued, it may include any form of relief that is legally and factually appropriate—such as requiring that the subject property or its equivalent be made available, payment of compensation to the aggrieved person for monetary losses, including out-of-pocket expenses incurred as a result of the discriminatory housing practice, and awarding the prevailing party costs and fees (as provided by proposed subsection 814(b)).

By not specifying what is "appropriate relief," it is intended that the relief available in this administrative forum be as broad as the Constitution permits, thereby maximizing the utility of the process. While the award of damages may be incidental to the broader role of enforcing the public interest (ending housing discrimination through equitable relief), damages may be the only means by which the victim or victims may be "made whole" for the losses suffered. See *National Labor Relations Board v. Jones & Laughlin Steel Corp.* 301 U.S. 1 (1937) and *Block v. Hirsh,* 256 U.S. 135 (1921).

The administrative law judge also is explicitly authorized to impose a civil penalty of up to $10,000. It is anticipated that such fines will serve a function of deterrence. Consequently, it is intended that this sanction be used only where the violation is willful or egregious; guidelines governing the propriety and amount of civil penalties should therefore be established by the Secretary.

As in court proceedings (see discussion below, regarding proposed subsection 814(d)), the order of the administrative law judge may not interfere with the contractual rights of innocent third parties—buyers or tenants or lien holders who execute contracts relative to the subject property prior to receiving notice of the charge filed under this title. With respect to tenants, actual notice is required. Consequently, where a bona fide purchaser, encumbrancer or tenant is present, the remedial order normally may not require that possession of the subject property be transferred to the aggrieved person; other forms of relief to make the victim whole should therefore be considered.

21

22

This provision is intended to minimize the unintended adverse effects of a remedial order upon transactions that are linked to the subject property. Unless the *status quo* of a property is maintained by agreement or temporary court order, sales or rentals of the subject property (and the chain of transactions connected to it) may continue (unless the tenant or buyer is on actual or constructive notice of the charge) without the danger that those contracts will be set aside.

Finally, the subsection provides that the Secretary may not modify any decision of the administrative law judge. This provision has the effect of vesting the authority of the agency to render decisions solely in the administrative law judge, whose independence is ensured by the statutory provisions regarding their appointment and grounds for removal; see, e.g. 5 U.S.C. sections 3105, 5372, 7521, and section 554(d)(2), which provides that the administrative law judges in an agency must be organizationally separate from and not responsible to the investigatory or prosecuting arm of the agency.

*Section 811(b)* provides for service of the final administrative order upon each aggrieved person and respondent in the proceedings. The time for filing appeals (see below) runs from the date of service of such order.

*Section 811(c)* describes the procedure for filing an appeal of an administrative order to the appropriate federal district court. Venue is to lie where the subject property is located, unless no specific property is involved, in which case the relevant provisions of Title 28 should apply. The initial petition must be filed not later than 30 days after the order has been served. It must specify the objections to the order and those portions of the record or findings of an act and conclusions of law to which objection is made. However, in the event the record of the administrative proceeding has not been completed within that 30 day period, the parties may amend the petition as of right (within a reasonable time after the record is available) to supplement or modify those specific objections.

Any aggrieved person who was a complainant in the administrative proceeding is deemed a party for the purposes of standing to file a petition for judicial review under this subsection (and any subsequent judicial appeals). Therefore, if the Secretary determines that an appeal is not warranted, the aggrieved person may, on his or her own, pursue the claim through appellate review. Likewise, if the Secretary does file a petition, the aggrieved person may also appear in that proceeding as a party.

The administrative record may be supplemented by the district court by either recommitting the matter to the administrative law judge (with instructions as to which evidentiary issue to supplement and how) or by the court's receiving that evidence directly. However, this supplementation procedure is intended to be utilized sparingly—only in those cases where the evidence was improperly excluded below, or some other factor supports a conclusion, as provided in the bill, that there is "a compelling need for further evidence to support a factual determination." It is not intended that the judicial review be transformed into a trial *de novo*. To the maximum extent possible, the record established in the administrative proceeding should be relied upon.

23

administrative law judges with respect to housing and title VIII violations.

The standard of review to be utilized by the district court is one of "*de novo* determination of the adequacy of the findings of fact and conclusions of law to which objection is made." The record upon which the court will make that determination will consist of the record of the proceeding below, as supplemented (if necessary) by additional evidence (as described above). The term "de novo" is meant to suggest that the court is not bound by any presumption of validity as to the findings and conclusions and order of the administrative law judge, although those findings and conclusions and order are also part of the record.

The court may accept, reject, or modify those findings and conclusions; the court's order may include any remedy that would have been appropriate in the administrative forum.

As with all court proceedings authorized under this title, judicial reviews under this subsection are to be given precedence over other civil proceedings. In cases involving possession of housing, prompt and final resolution of disputes is particularly appropriate, the interests of aggrieved person, respondents, and others with an indirect interest in the property require this. The victim of discrimination may be denied adequate housing during the pendency of the case. Where possession has been ordered transferred to the aggrieved, justice requires that the finality of that order quickly be resolved.

*Section 811(d)(1)* authorizes the administrative law judge to assess civil penalties for noncompliance with his or her final administrative order. Penalties may be imposed only after the order becomes unreviewable; i.e. 30 days after it is issued if no petition for review (under Subsection 811(c)) has been filed, or if the petition was filed, the date on which the decision of the last appellate court to which appeal has been made becomes final.[58]

Where final administrative orders are in force during the pendency of such appeals, non-compliance can be challenged in actions brought by the Attorney General under Subsection 813(b)(1).

*Section 811(e)* affirms the jurisdiction of the district court with respect to reviews of administrative orders under this title without regard to the amount in controversy. This is in conformity with 28 U.S.C. 331 and 343, which also provide jurisdiction to the district court for actions under Sections 812 and 813 without regard for the amount in controversy.

### PRIVATE ENFORCEMENT

*Section 812* continues a private right of action for aggrieved persons under title VIII with the following changes and clarifications:

*Section 812(a)(1).—*The statute of limitations is lengthened from 180 days to 2 years, running from the time the practice occurred, or if continuing, has terminated.

*Section 812(a)(2)* precludes simultaneous administrative and court proceedings involving the same aggrieved person. The Secretary is barred from commencing or continuing action under sections 810

---

[58] If, for example, an appeal is taken from the district court to the Court of Appeals, and no petition for certiorari to the Supreme Court is filed, the authority to assess penalties will mature

24

and 811 in response to a charge filed by an aggrieved person when a civil action has been filed by that aggrieved person. This provision would not preclude the Secretary from proceeding on the basis of charges filed by other persons, however, even if those charges arose from the same fact situation.

*Section 812(a)(3)* precludes the aggrieved person from pursuing relief under Section 812 if an administrative hearing on the record has begun. If the aggrieved person has filed a charge with HUD, a final election of original forums therefore must be made prior to the hearing.

*Section 812(a)(4)* permits the Attorney General to intervene in actions filed by aggrieved persons, but only when the case is "of general public importance."

*Section 812(b)* continues the existing title VIII provision permitting the appointment of an attorney for an aggrieved person, and waiving the payment of fees, costs, or security.

*Section 812(c)* describes the general character of relief which may be awarded in civil actions under this section. No change from existing law is intended except for the removal of the $1,000 limit on punitive damages for willful violations. This change will render this a more useful and realistic sanction available to the court under title VIII, and is in accord with relief available to racial minorities under the alternate remedy of 42 U.S.C. 1982.

### ENFORCEMENT ROLE OF ATTORNEY GENERAL

*Section 813(a)* continues the authority of the Attorney General to initiate civil actions involving either a "pattern or practice of resistance to the full enjoyment of any of the rights granted by title VIII or involving "any group of persons ... denied any rights granted by this title [where] ... such denial raises an issue of general public importance." These bases have been and should continue to be interpreted consistently in that isolated violations involving a single individual do not give rise to a cause of action under this provision.

*Section 813(b)*.—In addition to the authority to initiate pattern and practice cases (see above), cases may be brought upon referral from the Secretary (pursuant to subsections 810(c)), or for the purpose of enforcing final administrative orders and collecting civil penalties.

*Section 813(c)* clarifies the availability of the full range of judicial relief in actions brought by the Attorney General, including the authority to seek actual and punitive damages on behalf of victims of discrimination.

*Section 813(d)* permits the intervention of private parties in actions initially brought by the Attorney General, wherein that person is "aggrieved." This provision, along with subsection 812(a)(4), is intended to encourage consolidation of related cases, and thereby avoid duplication of effort and conflicting decisions.

### ANCILLARY AND PROCEDURAL MATTERS RELATING TO ENFORCEMENT

*Section 814(a)* authorizes the award of costs, including reasonable attorney and expert witness fees, to the prevailing party in any court proceeding under title VIII. Under existing law, the award of

25

attorney fees is limited to prevailing plaintiffs who are not financially able to assume those fees. This subsection is intended to put the award of attorney fees under title VIII into conformity with the standard established in other civil rights statutes.[39]

The court may award such costs in connection with the entry of any interlocutory order which determines the substantial rights of the parties. The United States, however, may not be awarded attorneys fees as a part of its costs, but shall be liable for such costs the same as a private party.

*Section 814(b)* authorizes the administrative law judge presiding over hearings under title VIII to award costs to the same extent and under the same standards as in court proceedings.

*Section 814(c)* adopts the existing title VIII provision requiring expedition of all court proceedings under title VIII.

*Section 814(d)* adopts the existing title VIII provision protecting bona fide purchasers, encumbrancers and tenants (see discussion above of the identical provision relative to administrative orders in section 811(a)).

### EFFECT ON OTHER LAWS

*Section 815(a)* adopts the existing title VIII provision affirming the validity of state or local laws which protect the same rights as this title. However, if any such laws require or permit practices that are illegal under title VIII, they are, to that extent, invalid. There is, therefore, no requirement that charges filed initially with a state or local fair housing agency, state insurance commission, etc., be referred to HUD, whether or not that agency has been certified under subsection 810(a)(3).

*Section 815(b)*.—This provision is intended to ensure that other federal laws protecting the handicapped are not construed as being repealed, superseded, or diminished by the amendments to Title VIII extending fair housing rights to the handicapped. This clarification is needed in light of other federal law that appears to require a greater degree of affirmative action towards the handicapped than does this title (see, for example, The Rehabilitation Act of 1973).

By explicitly including this provision, the Committee does not intend to suggest that other federal laws pertaining to fair housing (e.g. 42 U.S.C. 1981 and 1982) are in any way repealed, superseded, or diminished.

### INTERFERENCE, COERCION OR INTIMIDATION

*Section 9* conforming change (see section 4(a)).

### CONFORMING AMENDMENT TO TITLE IX OF THE 1968 CIVIL RIGHTS ACT

*Section 10* conforming change.

[39] See, for example, Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e-5(k), the Civil Rights Attorney's Fees Award Act (42 U.S.C. 1988); discretion in awarding such fees should be consistent with the principles adopted by the Supreme Court in *Christiansburg Garment Co. v. E.E.O.C....*

26

### RETROFITTING COST AND NEED STUDY

*Section 11.*—It is the view of the Committee that private housing suppliers should not, as a part of an anti-discrimination bill, be called upon to bear the expense of structural modification of dwellings in order to make them livable and accessible to handicapped persons.

However, the question of how important structural modification of private dwelling units is—to how many people—an open one deserving examination. Related questions of great concern include the potential cost of retrofitting activity in private housing, and who should bear such costs.

This provision authorizes and requires a "cost and need study", to be undertaken by the Architectural and Transportation Barriers Compliance Board, followed by a report to the Congress providing advice and recommendations for action.

The study must be completed within one year of the date of the bill's effective date.

### BUDGET AUTHORITY

*Section 12* delays authorization for appropriations under the bill to conform to the Congressional Budget Act.

### SUMMARY OF ADMINISTRATIVE ENFORCEMENT PROCESS

If a person believes he or she has or will be injured by a discriminatory housing practice, he or she may either file a civil action in the appropriate federal district court or file a charge with the Department of Housing and Urban Development. If the latter course is chosen, the charge will be referred (within 30 days) to the agency in the state or locality where the charge originated, whenever that agency has been certified as operating under a law and practice that is substantially equivalent to Title VIII. When referral occurs, that agency becomes responsible for investigation, conciliation, and remedial orders.

When no referral is made, HUD must investigate the charge, and seek to resolve it through conference, conciliation and persuasion. At any time when appropriate, the Secretary may seek a temporary or preliminary order from the appropriate court in order to preserve the *status quo.*

Within 270 days of the time the charge was filed, the Secretary must make a determination as to whether reasonable cause exists to believe the charge is true. If reasonable cause is found, the Secretary can either (1) refer the case to the Attorney General for civil action or (2) file an administrative complaint. If the latter is elected, there is then an opportunity for an administrative hearing (not less than 30 days after the complaint has been served), to be conducted by an Administrative Law Judge.

At the conclusion of the hearing, the Administrative Law Judge must issue findings of fact, conclusions of law, and, where appropriate, remedial orders—including compensatory and injunctive relief, and may assess civil penalties against the respondent.

Any party to the administrative proceeding (HUD, the aggrieved, the respondent) may file objections to the Administrative Law

27

Judge's findings and order to the appropriate federal district court. That review is a *de novo* determination of the adequacy of the findings and conclusions to which objection is made. The record may be supplemented in the district court or on remand to the Administrative Law Judge.

Simultaneous or duplicative administrative and judicial proceedings by the same complaint are prohibited. If the aggrieved files a civil action, HUD proceedings must cease. If an administrative hearing is commenced on the record, a civil action by that complainant is barred. (See accompanying chart.)

29

## COST ESTIMATE REQUIRED BY CLAUSE 7(A) OF RULE XIII OF THE RULES OF THE HOUSE OF REPRESENTATIVES

The Committee adopts the cost estimate prepared by the Congressional Budget Office (CBO) with reservations. The reservation pertains to the estimate for financial assistance to private and public agencies that work against housing discrimination. CBO's estimate was based primarily upon figures suggested by agencies that hope to receive funds under this provision. Any funding under this provision, however, would be totally discretionary. Consequently, HUD was unable to project this estimated budget request. The estimate offered by CBO is more akin to a statement of the need perceived by the potential grantees than to the realistic budget request.

Moreover, the purposes which would be served by this funding are more varied than counseling and investigation. In a letter to the Chairman of the Subcommittee on Civil and Constitutional Rights, following the CBO estimate, the Assistant Secretary for Fair Housing/Equal Opportunity made this clear:

Hon. DON EDWARDS,
*Chairman, House Subcommittee on Civil and Constitutional Rights,
House of Representatives, Washington, D.C.*

DEAR MR. EDWARDS: We have received and reviewed the cost estimate for H.R. 5200 as developed by the Congressional Budget Office and would like to provide you with some further details regarding its contents.

The Department's formal estimates of the cost of H.R. 5200 would depend upon the President's program budget submission. However, it would be appropriate to clarify some of the purposes which would be served by the funding that would be provided to private agencies working against housing discrimination.

These services could include:

Development of comprehensive strategies for training activities and/or legal seminars in civil rights law.

Monitoring of conciliation agreements reached with HUD or a State human rights commission.

Monitoring performance of signatures to Voluntary Agreements signed by realtors and HUD.

Monitoring of performance of developers and local housing authorities who have agreed to Affirmative Fair Housing Marketing Plans or Equal Housing Opportunity Plans for assisted housing projects.

Counseling individuals about their rights under the 1968 Civil Rights Act.

Referring individuals who believe they have been discriminated against to the appropriate enforcement agency.

Educating the public to the requirements of the law.

Both technical assistance and financial assistance would also be used to support similar activities on the part of agencies concerned with housing discrimination against the handicapped.

I hope this information will assist you in your deliberations.

Sincerely,

STERLING TUCKER.

28



30

## COMMITTEE'S ESTIMATED COST

| Fiscal year: | Millions |
|---|---|
| 1981 | 9.1 |
| 1982 | 8.9 |
| 1983 | 9.7 |
| 1984 | 10.5 |
| 1985 | 11.5 |
| 1986 | 12.5 |

## STATEMENTS UNDER 2(1)(3) OF RULE XI OF THE RULES OF THE HOUSE OF REPRESENTATIVES

A. *Oversight statement.*—No oversight findings or recommendations required pursuant to clause 2(b)(1) of Rule X have previously been filed with respect to this area.

B. *Budget statement.*—This bill does not provide any new budget authority.

C. *Cost estimate from Congressional Budget Office.*—The following letter and enclosure was received from Alice M. Rivlin, Director of the Congressional Budget Office.

CONGRESSIONAL BUDGET OFFICE,
U.S. CONGRESS,
*Washington, D.C., March 25, 1980.*

Hon. PETER W. RODINO, Jr.,
*Chairman, Committee on the Judiciary,
U.S. House of Representatives, Washington, D.C.*

DEAR MR. CHAIRMAN: Pursuant to Section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has prepared the attached cost estimate for H.R. 5200, as ordered reported by the House Committee on the Judiciary, March 4, 1980.

Should the Committee so desire, we would be pleased to provide further details on this estimate.

Sincerely,

ALICE M. RIVLIN, *Director.*

### CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

1. Bill number: H.R. 5200.
2. Bill title: Fair Housing Amendments Act of 1980.
3. Bill status: As ordered reported by the House Committee on the Judiciary, March 5, 1980.
4. Bill purpose: H.R. 5200 seeks to give the Department of Housing and Urban Development (HUD) the power to bring administrative action against those who violate the Fair Housing Act (Title VIII of the Civil Rights Act). The bill allows HUD to act on its own initiative or on behalf of individuals filing complaints with the department. The bill also includes the handicapped among the groups of people to be protected against housing discrimination. Such sums as may be necessary are authorized to carry out the purposes of this Act.
5. Cost estimate:

31

[In millions of dollars]

Estimated authorization level:

| Fiscal year: | |
|---|---|
| 1981 | 9.1 |
| 1982 | 8.9 |
| 1983 | 9.7 |
| 1984 | 10.5 |
| 1985 | 11.5 |
| 1986 | 12.5 |

Estimated outlays:

| Fiscal year: | |
|---|---|
| 1981 | 8.1 |
| 1982 | 9.0 |
| 1983 | 9.6 |
| 1984 | 10.5 |
| 1985 | 11.4 |
| 1986 | 12.4 |

The costs of this bill fall within budget subfunction 751.

6. Basis of estimate: H.R. 5200 grants HUD the authority to file on its own initiative a charge of discriminatory housing practice and conduct its own investigations. HUD estimates that it will require 110 additional staff members to carry out its new authority in this bill. The new positions consist of 50 field investigators, 12 lawyers, 7 administrative law judges, and support staff. The agency anticipates an increase in the number of complaints from 4,050 in 1980 to 6,000 in 1981. The estimated authorization level of $3.8 million in fiscal year 1981 includes salaries and overhead costs, and has been adjusted for inflation over the projection period. It is estimated that 90 percent of each year's funds will be spent in the first year and the remaining 10 percent in the following year.

The bill also allows HUD to give financial assistance to private agencies that work against housing discrimination. The financial aid HUD gives to private agencies will be used for counseling individuals and testing cases to see if there is probable cause for court action. It is estimated that approximately forty agencies will receive $100,000 each in 1981, and that the number of agencies will increase by 10 percent per year. Agencies concerned with housing discrimination against the handicapped are expected to account for a significant portion of this growth. It is also assumed that the amount of aid per agency will remain at $100,000 a year. It is estimated that 90 percent of each year's funds will go to the agencies in the first year, with the remaining 10 percent spent in the following year.

Under H.R. 5200, the Justice Department may bring civil action in federal court on behalf of individuals, at HUD's request. Based on information from the Department of Justice it is estimated that 5 new attorneys as well as support staff will be needed if this bill is enacted. In fiscal year 1981 salaries and overhead costs total $240,000. The following years are adjusted for inflation. It is assumed that 90 percent of this money will be spent each year, with the remaining 10 percent spent the following year.

The bill also requires the Architectural and Transportation Barriers Compliance Board to provide a report not later than October 1, 1981, on the private housing supply for handicapped people and make recommendations for further legislation. Based on information from the Board and their research on the cost of a similar report required of them by the Comprehensive Rehabilitation Amendments of 1978, it is estimated that this report will cost $1 million. It is estimated that 80 percent of the money will be spent in fiscal year 1981 and the remaining 20 percent in the following year.

H.R. 5200 allows the courts to assess civil penalties of up to $10,000 for violators of the Fair Housing Act and also to impose fines of up to $1,000 per day against those who refuse to comply with a court's final order. It is not possible to predict the amount of money the Treasury Department will gain as a result of this bill.

7. Estimate comparison: None.
8. Previous CBO estimate: None.
9. Estimate prepared by: Blaire French (225–7760).
10. Estimate approved by: James L. Blum, Assistant Director for Budget Analysis.

D. Government operations oversight.—No related oversight findings and recommendations have been made by the Committee on Government Operations under clause 4(c)(2) of Rule X.

STATEMENT UNDER CLAUSE 2(1)(4), OF RULE XI OF THE HOUSE OF REPRESENTATIVES CONCERNING ANY INFLATION IMPACT ON PRICES AND COSTS IN THE OPERATION OF THE NATIONAL ECONOMY

The committee concludes that there will be no inflationary impact on prices and costs in the operation of the national economy.

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of Rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, existing law in which no change is proposed is shown in roman):

ACT OF APRIL 11, 1968

AN ACT To prescribe penalties for certain acts of violence or intimidation, and for other purposes.

\* \* \* \* \* \* \*

*Be it enacted by the Senate and House of Representatives of the the United States of America in Congress assembled, That this Act may be cited as the Civil Rights Act of 1968.*

\* \* \* \* \* \* \*

TITLE VIII—FAIR HOUSING

SHORT TITLE

SEC. 800. This title may be referred to as the "Fair Housing Act".

\* \* \* \* \* \* \*

DEFINITIONS

SEC. 802. As used in this title—
(a) \* \* \*

\* \* \* \* \* \* \*

(f) "Discriminatory housing practice" means an act that is unlawful under [section 804, 805, or 806] *this title.*

\* \* \* \* \* \* \*

(h) *"Handicap" means, with respect to a person, (1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment; but such term does not include any current impairment that consists of alcoholism or drug abuse, or any other impairment that would be a direct threat to the property or the safety of others.*

(i) *"Aggrieved person" includes any person who claims to have been injured by a discriminatory housing practice or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur.*

EFFECTIVE DATES OF CERTAIN PROHIBITIONS

SEC. 803. (a) Subject to the provisions of subsection (b) and section 807, the prohibitions against discrimination in the sale or rental of housing set forth in section 804 shall apply:
(1) \* \* \*

(2) After December 31, 1968; *and before the date of the enactment of the Fair Housing Amendments Act of 1980,* to all dwellings covered by paragraph (1) and to all other dwellings except as exempted by subsection (b).

(b) [Nothing in section 804 (other than subsection (c))] *Before the date of the enactment of the Fair Housing Amendments Act of 1980, nothing in section 804 (other than subsections (c) and (e)) shall apply to—*

(c) For the purposes of [subsection (b),] *subsections (b) and (d),* a person shall be deemed to be in the business of selling or renting dwellings if—
(1) \* \* \*

(d)(1) *After the date of the enactment of the Fair Housing Amendments Act of 1980, subject to the provisions of section 807, the prohibitions set forth in section 804 of this title shall apply to all dwellings, except that the prohibitions set forth in subsections (a), (b), and (d) of section 804 shall not apply to any room or unit in a dwelling containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as the owner's residence, but only if such room or unit is sold or rented—*

34

(A) without the use in any manner of the sales or rental facilities or the sales or rental services of any real estate broker, agent, or salesman, or of such facilities or services of any person in the business of selling or renting dwellings, or of any employee or agent of any such broker, agent, salesman, or person; and

(B) without the publication, posting, or mailing of any advertisement or written notice in violation of section 804(c) of this title.

(2) Nothing in this subsection shall prohibit the use of attorneys, escrow agents, abstractors, title companies, and other such professional assistance as necessary to perfect or transfer the title.

DISCRIMINATION IN THE SALE OR RENTAL OF HOUSING AND OTHER PROHIBITED PRACTICES

SEC. 804. As made applicable by section 803 and except as exempted by sections 803(b), 803(d), and 807, it shall be unlawful—

(a) * * *

\*     \*     \*     \*     \*

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, or national origin, or an intention to make any such preference, limitation, or discrimination.

(d) To represent to any person because of race, color, religion, sex, handicap, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, handicap, or national origin.

(f) For a person in the business of insuring against hazards to refuse to enter into, or discriminate in the terms, conditions, or privileges of a contract of insurance against hazards to a dwelling because of the race, color, religion, sex, handicap, or national origin of persons owning, or residing in or near, the dwelling.

(g)(1) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, a dwelling to any person because of a handicap of a prospective buyer or renter or of any person associated with such buyer or renter unless such handicap would prevent a prospective dwelling occupant from conforming to such rules, policies, and practices as are permitted by paragraph (2) of this subsection.

(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of handicap. For purposes of this paragraph—

(A) discrimination includes—

(i) refusal to permit reasonable modifications of premises occupied, or to be occupied, by persons with a handicap which are necessary to afford such handicapped persons access to premises substantially equal to that of nonhandi-

35

capped persons, but in the case of a rental, only if the renter makes an agreement to restore the premises to the condition which existed before such modification, reasonable wear and tear excepted; and

(ii) refusal to make reasonable accommodations in policies, practices, rules, services, or facilities, when such accommodations are necessary to afford handicapped persons enjoyment of dwellings substantially equal to that of non-handicapped persons; and

(B) discrimination does not include—

(i) refusal to make alterations in premises at the expense of sellers, landlords, owners, brokers, building managers, or persons acting on their behalf;

(ii) refusal to make modification of generally applicable rules, policies, practices, services, or facilities where such modification would result in unreasonable inconvenience to other affected persons; or

(iii) refusal to allow architectural changes to, or modifications of, buildings which would materially decrease the marketability or value of a building or alter the manner in which a building or its environs has been, or is intended to be, used.

DISCRIMINATION IN THE FINANCING OF HOUSING

[SEC. 805. After December 31, 1968, it shall be unlawful for any bank, building and loan association, insurance company or other corporation, association, firm, or enterprise whose business consists in whole or in part in the making of commercial real estate loans, to deny a loan or other financial assistance to a person applying therefor for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling, or to discriminate against him in the fixing of the amount, interest rate, duration, or other terms or conditions of such loan or other financial assistance, because of the race, color, religion, sex, or national origin of such person or of any person associated with him in connection with such loan or other financial assistance or the purposes of such loan or other financial assistance, or of the present or prospective owners, lessees, tenants, or occupants of the dwelling or dwellings in relation to which such loan or other financial assistance is to be made or given: Provided, That nothing contained in this section shall impair the scope or effectiveness of the exception contained in section 803(b).]

DISCRIMINATION IN CERTAIN TRANSACTIONS THAT AFFECT HOUSING FINANCING

SEC. 805. It shall be unlawful for any person whose business includes the making, purchasing, or insuring of loans, or selling, brokering, or appraising of real property, to deny or otherwise make unavailable a loan or other financial assistance which is for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling, or to discriminate in the fixing of the amount, interest rate, duration, or other terms or conditions of such loan or other

*financial assistance, because of race, color, religion, sex, handicap, or national origin.*

### DISCRIMINATION IN THE PROVISION OF BROKERAGE SERVICES

SEC. 806. After December 31, 1968, it shall be unlawful to deny any person access to or membership or participation in any multiple-listing service, real estate brokers' organization or other service, organization, or facility relating to the business of selling or renting dwellings, or to discriminate against him in the terms or conditions of such access, membership, or participation, on account of race, color, religion, sex, *handicap,* or national origin.

### EXEMPTION

SEC. 807. Nothing in this title shall prohibit a religious organization, association, or society, or any nonprofit institution or organization operated, supervised or controlled by or in conjunction with a religious organization, association, or society, from limiting the sale, rental or occupancy of dwellings which it owns or operates for other than a commercial purpose to persons of the same religion, or from giving preference to such persons, unless membership in such religion is restricted on account of race, color, or national origin. Nor shall anything in this title prohibit a private club not in fact open to the public, which as an incident to its primary purpose or purposes provides lodgings which it owns or operates for other than a commercial purpose, from limiting the rental of occupancy of such lodgings to its members or from giving preference to its members. *Nothing in this title shall prohibit a minimum lot size requirement for residences unless such requirement is imposed with intent to discriminate against a class protected by this title.*

### ADMINISTRATION

SEC. 808. (a) The authority and responsibility for administering this Act shall be in the Secretary of Housing and Urban Development.

(b) The Department of Housing and Urban Development shall be provided an additional Assistant Secretary.

(c) The secretary may delegate any of his functions, duties, and powers to employees of the Department of Housing and Urban Development or to boards of such employees, including functions, duties, and powers with respect to investigating, conciliating, hearing, determining, ordering, certifying, reporting, or otherwise acting as to any work, business, or matter under this title. *The Secretary shall so delegate such functions, duties, and powers with respect to hearing, determining, and ordering under section 811 of this title.* The persons to whom such delegations are made with respect to hearing functions, duties, and powers shall be appointed and shall serve in the Department of Housing and Urban Development in compliance with sections 3105, 3344, [3362,] *5372,* and 7521 of title 5 of the United States Code. Insofar as possible, conciliation *meetings and hearings* shall be held in the cities or other localities where the discriminatory housing practices allegedly occurred. The Secretary shall by rule prescribe such rights of appeal from the de-

cisions of his hearing examiners [to other hearing examiners or to other officers in the Department, to boards of officers or to himself,] as shall be appropriate and in accordance with law.

(d) All executive departments and agencies shall administer their programs and activities relating to housing and urban development *(including any Federal agency having regulatory authority over financial institutions)* in a manner affirmatively to further the purposes of this title and shall cooperate with the Secretary to further such purposes.

(e) The Secretary of Housing and Urban Development shall—

(1) make studies with respect to the nature and extent of discriminatory housing practices in representative communities, urban, suburban, and rural throughout the United States;

(2) publish and disseminate reports, recommendations, and information derived from such studies;

(3) cooperate with and render *financial and* technical assistance to Federal, State, local, and other public or private agencies, organizations, and institutions which are formulating or carrying on programs to prevent or eliminate discriminatory housing practices;

(4) cooperate with and render such technical and other assistance to the Community Relations Service as may be appropriate to further its activities in preventing or eliminating discriminatory housing practices; and

(5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this title.

*[(f)(1)(A)(i) Simultaneously with promulgation or repromulgation of any rule, issued for the purpose of compliance with this title, the agency promulgating such rule shall transmit a copy thereof to the Committees on the Judiciary of the House of Representatives and the Senate. Except as provided in clause (ii) of this subparagraph, rules other than emergency rules shall not become effective, if—*

*(I) within 90 calendar days of continuous session of Congress after the date of promulgation, both Houses of Congress adopt a concurrent resolution, the matter after the resolving clause of which is as follows: "That Congress disapproves the rule promulgated by ____ dealing with the matter of ____, which rule was transmitted to Congress on ____.", the first blank being filled with the name of the agency issuing the rule, the second blank being filled with the title of the rule and the third blank being filled with the date of transmittal of the rule to Congress; or*

*(II) within 60 calendar days of continuous session of Congress after the date of promulgation, one House of Congress adopts such a concurrent resolution and transmits such resolution to the other House, and such resolution is not disapproved by such other House within 30 calendar days of continuous session of Congress after such transmittal.*

*(ii) If at the end of 60 calendar days of continuous session of Congress after the date of promulgation of a rule, other than an emergency rule, no committee of either House of Congress has reported or been discharged from further consideration of a concurrent resolution disapproving the rule, and neither ...*

title 5, United States Code, except that the exceptions contained in the matter which follows paragraph (3) in section 553(b) shall not be available to the agency and the agency shall hold a hearing for oral presentations. Rules repromulgated pursuant to this clause within 180 days of the passage of the resolution for reconsideration shall take effect as provided in paragraph (1)(A) of this subsection; and during the period for congressional review provided in that paragraph the reconsidered rule may remain in effect.

(D) A concurrent resolution of disapproval supersedes a resolution for reconsideration of the same rule or part thereof.

(3) If a resolution of Congress disapproves or directs reconsideration of a rule which was being promulgated subject to a statutory time limit for rulemaking, the adoption of the resolution shall not relieve the agency of its responsibility for adopting a rule, but any statutory time limit shall apply to such renewed rulemaking only from the date on which the resolution was adopted.

(4) For the purposes of this subsection—

(A) continuity of session is broken only by an adjournment sine die; and

(B) the days on which either House is not in session because of an adjournment of more than 3 days to a day certain are excluded in the computation of calendar days of continuous session.

(5)(A) The provisions of this paragraph are enacted by Congress—

(i) as an exercise of the rulemaking power of the Senate and the House of Representatives, respectively, and as such they are deemed a part of the rules of each House, respectively, but applicable only with respect to the procedure to be followed in that House in the case of resolutions described by paragraphs (1) and (2) of this subsection; and they supersede other rules only to the extent that they are inconsistent therewith; and

(ii) with full recognition of the constitutional right of either House to change the rules (so far as relating to the procedure of that House) at any time, in the same manner and to the same extent as in the case of any other rule of that House.

(B)(i) Resolutions of disapproval and resolutions for reconsideration of a rule shall, upon introduction or receipt from the other House of Congress be immediately referred by the presiding officer of the Senate or of the House of Representatives to the standing committee having oversight and legislative responsibility with respect to this title in accordance with the rules of the respective House; and such resolutions shall not be referred to any other committee.

(ii) If a committee to which a resolution which has not been adopted by the other House of Congress, does not report out such resolution—

(I) within 45 calendar days of continuous session of Congress after referral, in the case of a resolution to disapprove or to require reconsideration of a rule pursuant to paragraphs (1)(A) or (2)(B) of this subsection; or

(II) within 90 calendar days of continuous session of Congress after referral, in the case of a resolution to require reconsideration of a rule pursuant to paragraph (2)(C) of this subsection; it shall be in order to move to discharge such committee from further consideration of such resolution...

resolution, the rule may go into effect immediately. If, within such 60 calendar days, such a committee has reported or been discharged from further consideration of such a resolution, or either House has adopted such a resolution, the rule may go into effect not sooner than 90 calendar days of continuous session of Congress after its promulgation unless disapproved as provided in clause (i) of this subparagraph.

(B)(ii) An agency may not promulgate a new rule or an emergency rule identical to one disapproved under this paragraph unless an Act of Congress is adopted affecting the agency's powers with respect to the subject matter of the rule.

(ii) If an agency proposes a new rule dealing with the same subject matter as a disapproved rule, it shall comply with the procedures required for the issuance of a new rule, except that if less than 12 months have passed since the date of such disapproval, such procedures may be limited to changes in the rule.

(2)(A) Either House of Congress may adopt a resolution directing agency reconsideration of a rule other than an emergency rule. The matter after the resolving clause of such a resolution shall be as follows: "That the ____ directs ____ to reconsider its rule dealing with the matter of ____ which is found at ____", or if a new rule "was transmitted to Congress on ____", the first blank being filled with the House of Congress issuing the resolution, the second blank being filled with the name of the agency issuing the rule, the third blank being filled with the title of the rule and such further description as may be necessary to identify it, and the fourth blank being filled with the citation to the rule in the Federal Register or, if it is a new rule, the date on which it was transmitted to Congress.

(B)(i) If a resolution for reconsideration of a rule, other than an emergency rule, is adopted by either House within 90 calendar days of continuous session of Congress after the date the rule was promulgated, the rule shall not go into effect. The agency shall reconsider the rule and within 60 days either withdraw or repromulgate the rule with such changes and with such public participation as the agency determines appropriate. If the agency takes no action within 60 days such rules shall lapse. If promulgated, the rule shall be subject to congressional review and go into effect as provided in this subsection.

(ii) If at the end of 60 calendar days of continuous session of Congress after the date of promulgation of a rule, other than an emergency rule, no committee of either House of Congress has reported or been discharged from further consideration of a resolution of reconsideration of a rule, the rule may go into effect at the end of such period. If, within 60 calendar days, such a committee has reported or been discharged from further consideration of such a resolution, the rule may go into effect not sooner than 90 calendar days of continuous session of Congress after its promulgation.

(C) One hundred and eighty days after passage of a resolution for reconsideration with respect to a rule which has taken effect, the rule shall lapse, unless repromulgated by the agency. Unless excepted by subsection 553(a) of title 5, United States Code, the agency shall, not less than 60 days prior to repromulgating such a rule, give notice of a proceeding to consider its repromulgation. The notice and proceeding shall comply with subsections (b) and (c) of section 553 of...

41

within thirty days after the expiration of any period of reference under subsection (c), the Secretary shall investigate the complaint and give notice in writing to the person aggrieved whether he intends to resolve it. If the Secretary decides to resolve the complaint, he shall proceed to try to eliminate or correct the alleged discriminatory housing practice by informal methods of conference, conciliation, and persuasion. Nothing said or done in the course of such informal endeavors may be made public or used as evidence in a subsequent proceeding under this title without the written consent of the persons concerned. Any employee of the Secretary who shall make public any information in violation of this provision shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $1,000 or imprisoned not more than one year.

[(b) A complaint under subsection (a) shall be filed within one hundred and eighty days after the alleged discriminatory housing practice occurred. Complaints shall be in writing and shall state the facts upon which the allegations of a discriminatory housing practice are based. Complaints may be reasonably and fairly amended at any time. A respondent may file an answer to the complaint against him and with the leave of the Secretary, which shall be granted whenever it would be reasonable and fair to do so, may amend his answer at any time. Both complaints and answers shall be verified.

[(c) Wherever a State or local fair housing law provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in this title, the Secretary shall notify the appropriate State or local agency of any complaint filed under this title which appears to constitute a violation of such State or local fair housing law, and the Secretary shall take no further action with respect to such complaint if the appropriate State or local law enforcement official has, within thirty days from the date the alleged offense has been brought to his attention, commenced proceedings in the matter, or, having done so, carries forward such proceedings with reasonable promptness. In no event shall the Secretary take further action unless he certifies that in his judgment, under the circumstances of the particular case, the protection of the rights of the parties or the interests of justice require such action.

[(d) If within thirty days after a complaint is filed with the Secretary or within thirty days after expiration of any period of reference under subsection (c), the Secretary has been unable to obtain voluntary compliance with this title, the person aggrieved may, within thirty days thereafter, commence a civil action in any appropriate United States district court, against the respondent named in the complaint, to enforce the rights granted or protected by this title, insofar as such rights relate to the subject of the complaint: Provided, That no such civil action may be brought in any United States district court if the person aggrieved has a judicial remedy under a State or local fair housing law which provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in this title. Such actions may be brought without regard to the amount in controversy in any United States district court for the district in which the discriminatory housing practice is alleged

---

40

(iii) If a committee to which is referred a resolution which has been adopted by the other House of Congress does not report out such resolution within 15 calendar days of continuous session of Congress after referral, in the case of a resolution to disapprove a rule pursuant to paragraph (1)(A) of this subsection, it shall be in order to move to discharge such committee from further consideration of such resolution.

(iv) Such motion to discharge must be supported by one-fifth of the Members of the House of Congress involved, and is highly privileged in the House and privileged in the Senate (except that it may not be made after the committee has reported a resolution of disapproval or for reconsideration with respect to the same rule; and debate thereon shall be limited to not more than 1 hour, the time to be divided in the House equally between those favoring and those opposing the motion to discharge and to be divided in the Senate equally between, and controlled by, the majority leader and the minority leader or their designees. An amendment to the motion is not in order, and it is not in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

(C)(i) Except as provided in clauses (ii) and (iii) of this subparagraph, consideration of a resolution of disapproval or for reconsideration shall be in accord with the rules of the House of Representatives, respectively.

(ii) When a committee has reported or has been discharged from further consideration of a resolution with respect to a rule, it shall be in order at any time thereafter (even though a previous motion to the same effect has been disagreed to) to move to proceed to the consideration of the resolution. The motion is highly privileged and is not debatable. An amendment to the motion is not in order, and it is not in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

(iii) Debate on the resolution shall be limited to not more than 2 hours, which shall be divided equally between those favoring and those opposing the resolution. A motion further to limit debate is not debatable. An amendment to or motion to recommit, the resolution is not in order and it is not in order to move to reconsider the vote by which the resolution is agreed or disagreed to.

(6) Congressional inaction on or rejection of a resolution of disapproval or of a resolution for reconsideration shall not be deemed an expression of approval of such rule.

*

*

*

[ENFORCEMENT

[SEC. 810. (a) Any person who claims to have been injured by a discriminatory housing practice or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur (hereafter "person aggrieved") may file a complaint with the Secretary. Complaints shall be in writing and shall contain such information and be in such form as the Secretary requires. Upon receipt of such a complaint the Secretary shall furnish a copy of the same to the person or persons who allegedly committed or are about to commit the alleged discriminatory housing practice. Within thirty days after receiving a complaint, or

42

to have occurred or be about to occur or in which the respondent resides or transacts business. If the court finds that a discriminatory housing practice has occurred or is about to occur, the court may, subject to the provisions of section 812, enjoin the respondent from engaging in such practice or order such affirmative action as may be appropriate.

(e) In any proceeding brought pursuant to this section, the burden of proof shall be on the complainant.

(f) Whenever an action filed by an individual, in either Federal or State court, pursuant to this section or section 812, shall come to trial the Secretary shall immediately terminate all efforts to obtain voluntary compliance.

INVESTIGATION; SUBPENAS; GIVING OF EVIDENCE

SEC. 811. (a) In conducting an investigation the Secretary shall have access at all reasonable times to premises, records, documents, individuals, and other evidence or possible sources of evidence and may examine, record, and copy such materials and take and record the testimony or statements of such persons as are reasonably necessary for the furtherance of the investigation: *Provided, however,* That the Secretary first complies with the provisions of the Fourth Amendment relating to unreasonable searches and seizures. The Secretary may issue subpenas to compel his access to or the production of such materials, or the appearance of such persons, and may issue interrogatories to a respondent, to the same extent and subject to the same limitations as would apply if the subpenas or interrogatories were issued or served in aid of a civil action in the United States district court for the district in which the investigation is taking place. The Secretary may administer oaths.

(b) Upon written application to the Secretary, a respondent shall be entitled to the issuance of a reasonable number of subpenas by and in the name of the Secretary to the same extent and subject to the same limitations as subpenas issued by the Secretary himself. Subpenas issued at the request of a respondent shall show on their face the name and address of such respondent and shall state that they were issued at his request.

(c) Witnesses summoned by subpena of the Secretary shall be entitled to the same witness and mileage fees as are witnesses in proceedings in United States district courts. Fees payable to a witness summoned by a subpena issued at the request of a respondent shall be paid by him.

(d) Within five days after service of a subpena upon any person, such person may petition the Secretary to revoke or modify the subpena. The Secretary shall grant the petition if he finds that the subpena requires appearance or attendance at an unreasonable time or place, that it requires production of evidence which does not relate to any matter under investigation, that it does not describe with sufficient particularity the evidence to be produced, that compliance would be unduly onerous, or for other good reason.

(e) In case of contumacy or refusal to obey a subpena, the Secretary or other person at whose request it was issued may petition for its enforcement in the United States district court for the dis-

43

trict in which the person to whom the subpena was addressed resides, was served, or transacts business.

(f) Any person who willfully fails or neglects to attend and testify or to answer any lawful inquiry or to produce records, documents, or other evidence, if in his power to do so, in obedience to the subpena or lawful order of the Secretary, shall be fined not more than $1,000 or imprisoned not more than one year, or both. Any person who, with intent thereby to mislead the Secretary, shall make or cause to be made any false entry or statement of fact in any report, account, record, or other document submitted to the Secretary pursuant to his subpena or other order, or shall willfully neglect or fail to make or cause to be made full, true, and correct entries in such reports, accounts, records, or other documents, or shall willfully mutilate, alter, or by any other means falsify any documentary evidence, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

(g) The Attorney General shall conduct all litigation in which the Secretary participates as a party or as amicus pursuant to this Act.

ENFORCEMENT BY PRIVATE PERSONS

SEC. 812.(a) The rights granted by sections 803, 804, 805, and 806 may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy and in appropriate State or local courts of general jurisdiction. A civil action shall be commenced within one hundred and eighty days after the alleged discriminatory housing practice occurred: *Provided, however,* That the court shall continue such civil case brought pursuant to this section or section 810(d) from time to time before bringing it to trial if the court believes that the conciliation efforts of the Secretary or a State or local agency are likely to result in satisfactory settlement of the discriminatory housing practice complained of in the complaint made to the Secretary or to the local or State agency and which practice forms the basis for the action in court: *And provided, however,* That any sale, encumbrance, or rental consummated prior to the issuance of any court order issued under the authority of this Act, and involving a bona fide purchaser, encumbrancer, or tenant without actual notice of the existence of the filing of a complaint or civil action under the provisions of this Act shall not be affected.

(b) Upon application by the plaintiff and in such circumstances as the court may deem just, a court of the United States in which a civil action under this section has been brought may appoint an attorney for the plaintiff and may authorize the commencement of a civil action upon proper showing without the payment of fees, costs, or security. A court of a State or subdivision thereof may do likewise to the extent not inconsistent with the law or procedures of the State or subdivision.

(c) The court may grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order, and may award to the plaintiff actual damages and not more than $1,000 punitive damages, together with court costs and reasonable attorney fees in the case of a prevailing plaintiff:

*Provided,* That the said plaintiff in the opinion of the court is not financially able to assume said attorney's fees.

### [ENFORCEMENT BY THE ATTORNEY GENERAL

[SEC. 813. (a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this title, or that any group of persons has been denied any of the rights granted by this title and such denial raises an issue of general public importance, he may bring a civil action in any appropriate United States district court by filing with it a complaint setting forth the facts and requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order, or order against the person or persons responsible for such pattern or practice or denial of rights, as he deems necessary to insure the full enjoyment of the rights granted by this title.

### [EXPEDITION OF PROCEEDINGS

[SEC. 814. Any court in which a proceeding is instituted under section 812 or 813 of this title shall assign the case for hearing at the earliest practicable date and cause the case to be in every way expedited.

### [EFFECT ON STATE LAWS

[SEC. 815. Nothing in this title shall be construed to invalidate or limit any law of a State or political subdivision of a State, or of any other jurisdiction in which this title shall be effective, that grants, guarantees or protects the same rights as are granted by this title; but any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this title shall to that extent be invalid.]

### ENFORCEMENT BY SECRETARY; PRELIMINARY MATTERS

SEC. 810. (a)(1) Whenever an aggrieved person, or the Secretary on the Secretary's own initiative, files a charge alleging a discriminatory housing practice, the Secretary shall serve a notice of the alleged discriminatory housing practice on the party charged (hereinafter in this title referred to as the "respondent") within 10 days after such filing, and shall make an investigation thereof. Upon receipt of such charge, the Secretary shall serve notice upon the aggrieved person acknowledging receipt of the charge and advising the aggrieved person of the time limits and choice of forums provided under this title. Such charges shall be in writing under oath or affirmation and shall contain such information and be in such form as the Secretary requires. At any time after the filing of a charge, the Secretary shall proceed to try to eliminate or correct the alleged discriminatory housing practice by informal methods of conference, conciliation, and persuasion. Nothing said or done in the course of such informal endeavors may be made public or used as evidence in

44

of the persons concerned. Any employee of the Secretary who shall make public any information in violation of this provision shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $1,000 or imprisoned not more than one year. An aggrieved person shall file a charge under this section with the Secretary not later than one year after the alleged discriminatory housing practice occurred or terminated. The Secretary may also investigate housing practices to determine whether charges should be brought under this section or new rules should be made under this title.

(2)(A) In connection with any investigation of such charge, the Secretary shall, at reasonable times, have access to, and the right to copy, any information that is reasonably necessary for the furtherance of the investigation. The Secretary may issue subpenas to compel such access to or the production of such information, or the appearance of persons, and may issue interrogatories to a respondent, to the same extent and subject to the same limitations as would apply if the subpenas or interrogatories were issued or served in aid of a civil action in the United States district court for the district in which the investigation is taking place. The Secretary may administer oaths.

(B) Upon written application to the Secretary, a respondent shall be entitled to the issuance of a reasonable number of subpenas by and in the name of the Secretary to the same extent and subject to the same limitations as subpenas issued by the Secretary under clause (A) of this paragraph.

(C) Witnesses summoned by subpena of the Secretary under this title shall be entitled to the same witness and mileage fees as are witnesses in proceedings in United States district courts.

(D) The Secretary or other party at whose request a subpena is issued under this title may enforce such subpena in appropriate proceedings in the United States district court for the district in which the person, to whom the subpena was addressed resides, was served, or transacts business.

(E) Any person who willfully fails to attend and testify or to answer any lawful inquiry or to produce records, documents, or other evidence, if in such person's power to do so, in obedience to the subpena or lawful order of the Secretary under this title, shall be fined not more than $1,000. Any person who, with intent thereby to mislead the Secretary shall make or cause to be made any false entry or statement of fact in any report, account, record, or other document produced pursuant to the Secretary's subpena, or other order, or shall willfully fail to make or cause to be made full, true, and correct entries in such reports, accounts, records, or other documents, or shall willfully mutilate, alter, or by any other means falsify any documentary evidence, shall be fined not more than $1,000.

(3) Whenever a charge alleges a discriminatory housing practice within the jurisdiction of a State or local public agency certified by the Secretary under this paragraph, the Secretary shall, within 30 days after receiving such charge and before taking any action with respect to such charge, refer such charge to that certified agency. Except with the consent of such certified agency, the Secretary shall, after that referral is made, take no further action with respect to such charge, if the appropriate State or local law enforcement offi-

45

46

been brought to such official's attention, commenced proceedings in the matter, and, having so commenced proceedings, carries forward such proceedings with reasonable promptness. An agency shall be deemed certified under this paragraph if the Secretary determines that the procedures followed by that agency, the remedies available to such agency, and the availability of judicial review of such agency's action, are substantially equivalent to those created by and under this title. Before making such certification, the Secretary shall take into account the current practices and past performance, if any, of such agency. Any State or local agency may submit a written request for certification to the Secretary. Unless the Secretary interposes a written objection within 90 days after such submission, such State or local agency shall be deemed certified within the meaning of this title. If the Secretary objects within the prescribed 90-day period, he shall provide the State or local agency with an explanation specifically outlining the reason for his decision, and such decision shall be subject to review by the appropriate United States district court.

(4) The Secretary and other Federal agencies having authority to prevent housing discrimination shall cooperate and seek to avoid duplication of effort in the exercise of their several authority. The Secretary and such other Federal agencies shall notify each other of any allegation of housing discrimination which may be within their respective responsibilities. The Secretary or such other Federal agency shall, upon such notification, take additional appropriate action.

(b) If the Secretary concludes on the basis of a preliminary investigation of a charge that the Secretary is unable to obtain voluntary compliance and prompt judicial action is necessary to carry out the purposes of this title, an action may be brought on behalf of the Secretary for appropriate temporary or preliminary relief pending final disposition of such charge. Any temporary restraining order or other order granting preliminary or temporary relief shall be issued in accordance with rule 65 of the Federal Rules of Civil Procedure. An application for relief under this paragraph shall not affect the initiation or continuation of administrative proceedings under sections 810 and 811 of this title.

(c) If the Secretary determines, after an investigation under this section, that reasonable cause exists to believe the charge is true, the Secretary shall file an administrative complaint under section 811(a) of this title or refer the matter to the Attorney General for the filing of an appropriate civil action under section 813(b) of this title. Such determination in the case of a charge made by an aggrieved person may not be made later than 270 days after the filing of such charge. After each investigation under this section, the Secretary shall provide to each aggrieved person and each respondent a copy of the findings of such investigation.

ENFORCEMENT BY THE DEPARTMENT OF HOUSING AND URBAN
DEVELOPMENT; HEARING PROCESS

SEC. 811. (a) Upon filing an administrative complaint, the Secretary shall cause a copy of such complaint to be served on the respondent, together with a notice of opportunity for a hearing on the

47

ice of such complaint) specified in such notice. On the request of the respondent and with the consent of all other parties, a hearing may be rescheduled for a time earlier than the time specified in such notice. Any resolution of a charge or complaint by means of conciliation shall require the consent of the person who filed the charge, and any such resolution following the service of a complaint under this subsection shall also require the approval of the Secretary. The respondent shall have the right to file an answer to the administrative complaint and to appear in person or otherwise and give testimony at a hearing in the proceeding. Any aggrieved person may be allowed to intervene in the proceeding, to appear in person or otherwise, to obtain the issuance of a reasonable number of subpenas in the manner set forth in section 810 of this title, and to present testimony. After the conclusion of such hearing, the administrative law judge conducting the hearing shall make findings of fact and conclusions of law, and may issue an order providing such relief as may be appropriate, and may impose a civil penalty of not to exceed $10,000. No such order shall affect any contract of sale, encumbrance, or lease executed before the issuance of such order, and involving a bona fide purchaser, encumbrancer, or tenant without actual notice of the charge filed under this title. The Secretary is not authorized to modify any order under this section, or the decision of the administrative law judge.

(b) The findings of fact and conclusions of law made with copy of such order issued under subsection (a), together with a copy of such order, shall be served on each aggrieved person and each respondent in the proceeding.

(c) Any petition for judicial review of a final order under subsection (a) shall be filed in the Federal district court for the district in which the property is located not later than 30 days after service of such order. The petition may be amended after a reasonable opportunity to review the record of the administrative proceeding. For the purposes of judicial review of such an order, any aggrieved person shall be deemed a party in the administrative proceeding reviewed. The petition shall contain written objections to such order and shall specify those portions of the record or findings of fact and conclusions of law to which objection is made. The court shall make a de novo determination of the adequacy of the findings of fact and conclusions of law to which objection is made. The court may receive further evidence, or recommit the matter to the administrative law judge with instructions, if such evidence was improperly excluded by the administrative law judge or if the court determines that there is a compelling need for further evidence to support a factual determination. To the extent that further evidence is received by the court, such evidence shall be deemed a part of the record and shall be considered in the determination of whether to accept, reject, or modify the findings of fact and conclusions of law of the administrative law judge. Based on a review of the record as a whole, the court may accept, reject, or modify, in whole or in part, the findings of fact and conclusions of law made by the administrative law judge. All proceedings under this subsection in the Federal district court shall be given precedence over other civil proceedings pending therein and shall be in every way expedited.

(d)(1) Any person who violates a final order under subsection (a) shall be...

48

judge holding the hearing of not more than $1,000 for each day during which such violation continues after the date on which such final order becomes unreviewable.

(2) For the purposes of paragraph (1) of this subsection, a final order becomes unreviewable—

(A) if a petition for review has not been filed within the appropriate Federal district court on the day 30 days after the service of such final order, or

(B) if such a petition is so filed within such 30-day limit, on the date on which the last appellate court's decision becomes final and not subject to any further appellate proceeding.

(e) The United States district courts shall have original jurisdiction over petitions for judicial review of final orders under subsection (a) of this section without regard for the amount in controversy.

### PRIVATE ENFORCEMENT

Sec. 812. (a)(1) An aggrieved person may commence a civil action in an appropriate United States district court or State court at any time not later than two years after the alleged discriminatory housing practice occurred or terminated.

(2) After an aggrieved person has commenced a civil action under this section, the Secretary may not continue administrative proceedings toward the issuance of a remedial order based on such charge.

(3) An aggrieved person shall not commence a civil action under this subsection with respect to a charge made by that person to the Secretary if the Department of Housing and Urban Development (or a State or local agency to which the Secretary refers such charge) has commenced the hearing on the record with respect to that charge.

(4) Upon timely application, the Attorney General may intervene in such civil action, if the Attorney General certifies that the case is of general public importance.

(b) Upon application by an aggrieved person, any trial or appellate court may, in such circumstances as it deems just, appoint an attorney for such person and may authorize the commencement or continuation of the action without the payment of fees, costs, or security.

(c) In a civil action under this section, a court may award such relief as may be appropriate, which may include money damages, equitable and declaratory relief, and, in the case of a willful violation, punitive damages.

### ENFORCEMENT ROLE OF ATTORNEY GENERAL

Sec. 813. (a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this title, or that any group of persons has been denied any of the rights granted by this title and such denial raises an issue of general public importance, the Attorney General may bring a civil action in an appropriate United States district court.

(b) The Attorney General may bring a civil action in an appropriate United States district court (1) to enforce any final order under section 811(a) of this title that is referred for enforcement by the Sec-

49

retary; (2) to collect any civil penalty assessed under section 811 of this title; and (3) to remedy any discriminatory housing practice (A) with respect to which the Secretary has made a finding that reasonable cause exists under this title and (B) which the Secretary refers to the Attorney General for enforcement under this subsection.

(c) The court may award such relief in any civil action under this section as is authorized in section 812(c) of this title in cases brought under that section.

(d) A person may intervene in any civil action commenced under this section which involves an alleged discriminatory housing practice with respect to which such person is an aggrieved person.

### ANCILLARY AND PROCEDURAL MATTERS RELATING TO ENFORCEMENT

Sec. 814. (a) In any action or proceeding under this title, the court, in its discretion, may allow a prevailing party (other than the United States with respect to attorney fees) reasonable attorney and expert witness fees as part of the costs, and the United States shall be liable for such costs the same as a private person. Such costs may also be awarded upon the entry of any interlocutory order which determines substantial rights of the parties.

(b) In any administrative proceeding based on a charge under section 810(a) of this title, any prevailing party (other than the United States with respect to attorney fees) may be awarded reasonable attorney and expert witness fees as a part of a final order under section 811(a) of this title.

(c) Any court in which a proceeding is instituted under this title shall assign the case for hearing at the earliest practicable date and cause the case to be in every way expedited.

(d) Any sale, encumbrance, or lease executed before the issuance of any court order under this title, and involving a bona fide purchaser, ... or encumbrancer, or tenant without actual notice of the existence of the filing of a complaint or civil action under this title shall not be affected by such court order.

### EFFECT ON OTHER LAWS

Sec. 815. (a) Nothing in this title shall be construed to invalidate or limit any law of a State or political subdivision of a State, or of any other jurisdiction in which this title shall be effective, that grants, guarantees, or protects the same rights as are granted by this title; but any such law that purports to require or permit any action that would be a discriminatory housing practice under this title shall to that extent be invalid.

(b) Nothing in this title shall be construed to repeal, supersede, or diminish the protection provided to handicapped persons by any other Federal law.

### INTERFERENCE, COERCION, OR INTIMIDATION

Sec. 817. It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or en-

joyment of, any right granted or protected by [section 803, 804, 805, or 806,] this title. This section may be enforced by appropriate civil action.

50

* * *

## TITLE IX

### PREVENTION OF INTIMIDATION IN FAIR HOUSING CASES

SEC. 901. Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

(a) any person because of his race, color, religion, sex, *handicap (as defined in section 802 of this Act)*, or national origin and because he is or has been selling, purchasing, renting, financing, occupying, or contracting or negotiating for the sale, purchase, rental, financing, or occupations of any dwelling, or applying for or participating in any service, organization, or facility relating to the business of selling or renting dwellings; or

(b) any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from—

(1) participating, without discrimination on account of race, color, religion, sex, *handicap (as defined in section 802 of this Act)*, or national origin, in any of the activities, services, organizations or facilities described in subsection 901(a); or

(2) affording another person or class of persons opportunity or protection so to participate; or

(c) any citizen because he is or has been, or in order to discourage such citizen or any other citizen from lawfully aiding or encouraging other persons to participate, without discrimination on account of race, color, religion, sex, *handicap (as defined in section 802 of this Act)*, or national origin, in any of the activities, services, organizations of facilities described in subsection 901(a), or participating lawfully in speech or peaceful assembly opposing any denial of the opportunity to so participate—

shall be fined not more than $1,000, or imprisoned not more than one year, or both; and if bodily injury results shall be fined not more than $10,000, or imprisoned not more than ten years, or both; and if death results shall be subject to imprisonment for any term of years or for life.

51

## SUPPLEMENTAL VIEWS OF CONGRESSMAN ROBERT F. DRINAN TO H.R. 5200, THE FAIR HOUSING ACT AMENDMENT OF 1980

H.R. 5200, as originally introduced, included a provision that limited the use of land use practices to block the establishment of small group homes for the disabled. During our considerable discussion of this provision in the full Judiciary Committee, a consensus emerged that the states should be given more time to remedy this situation before federal prohibitions are adopted. However, the consensus also reflected the view that local land use practices can be used to create major obstacles to deinstitutionalization of the mentally and physically disabled.

The record supporting this conclusion is clear. For example, in early 1977, the General Accounting Office (FAO) sent a major report to the Congress on deinstitutionalization. The report concluded that "inadequate housing is a major obstacle to returning the mentally disabled to the community." This finding was echoed by the 1979 report of the President's Commission on Mental Health.

In hearings on this legislation before the Subcommittee on Civil and Constitutional Rights in both the 95th and 96th Congress, numerous witnesses supported this view. Commissioner Robert L. Okin of the Massachusetts Department of Mental Health told our Subcommittee that there were well over 5,000 persons housed in Massachusetts public mental hospitals solely because of the lack of residences in the community. In addressing the problem of exclusionary zoning he said:

This type of exclusion can be devastating. They [the mentally disabled] are told in effect, at a time when they are struggling to gain or regain their self-esteem, that they are not worthy of living in a particular community, that they are second class citizens, and that they might as well live in the institution where they won't be exposed to such animosity.

Similar testimony was received from Congressman Christopher Dodd, The National Center for Law and the Handicapped, the American Council of the Blind, the American Coalition of Citizens With Disabilities, the Consortium Concerned With the Development Disabled, the National Association of State Mental Health Program Directors, the National Association of State Mental Retardation Program Directors and the Mental Health Law Project.

Exclusionary zoning of group homes for the disabled is clearly contrary to now well-established federal and state policy that disabled persons should live and receive the services they need in their own communities and not in isolated and costly institutions. In my view this is also a violation of disabled persons fundamental civil rights. Disabled citizens should have the same rights as others protected under the Fair Housing Act. But because of myth and prejudice they continue to be ostracized and feared. This is especially true with regard to the establishment of small group homes for the mentally disabled. As to the misperception that the

52

Mental Health reported that "violence" of mentally disabled persons "is more a device of fiction than a fact of life." A number of recent studies have invalidated the often-cited assumption that the presence of group homes in a neighborhood will decrease property values.

*The process of excluding group homes*

Zoning authority is a recognized part of a local government's common law power to enact laws protecting the health, safety and welfare of its citizens. This legitimate power has been seized upon as a means of excluding group homes for the disabled from a neighborhood. There are three basic types of zoning ordinances that have been used to discriminate against group homes:

(*a*) Some zoning ordinances explicitly exclude such homes by classifying them as a business, school, or medical facility, rather than as a residential use of property. Such homes are thus restricted to non-residential or business areas of a municipality.

(*b*) More commonly, group homes are not mentioned on the face of the ordinance, but residential areas are limited to single-family dwellings. When "family" is defined, it is limited to a number of persons related by blood, marriage or adoption living together in a single housekeeping unit. Because group homes consist of six to eight unrelated residents with one or two houseparents, they do not meet the technical requirements of the definition.

(*c*) The third type of ordinance allows group homes in specified residential districts, but only if they meet the conditions set out in local zoning laws and regulations or those imposed in an *ad hoc* fashion by the city government. A special use permit must be obtained. The conditions imposed often include elaborate building code standards; the procedure for obtaining the special use permit usually requires one or more public hearings. Sponsors of group homes often cannot afford to delay the opening of a home pending the outcome of expensive and lengthy local and state procedures. Thus, even a favorable court judgment can come too late to do any good. The zoning ordinance creates so many hurdles that, in effect, it excludes group homes for the disabled.

In a number of states, courts have invalidated the use of zoning to exclude group homes. The term "family" as used in local zoning ordinances has been interpreted to include small groups of disabled persons. The courts have seen that the group functions as a family with residents living as a single unit and participating in house-keeping and other activities as a "family" group. As long as the home is small, blends into the neighborhood and is residential rather than institutional in character, some courts have found no relevant difference for zoning purposes between a small group of disabled persons living as a family unit and a family.

*Need for Federal action*

As already noted, court activity has been encouraging. Also, seventeen states have enacted statutes that bar municipalities from excluding small group homes for the disabled from residential zones. But, at the same time, court challenges to single-family ordinances and to state pre-emptive statutes are time-consuming and often result in the loss of the home in question. Sponsors of group

53

homes seldom have the financial resources for involvement in such costly litigation.

It is my hope that the Judiciary Committee will remain interested in the adverse effect local land use practices can have on group homes for the disabled. I have asked the General Accounting Office to undertake a study of the extent to which land use practices are hampering deinstitutionalization of the disabled and the progress being made at the state level to deal with this problem. It is my expectation that if the problem continues unabated, the Fair Housing Act will be amended at a later time to explicitly limit the use of exclusionary zoning against group homes for the disabled.

1. General Accounting Office, *Returning the Mentally Disabled to the Community: Government Need to Do More*, (January, 1977, HRD-76-1.52).

2. *Fair Housing Act: Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary*, 95th Congress, Second Session, Serial No. 46 and *Fair Housing Amendments Act of 1979: Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary*, 96th Congress, First Session, Serial No. 12.

3. See, for example, "Legal Theories and Cases Encouraging Deinstitutionalization," Memorandum prepared by the Congressional Research Service of the Library of Congress, reprinted in *Fair Housing Amendments Act of 1979: Hearings before . . . , supra*, at 682–696.

4. PCMH, *Report to the President*, GPO (1978), I at 56 and Task Panel on Public Attitudes, IV at 1871, 1876. See also O. Wahl, "Fear and rejection—one social response," *These People, A Report*, Horizon House Institute (June, 1977); S. A. Shah, "Dangerousness and Civil Commitment of the Mentally Ill," *American Journal of Psychiatry*, Vol. 132, pp. 501–505 (1975).

5. *Group Homes for the Mentally Retarded: An Investigation of Neighborhood Property Impacts*, Julian Wolpert, Woodrow Wilson School of Public & International Affairs, Princeton University, August 31, 1978; *The Influence of Halfway Houses and Foster Care Facilities Upon Property Values*, City of Lansing Planning Department, Lansing, Michigan.

ROBERT DRINAN.

## SUPPLEMENTAL VIEWS OF HON. ROBERT McCLORY ON H.R. 5200

I was pleased to see that the Fair Housing Amendments Act passed the full Judiciary Committee by an impressive 24 to 6 vote. Had it not been for Republican sponsorship of a compromise proposal designed to resolve the impasse caused by the unchecked administrative procedure originally in the bill, victims of housing discrimination would still lack an effective mechanism to resolve their complaints. As a result of the Minority Compromise, authored by Congressman Tom Railsback, which I supported, the administrative procedure deemed necessary for purposes of expediting enforcement will be subject to substantial *de novo* review by a federal district judge. That judge will have the power to alter the administrative order if, in his opinion, the decision of the administrative law judge is not supported by the evidence. Further, he will be able to entertain additional evidence if he believes it will be useful for purposes of perfecting the record or guaranteeing equity.

Two items, however, gave me pause. One involved the inclusion of the insurance industry under proposed section 6(c) of the bill. At first glance, we are told that the industry's inclusion is merely intended to codify a federal district judge's decision last June in *Dunn v. The Midwestern Indemnity Mid-American Fire and Casualty Co.* 472 F.Supp. 1106 (S.D. Ohio, 1979). In that case, the judge determined that the insurance industry is impliedly covered under section 804(a) of existing title VIII, which makes it illegal to:

refuse to sell or rent after making a bona fide offer, or to refuse to negotiate for the sale or rental of, or to *otherwise make unavailable or deny*, a dwelling to any person because of race, color, religion, sex, or national origin. (Emphasis added.)

In holding against the insurance company, the judge appeared to give a great deal of weight to previous judicial decisions interpreting the "broadwise make unavailable or deny" language in section 804(a) "as broadly] as Congress could have made it." Whether or not *Dunn* remains the law is open to conjecture as it is only a district court decision. There are other decisions not relating to insurance but which apply the same logic and which interpret the same statutory language.

Unlike many other links in the housing chain, the insurance industry is heavily regulated, both at the state and federal level. Some sixteen states already specifically prohibit unfair discrimination based on factors or characteristics similar to those in proposed section 6(c) while an additional twenty-two generally prohibit unfair discrimination in a manner which would include those same individual factors or characteristics. Furthermore, the National Association of Insurance Commissioners has adopted a new model termination, declination and non-renewal bill which is currently pending in state legislatures nationwide and which is intended to remedy a number of minority complaints. To meet complaints that access to insurance is being denied, virtually every state with a property insurance availability problem has established a mandatory insurance company pooling mechanism, commonly known as a FAIR plan, in order to provide a guaranteed market for the basic property insurance coverage needed to obtain a home mortgage. In short, the insurance industry is already responding to the problems of discrimination in the housing industry. While I cannot disagree that it should be held responsible for any discriminatory acts which deprive otherwise qualified individuals of housing, I am not prepared to accept the language which is contained in proposed section 6(c) which could grant broad federal authority over the insurance industry far beyond the requirements of a fair housing bill.

Another amendment which caught my interest was one offered by the gentleman from Virginia, Mr. Butler. His amendment, which eight democratic proxy votes helped defeat by a vote of 13 to 16, would have stricken a little known addition to the bill. Under existing law, section 808(e)(3) mandates that the Secretary of HUD "shall '(3) cooperate with and render technical assistance to . . . agencies, organizations, and institutions" whose mission it is to eliminate discriminatory housing practices. H.R. 5200 would have inserted the words "financial and" before "technical" in this authorization. Given the fact that HUD already advises over 300 public and private groups whose responsibilities include eliminating housing discrimination, the potential outlay of funds could be dramatic. Even HUD admits that it does not know how much money could be involved.

It may well be that some federal funding is necessary to assist existing state and local agencies in their efforts to gain certification under proposed section 810(a)(3) and thereby qualify to receive and consider housing complaints before HUD does. I would support such action, and I plan to offer an amendment which would alter the bill's language in that regard. Failing that, I would feel constrained again to support Mr. Butler's efforts to eliminate from this legislation such authority for the funding of any number of newly established private organizations.

Finally, I want to reiterate my satisfaction with the compromise enforcement provisions which should enable the Department of HUD to resolve most unfair housing complaints. If this measure is enacted into law, I hope that HUD will exercise its broad new authority judiciously.

ROBERT McCLORY.

56

# SUPPLEMENTAL VIEWS TO H.R. 5200 BY MR. VOLKMER AND MR. SENSENBRENNER

Title VIII of the Civil Rights Act was enacted to prevent discrimination in the sale and leasing of housing. In recent years this act has been criticized because it does not provide sufficient enforcement powers to combat discrimination. H.R. 5200 is legislation which is aimed at meeting this criticism.

A major issue which remains to be resolved is what the most appropriate enforcement means will be. A choice will have to be made between the administrative enforcement procedures, which the reported bill establishes, and the Sensenbrenner-Volkmer approach, which utilizes the U.S. District Courts including U.S. Magistrates where possible and emphasizes a nonformal resolution of differences through conciliation. We offered such an amendment in the Committee markup but were defeated by a 10-20 vote.

This policy choice raises significant questions which must be answered:

1. Which approach improves an individual complainant's access to the system and speeds resolution of the issues?

2. Which approach will provide the best relief for a victim of discrimination while maintaining fairness?

3. Which approach provides the most incentive to settle disputes without resorting to formal procedures?

We believe that the Sensenbrenner-Volkmer approach provides the best answer to these questions.

H.R. 5200, as reported, envisions Administrative Law Judges as the enforcement mechanism. HUD officials have testified that they envision utilizing 7 ALJ's to handle the caseload for the entire nation. This is not even one ALJ for each of the 10 HUD regional offices. We find it hard to believe 7 individuals, who at best will ride circuit within the regions, can provide sufficient access to the enforcement system.

These 7 ALJ's must be compared with a court system to which we have recently added new judgeships and greatly expanded the powers of U.S. Magistrates. We believe the U.S. District Courts, which cover much smaller territorial area than HUD regions, are well staffed to handle the caseload within that particular district. When you consider that the District Courts are multi-judge, sit in more than one location, and that magistrates in appropriate situations may be utilized, the choice is clear.

Instead of HUD being the lead agency in actual enforcement proceedings, we would place Federal enforcement within the Department of Justice. This allows a more coordinated enforcement effort. In fact, the Civil Rights Commission in "The recent report of the United States Civil Rights Commission. "The State of Civil Rights: 1979" commended the Civil Rights Division of DOJ for its announced decision "to make a greater effort to focus on bringing (housing discrimination) cases that have a high impact in terms of number of units affected on the issues raised". The report goes on to state that DOJ's "interest in coordinating (litigative action—

57

The Sensenbrenner-Volkmer approach provides the best solution. By utilizing the courts we provide greater access. By spreading the caseload we provide greater speed. By allowing DOJ to be the lead Federal enforcement agency, we promote coordinated activity.

As reported, H.R. 5200 is deficient in providing relief for a victim of discrimination. The ALJ will not be able to award certain kinds of damages, i.e. pain and suffering and punitive damages. This can only be done by an article III court. Any administrative proceeding brought under the Act will benefit only the government (a civil penalty of up to $10,000), while awarding the victim nothing.

Our amendment would not result in these deficiencies. Courts can award compensatory and punitive damages. The arbitration provision we will discuss later allows an award of up to $500, to be made by an arbitrator without a case going to court. These provisions will allow adequate monetary as well as specific relief to be granted a victim.

In addition, the independence of the administrative forum, must be questioned. It must be remembered that the ALJ's will be employees of HUD. As written, the bill would allow HUD to assure the role of investigator, prosecutor and judge, all in the same case. We do not believe this is proper. Despite the Administrative Procedures Act, ALJ's will have a natural institutional bias. Utilization of the Courts under our amendment avoids a potential conflict.

We also believe that the Sensenbrenner-Volkmer approach better promoted the use of informal conciliation as a method of resolving disputes. While both present law and the reported bill do not in any way encourage conciliations we provide the necessary incentive by allowing sanctions to be imposed against those who refuse to make a good faith effort at conciliation. We allow the parties to submit, upon mutual consent, to binding arbitration of the dispute with HUD given administrator enforcement power over the arbitration award. An arbitrator will be able to award specific damages.

In the recent past HUD itself has been criticized in reference to its enforcement of fair housing laws by the Civil Rights Commission. These criticisms range from poorly trained staff, failure to issue guidelines and regulations to implement Title VIII and failure to promptly process discrimination complaints to failure to improve the conciliation rates for Title VIII complaints.

Because we believe many of these complaints are justified, we should not at this time create a new bureaucracy within HUD to enforce fair housing laws. The amendment which we will offer will provide a fair, speedy and effective enforcement mechanism while avoiding the problems inherent in the administrative procedure. We put teeth into fair housing enforcement without adding to the government bureaucracy.

HAROLD L. VOLKMER
JAMES F. SENSENBRENNER, Jr.

58

## SUPPLEMENTAL VIEWS OF MR. HYDE

I reluctantly voted for the passage of H.R. 5200 principally because I believe title VIII of the 1968 Civil Rights Act has been ineffective and because this legislation is a decided improvement. I trust Floor amendments will further improve this bill. However, two measures in particular require this dissident.

First, I believe that though the administrative procedure contained in the Edwards-Railsback Amendment is a vast improvement over what was initially contained in the bill, the mere existence of an administrative procedure within HUD, even if supervised by the federal courts, represents a major departure from the traditional avenues through which the civil rights laws have been enforced. The Sensenbrenner alternative, through which complaints would be referred by HUD to the Department of Justice, is a simpler, more sensible, course to take, and one which assures the likelihood of more even-handed adjudication. Having the investigator/prosecutor/judge all within the same agency is not my idea of due process. Accordingly, I expect to again support his amendment on the House Floor.

Second, the slim defeat of my amendment to acknowledge the right of appraisers to "take into consideration . . . all factors shown by documentation to be relevant to [their] estimate of the value of the property" was a grave mistake. Appraisers have a fiduciary obligation to their employers. The work product produced through that obligation serves as the basis for loans from banks and the federal government. In order to protect lenders who depend on accurate appraisals, appraisers must be permitted to rely on all factors which can be documented as relevant. I do not know how they can properly carry out the responsibilities otherwise.

In recent years, HUD and the Federal Home Loan Bank Board (FHLBB) have issued regulations prohibiting appraisers from including in their reports certain words and phrases which, in the view of the regulators tend to make race, ethnicity, religion, and national origin factors which adversely affect market value. For example, the FHLLB has prohibited the use of such presumably discriminatory phrases as "church", "synagogue", "prestigious neighborhood", or "poor schools." I believe none of these references necessarily has a discriminatory implication, but I suggest that they are all very relevant in determining fair market value.

Some might contend that each of the phrases I have mentioned is subject to a subjective assessment. True enough. But each is also subject to a documentary showing of impact on marketability and subject to a documentary showing which my amendment requires. For it is a documentary showing which my amendment requires. For example, Georgetown, in the District of Columbia, is clearly a prestigious neighborhood. In it reside representatives of all races and nationalities and its "prestigious" nature makes loans far easier to obtain and far more secure from the standpoint of a lender. Similarly, the proximity of schools can be shown by a myriad of means, not the least of which are test scores. Lastly, the proximity of

59

over the possible thirty-year life of a mortgage. We engage in self-deception by failing to recognize that appraisers—being human—cannot avoid making subjective judgments, not matter how hard they try to avoid them. Not permitting them to explain the relevant and documentable reasons for their appraisal is unprofessional and myopic. "Tell it like it is" apparently doesn't apply to appraisers. Next perhaps we shall be forbidding doctors from explaining their diagnosis for fear of a negative impact on the patient.

Federal money is often involved in loans made as a result of appraisals. Though a slight majority of the House Judiciary Committee fails to be persuaded by that fact, I trust the same will not be true of the Whole House. I intend to once again offer my amendment when this bill is considered on the Floor; I hope the result will be different.

HENRY J. HYDE.
DAN LUNGREN.
HAROLD S. SAWYER.

60

## SUPPLEMENTAL VIEWS OF HON. M. CALDWELL BUTLER

In 1968, the United States Congress enacted title VIII of the Civil Rights Act, known as the Fair Housing Act, which adopted as a Federal policy extension of the principle of Federal involvement in the elimination of discrimination in housing based on race, sex, religion, and national origin.

The principal enforcement mechanism was the creation of a private right of action for an aggrieved person with power in the Attorney General to institute suits where there is a "pattern or practice" of discrimination. The principal government enforcement mechanism, however, was vested in the Department of Housing and Urban Development (HUD) and was limited to efforts to obtain conciliation between the parties.

Civil rights advocates have expressed great disappointment with the effectiveness of this legislation, and the fifteen days of hearings held by the House Subcommittee on Civil and Constitutional Rights of the Judiciary Committee during the years 1978 and 1979 indicated that the present enforcement mechanism is deficient.

The earliest proposals for improving the enforcement machinery placed extensive authority in the Secretary of HUD. Originally introduced as H.R. 3504 in the 95th Congress, and thereafter as H.R. 2540 in this, the 96th Congress, the bill would have given the Secretary the right to order temporary or preliminary relief pending the final administrative disposition of a charge of discrimination in housing. In my view, such authority was unnecessary and excessive. Administrative proceedings can go on for months, even years. But the Secretary would have been empowered to halt a construction project or housing development, for example, if he felt such action "was necessary to carry out the purposes" of the legislation.

The bill also provided for an administrative procedure, within HUD, which would permit an administrative law judge to issue an injunction and impose a fine of up to $10,000 in cases where he believed housing discrimination existed. If, after issuance of an administrative order, the Secretary believed it to be inappropriate, for any reason, he retained the right to increase or decrease it. The only review of his decision would have been an appeal to the Federal circuit court of appeals under the "substantial evidence rule," a virtually impossible standard for reversal. In order to sustain the administrative law judge under this standard, the court of appeals need only find that there existed substantial evidence to support his decision, but the Supreme Court, more than forty years ago, defined "substantial evidence" as little more than a "mere scintilla" of evidence.

The enforcement provisions of H.R. 5200 are a compromise which is a good deal more reasonable and practical than that originally proposed. Essentially, it retains an administrative law mechanism within the Department of Housing and Urban Development but provides for appeal to a Federal district court as a matter of right. Once that appeal is taken, a Federal judge may make his own judgment as to the validity of the administrative law judge's ruling, with access to additional evidence if he believes it appropriate.

61

In my judgment, we have developed a legislative proposal for civil rights law enforcement which is reasonable, effective, and fair. It imposes strict time limits on each phase of the process. In my judgment, that is significant. The essence of civil rights enforcement is speedy trial. Both the aggrieved person and the accused profit from a quick determination and suffer from lingering indecision.

Also gratifying is the bill's renewed emphasis on the use of state-created enforcement proceedings. Under existing law, where the Department is limited to the conciliation process alone, there is still a requirement of referral to those State agencies which meet minimum statutory requirements satisfactory to the Secretary of Housing and Urban Development.

This feature has been retained. Although new and perhaps insurmountable requirements have been imposed upon the States in order to gain "certification" pursuant to H.R. 5200, the principle that appropriate State agencies should review complaints of housing discrimination before they are sent to Washington has remained in the law.

The Department is required to act promptly in determining whether a State or local housing agency meets the necessary requirements for certification and its decision is reviewable in the U.S. district court. This provision is further strengthened by an amendment offered by the gentleman from New Jersey, Mr. Hughes, which further requires that HUD certify a State which qualifies.

It is my judgment, after reviewing this legislation with some care, that it simply undertakes to accomplish too much. It has been marketed as being necessary in order to give credibility to the enforcement process within HUD and the Department of Justice.

But H.R. 5200 does far more than that.

It extends statutory coverage of the Fair Housing Act to the insurance industry, the appraisal industry, the real estate industry, and the banking industry; it extends the statute of limitations for the commencement of a private civil action; it provides the Attorney General with the right to intervene in any private civil action; it extends coverage of the act to an entirely new and never clearly defined class called the handicapped; it creates a private right of action for handicapped persons, a first in the civil right statutes; and it contains a number of "sleepers" whose ultimate impact is neither documented nor predictable. It should be sufficient to streamline the enforcement process, as has been done through the compromise proposal drafted principally by the Minority, and to get the bugs out of existing title VIII before taking on new problems and unpredictable dimensions.

For this reason, I voted against reporting H.R. 5200 in full Committee. I can support this legislation, however, if it can be confined to the purposes for which its architects were originally employed. I have undertaken to explain in the paragraphs which follow the amendments which I will offer and which, if adopted, will fashion it into a form I can support.

62

## I

Under Section 804(a) of the present Fair Housing Act, it is unlawful to:

[R]efuse to sell or rent after making a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

There is no reference to insurance in Section 804(a). Only one case has decided the issue as to whether the insurance industry is affected by that section, and that case will be appealed. In my judgment, it was the clear intention of Congress in 1968 not to touch the insurance industry, and that is as it should be.

However, Section 6(e) of the proposed bill amends Section 804 of existing law in such a way as to make it:

[U]nlawful for any person whose business includes the making, purchasing, or *insuring* of loans, or selling, brokering, or appraising real estate property, to deny or otherwise make unavailable a loan or other financial assistance which is for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling, or to discriminate in the fixing of the amount, interest rate, duration, or other terms or conditions of such loans or other financial assistance, because of race, color, religion, sex, handicap, or national origin. (Emphasis added.)

In my judgment, this is a mistake. Congressman John M. Ashbrook, a Member of the Subcommittee, offered an amendment in full committee to strike Section 6(e). I expect to support him when he renews this motion on the floor and desire to associate myself with the views expressed by Congressman McClory on this provision.

## II

Existing law makes no reference to the appraisers of real estate. H.R. 5200 does, in such a manner as to comprise their professional integrity without serving any useful purpose.

I expect to support renewal of the effort by Congressman Henry J. Hyde to strike a compromise between the appraisal industry and the language presently in the bill, and desire to associate myself with his views on this issue.

## III

H.R. 5200 would make the underlined changes in Section 808(e)(3) of the Fair Housing Act, which provides that the Secretary "shall":

(3) cooperate with and render *financial and technical* assistance to Federal, state, local and other public or private agencies; organizations, and institutions which are formulating or carrying on programs to prevent or eliminate discriminatory housing practices;

63

The hearing record is silent as to why the proposed change is requested or what it is designed to accomplish. We can only speculate as to that.

We do know, however, that it would authorize or possibly mandate a grant of federal funds for purposes not heretofore authorized. It is, therefore, a new federal grant program!

The anticipated beneficiaries of the proposed grant program are not immediately apparent since there are more than 300 private organizations involved in efforts to reduce housing discrimination, as well as a substantial number of State and local agencies.

We do have some indication of what it would cost: at least four million dollars the first year, with an increase of ten percent for each succeeding year.

Attention is called to the following excerpt from the cost estimate dated March 25, 1980:

The bill also allows HUD to give financial assistance to private agencies that work against housing discrimination. The financial aid HUD gives to private agencies will be used for counseling individuals and testing cases to see if there is probably cause for court action. It is estimated that approximately forty agencies will receive $100,000 each in 1981, and that the number of agencies will increase by 10 percent per year. Agencies concerned with housing discrimination against the handicapped are expected to account for a significant portion of this growth. It is also assumed that the amount of aid per agency will remain at $100,000 a year. It is estimated that 90 percent of each year's funds will go to the agencies in the first year, with the remaining 10 percent spent in the following year.

I offered an amendment within the full Committee to strike the proposed change in this section, and it was defeated by a narrow margin. I expect to renew my amendment on the floor.

I would also like to associate myself with the views expressed by my colleague, Congressman Robert McClory, on this amendment.

## IV

Subject to relatively minor qualifications, two classes of people are exempt from the sanctions created by the existing Fair Housing Act:

1. The person who owns three houses or less, and leases two of them; and

2. The person who owns and lives in a rooming house with four or fewer rooms for rent. This person is often called "Mrs. Murphy" although there is no evidence that the Irish have copyrighted this lifestyle.

The reasons for these two exceptions are clear: private persons not engaged in the business of renting or selling houses are not themselves the causes of housing discrimination; they are not suited to extensive federal regulation and control; and they do not generally have the sophistication or the resources to understand fully what is expected of them.

64

H.R. 5200 removes these two exemptions from the law and subjects both Mrs. Murphy and the owner of three houses to the sanctions of this legislation.

The fifteen-day hearing record on this legislation is silent as to the reasons why we must extend the law to these heretofore exempt persons. There is no evidence that they have discriminated under existing law.

Bear in mind that the new law will tip the balance heavily in favor of an allegedly aggrieved person. HUD will be the legal enforcer and, if that's not enough, the Legal Services Corporation is standing in the wings.

Under these circumstances, if Mrs. Murphy or the owner of a few houses is confronted by the awesome power of the Federal Government charging her with discrimination, she will give up. Lawyers simply cost too much for Mrs. Murphy.

In my judgment the removal of these well-established exceptions is an unreasonable extension of the law and no improvement in it. I will renew the new amendments which I offered in the full Committee to strike these changes from the law and renew the existing exemptions.

V

H.R. 5200 would make the underlined changes in Section 808(d) of the Fair Housing Act:

(d) All executive departments and agencies shall administer their programs and activities relating to housing and urban development (including any Federal agency having regulatory authority over financial institutions) in a manner affirmatively to further the purposes of this title and shall cooperate with the Secretary to further such purposes.

The hearing record is silent as to why this new parenthetical clause is requested or what it is designed to accomplish. We can only speculate as to what?

We do know that it will affect at least the following: "federal regulatory agencies having authority over financial institutions". Federal Reserve Board; Federal Home Loan Bank Board; Federal Deposit Insurance Corporation; and Comptroller of the Currency.

It is subject to interpretation that the Secretary of HUD shall have the authority to impose affirmative action plans on independent federal agencies "to further the purposes of this title."

In my judgment, this is not the present intention of the House of Representatives.

If, however, this is the intention of the sponsors of the legislation they should have built a record to support it and they should have been candid enough to say so. They did neither.

Under these circumstances, this proposed change in the law should be stricken from the bill and it is my present intention to offer an amendment to do so.

65

VI

Under existing law, a successful plaintiff in a private action for damages arising out of housing discrimination can recover actual damages plus punitive damages not to exceed $1,000.

H.R. 5200 would remove the limitation on the amount of punitive damages. The hearing record does not indicate a need for this change and in my judgment, it is a mistake.

Remember that H.R. 5200 enhances greatly the protections available to an allegedly aggrieved person. The grievance procedures within HUD represent substantial changes for his benefit.

There is no suggestion that the actual damages provable and receivable under existing laws are inadequate. Attorneys fees and court costs are added to improve his chances; and of course, the Legal Services Corporation will aid the impecunious one.

Punitive damages are frightening to contemplate because these are subject to the emotional and political considerations which have no place in the determination of damages.

It is my present intention to offer an amendment to return the law to its present limitation of $1,000 for punitive damages.

VII

It is my view that the most appropriate way to approach any proposed expansion of federal regulatory authority by statute is to assume that those persons who will write the regulations implementing the legislation will be completely ignorant of the legislation itself, but firmly committed to the principle that the only limitation on Congressional intent is the imagination of the regulation writer; and further to assume that responsibility for enforcement of the legislation and accompanying regulation will be delegated to unprincipled zealots, fully assured in moments of doubt by the moral justification of their mission.

With this in mind, I have approached, with some trepidation, the proposed changes in the Fair Housing Act which are intended to add handicapped persons to the classes of persons protected by federal legislation from discriminatory housing practices.

The Fair Housing Act, in its present form, prohibits discrimination in housing which is based on race, color, religion, sex, or national origin. H.R. 5200 would add handicapped persons to the protected classes.

This is a big step!

Those who are concerned about the need to improve the existing protections against racial and sex discrimination should bear in mind that this new class of protected persons will command a substantial, and perhaps disproportionate, amount of federal resources committed to the fight against discrimination in housing.

The reason we can expect protecting the handicapped to be so expensive is the easily predictable and extensive explanations which will be required by federal regulations, guidelines, and the like.

Regulations concerning the handicapped already exist for a number of housing related programs. For example, there are regulations which discuss standards for the design of publicly owned residential structures in order to insure that the handicapped will

67

ards and procedures relative to providing rent supplement payments (24 C.F.R. Part 215); which discuss school construction policies regarding the handicapped (41 C.F.R. Parts 112-113; and which promulgate standards and procedures for providing housing insurance for handicapped persons (24 C.F.R. Part 231).

There are also a number of federal regulations, apart from housing, which involve the handicapped. Some of them define handicapped for purposes of eligibility under the Small Business Act (13 C.F.R. Part 118; include handicapped among those eligible for certain student loans (20 C.F.R. §108?ee); describe special learning programs for children with learning disabilities (20 C.F.R. § 1461); and define handicapped for eligibility under certain public contracts (41 C.F.R. §48b). In all, there are some twenty different definitions of "handicapped" in the Code of Federal Regulations, only eight of which relate to housing.

The definition of handicapped which has been settled upon for this bill is one of the options already available in existing federal statutes. Specifically, Section 4b of H.R. 5200 tracks Section 504 of the Rehabilitation Act of 1973 by defining handicapped as meaning, with respect to persons:

(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such impairment.

Interestingly, this very same definition has recently come under attack following examination by those who will be obliged to interpret what it means. On March 6, 1980, the Federal Communications Commission (FCC) issued a report concerning the extent to which the handicapped, as defined in the Rehabilitation Act, should be included in its equal opportunity rules. Briefly, the Commission noted that:

The individuals covered are so diverse that case-by-case employer/employee resolutions will frequently be necessary if all are to be treated fairly. The definition, for example, encompasses individuals who have suffered cosmetic disfigurement, and, at the same time, individuals suffering from mental illness such that the illness substantially limits their life activities. (See Commission report, pages 11-12)

In addition, a *Washington Post* article reporting on the above findings of the FCC quoted an FCC official's description of the definition, as "one of the most absurd ever written by Congress or the bureaucracy."

This is also the definition adopted for use in H.R. 5200!

It is important to note, of course, that there are many protections for the handicapped in existing housing statutes. For example, under law already on the books, the Secretary of HUD is authorized to: makes loans to public or private groups which provide housing and related facilities for the handicapped (12 U.S.C. §1701(q); carry out research on housing designs, structures, facilities and amenities which most appropriately meet the needs of the handicapped (12 U.S.C. § 1701(z)); and provide rent supplement pay-

ments for lower income persons who are handicapped (12 U.S.C. §1701(s)).

Existing law also: prohibits discrimination, exclusions, or denial of benefits against qualified handicapped individuals by any program which receives federal assistance (29 U.S.C. §794); provides for special low-income housing projects for handicapped persons (42 U.S.C. §1438); permits the Secretary of Agriculture to grant financial assistance for farm housing for the handicapped (42 U.S.C. §1471); provides criteria for loans to build housing for handicapped persons in rural areas (42 U.S.C. §1490(a)); and creates urban development action grants for housing which addresses the needs of the handicapped (42 U.S.C. §5304).

In reality, the only housing for the handicapped not specifically addressed by existing law, and therefore the only real target of the proposed change, is the private housing industry, and it is fast drying up.

A March 23, 1980, article in the *New York Times* declared that sales in some portions of the country are already down 50% from a year ago. The prime rate, which may peak around mid-May at 20 or 21% has made money so unavailable that housing starts have declined dramatically.

Add the potentiality of federal regulation to the fragile health of the housing industry caused by today's economic problems, and you have a compounded chilling effect on housing starts and the jobs they create. It is an industry without any need for further federal regulation!

Section 12 of H.R. 5200 provides some insight into what the regulators at HUD have in store for the housing industry. That section authorizes the Architectural and Transportations Barriers Compliance Board to provide a report, which the Congressional Budget Office estimates will cost $1 million, concerning:

(1) the extent to which architectural barriers and other obstacles are depriving handicapped persons of housing; (2) the extent to which private, public or cooperative public and private efforts have increased the availability of housing for the handicapped in the private market; and (3) *the cost of retrofitting existing units to make them suitable for the handicapped.* (Emphasis added)

The inescapable result of studies like this is always increased federal regulation.

Although we fought one zoning battle in the full Committee, court cases indicate that the possibility remains open that judges will interpret zoning ordinances which allegedly discriminate against the handicapped, whether in fact or in effect, as discriminatory acts within the coverage of the proposed statute. For example, where race is concerned, the courts have already determined that discrimination exists when a jurisdiction's refusal to rezone effectively precludes the covered class (which will include handicapped if H.R. 5200 passes in its present form) from constructing low-cost housing within that community. Specifically, the Seventh Circuit has said that a violation of the Fair Housing Act "can be established by a showing of discriminatory effect without a showing of discriminatory intent." *Village of Arlington Heights v. Met-*

96th Congress, 2d Session . . . . . . House Report No. 96–

# FINAL REPORT

### OF THE

# SELECT COMMITTEE ON COMMITTEES
# U.S. HOUSE OF REPRESENTATIVES



APRIL 1, 1980.—Referred to the House Calendar and ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1980

★60-426 O

---

68

*ropolitan Housing Development Corp.*, 558 F. 2d 1283, 1290 (7th Cir. 1977), *cert. denied,* 434 U.S. 1025 (1978).

In my opinion, the net effect of including the handicapped within the protection of the Fair Housing Act, in view of existing case law concerning zoning, could be a federally required acceptance of community houses for former or potential criminals. I do not think Congress wants to do this.

Only three witnesses testified on that important aspect of H.R. 5200, which concerned discriminatory housing practices affecting the handicapped. Their testimony, however, was limited to explaining the problems attendant to the more familiar handicapped: the physically and developmentally disabled.

No attention was given in the hearings to those whose "handicap" is not so apparent but who have nevertheless been held by various courts to be entitled to the protection of other statutes. As proof of this claim, I need only cite a federal district court decision in Pennsylvania which held that persons with a history of drug abuse, including present participants in methadone maintenance programs, are "handicapped" within the meaning of the Rehabilitation Act. *Davis v. Bucher,* 451 F. Supp. 791, 796 (1978). Remember that the definition in the Rehabilitation Act is identical to the definitions first considered by the Committee.

Similarly, the Wisconsin court has held that asthma can be considered a handicap when it makes "achievement" unusually difficult. *Chicago v. State Department of Industry, Labor, and Human Relations,* 62 Wis. 2d 392.

In my judgment, the potential for regulatory disaster far outweighs the benefits to be derived from the inclusion of the handicapped in this bill. As I said earlier, H.R. 5200 undertakes too much with too little thought given to the possible consequences. It is my sincere hope that my colleagues in the House will conclude as I have that it would be unwise to add protection of the "handicapped" to this legislation at this time. It is enough for the present to develop an effective enforcement procedure.

M. CALDWELL BUTLER.