EXHIBIT C

ARCHSTON

```
0001
  1

  2

  3              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
  4                    NORTHERN DIVISION

  5

  6

  7                                    )
       EQUAL RIGHTS CENTER, et al.     )
  8                                    )
              Plaintiffs               )
  9                                    )
       v.                              )    Civil Docket No. AMD-04-3975
 10                                    )
       ARCHSTONE SMITH TRUST, et al.   )
 11                                    )
              Defendants               )
 12                                    )

 13

 14
                                    Baltimore, Maryland
 15                                 November 17, 2005
                                    10:08 AM to 11:38 AM
 16

 17

 18   The above-entitled matter came on for a motions hearing before
                  The Honorable Andre M. Davis
 19

 20

 21

 22

 23

 24

 25
0002
  1

  2

  3

  4                  A P P E A R A N C E S

  5

          On Behalf of the Plaintiffs:
  6       Joseph M. Sellers, Esquire
          Matthew Keith Handley, Esquire
```

Page 1

```
                                    ARCHSTON
 7        Donald Lee Kahl, Esquire
          Isabelle Marie Thabault, Esquire
 8

 9        On Behalf of the Defendant Clark Realty Builders:
          Robert Milton Moore, Esquire
10        Richard O. Wolf, Esquire

11
          On Behalf of the Defendant Archstone Smith Trust:
12        Gary A. Winters, Esquire
          Richard Ben-Veniste, Esquire
13        Timothy Lambert, Esquire

14        On Behalf of the Defendant Niles Bolton Associates:
          Russell S. Drazin, Esquire
15

16

17

18

19

20

21

22

23

24

25
0003
 1              PROCEEDING OF NOVEMBER 17, 2005

 2        THE COURT:  Good morning.

 3        COUNSEL:  Good morning, Your Honor.

 4        THE COURT:  We are on the record for a motions hearing

 5   in Equal Rights Center v. Archstone Smith Trust, Case Number

 6   AMD-04-3975.

 7        Counsel, please state your appearances for the record.

 8        MR. SELLERS:  Good morning, Your Honor.  Joseph

 9   Sellers for the plaintiffs.  With me is Matthew Handley, Donald

10   Kahl and Isabelle Thabault.

11        THE COURT:  Good morning to each of you.

12        MR. MOORE:  Good morning, Your Honor.  Robert Moore

13   from Moore and Lee on behalf of the Defendant Clark Realty
```

ARCHSTON

14  Builders.  With me is Richard Wolf.

15           THE COURT:  Good morning.

16           MR. WINTERS:  Good morning, Your Honor.  Gary Winters

17  on behalf of the Archstone defendants.  As one preliminary

18  matter, I would like to file this motion pro hac vice to admit

19  my partner Richard Ben-Veniste, who will be arguing on behalf

20  of Archstone today.

21           THE COURT:  Thank you.

22           Welcome, Mr. Ben-Veniste.

23           MR. BEN-VENISTE:  Thank you, Your Honor.

24           THE COURT:  Did you bring the check?

25           MR. BEN-VENISTE:  I did.
0004
1           THE COURT:  Okay, that's the key.

2           (Laughter.)

3           THE COURT:  Welcome to you, Mr. Ben-Veniste.

4           MR. BEN-VENISTE:  Thank you, Your Honor.

5           MR. DRAZIN:  Good morning, Your Honor.  Russell Drazin

6  from Jackson and Campbell for the defendant Niles Bolton

7  Associates.

8           THE COURT:  Good morning.

9           THE COURT:  Sir, do you wish to --

10          MR. LAMBERT:  Your Honor, I'm also with Mayer Brown.

11  I'm Tim Lambert.

12          THE COURT:  Good morning.

13          Well, thank you, counsel, for coming up.

14          MS. CALKINS:  Your Honor, I just wanted to introduce

15  myself.  My name is Lynn Calkins.  I am here for the amicus

16  curiae National Multi Housing Council.

17          THE COURT:  Good morning.  I have reviewed your

18  papers, and your briefing on these issues has been thorough, of

19  course, and I thank you for that.

Page 3

ARCHSTON

20          I thought it might be useful to have some brief oral

21  argument.  I must say that the defendants have, in my view, a

22  very heavy oar on all the issues.  I should say the movants.  I

23  will be glad to hear from counsel in any order that you may

24  have agreed that you will proceed.

25          MR. MOORE:  Your Honor, again, Robert Moore on behalf
0005
 1  of the defendant Clark Realty Builders.  Just to set the stage,

 2  we are here on Clark Realty Builders' Motion for Partial

 3  Summary Judgment as to the two claims for relief asserted by

 4  these plaintiffs.

 5          Now, this Complaint was filed against --

 6          THE COURT:  Mr. Moore, let me ask you a question to

 7  begin with, because I try to be a judge who pays attention to

 8  the practicalities as well as the theory and the abstract

 9  principles, which are, of course, always very interesting.

10          Could you just tell me very succinctly, what is the

11  practical effect of your motion?

12          If I grant your motion, that leaves two properties

13  clearly in play, apart from your statutory interpretation

14  argument.

15          Is that going to have a practical impact on discovery,

16  on the relief?  Why does it matter, as a practical matter?

17          MR. MOORE:  Well, I think it does have a practical

18  effect on discovery.  It would eliminate three of the five

19  projects that are subject to discovery under the Fair Housing

20  Act.

21          THE COURT:  But do you really contend that under the

22  allegations of the Complaint, plaintiffs wouldn't be entitled

23  to take discovery on what I think we all understand to be the

24  practice of the design?

25          In other words, you can design a building, you can
0006
 1  design a project, but over years, you design many buildings and
Page 4

ARCHSTON

2 many projects.

3          Part of what the plaintiff is going after here is that
4 the whole approach by your client to the design of buildings is
5 something that your client has engaged in over many years.

6          So, it's hard for me to imagine that I would sustain a
7 motion for a protective order, if you were to come in, even if
8 I granted your motion, to say, Judge, they shouldn't be
9 permitted to take discovery on all these other projects.  I
10 just don't quite see that.

11          MR. MOORE:  Well, Your Honor, my client has not
12 designed any projects.

13          THE COURT:  You're the builder.

14          MR. MOORE:  We're the builder, right.

15          THE COURT:  But the principle is the same.

16          MR. MOORE:  Well, except that I don't think they are
17 going to establish any kind of a practice on the part of the
18 builder other than a practice of building in accordance with
19 the architectural design that's been handed to it.

20          So, of what relevance would be our building of a
21 project in 1988 or 2001 with regard to Fair Housing Act
22 violations on another project, in another state, built under
23 another contract, and built by my client in accordance with a
24 separate and distinct architectural design separate and apart
25 from that original project?
0007
1          I think it is irrelevant and you would limit
2 discovery.

3          THE COURT:  Well, you're going to lose that Motion to
4 Compel no matter how this motion comes out.  I can tell you
5 that.  Obviously, I would consider burdensomeness and arguments
6 of irrelevance, but it seems to me perfectly obvious, perfectly
7 obvious, that it would be relevant to what builders have done.

ARCHSTON
8  Certainly within the period of the amendments, clearly it's
9  relevant.

10        MR. MOORE:  Well, Your Honor, I disagree that it's
11  relevant.  The only issue they could possible establish --

12        THE COURT:  Well, at least we've gotten rid of the
13  Motion to Compel.  We haven't dealt with the motions that are
14  here today, but we've gotten rid of those motions.

15        MR. MOORE:  Well, let me point out that on the motion
16  we are here on today, their Complaint is brought against an
17  owner who has procured a design and developed 111 properties in
18  18 states and the District of Columbia, and they have also sued
19  several of the architects who put pen to paper to design those
20  projects on behalf of that owner.

21        Then they sued my client.  My client built five of
22  these 111 projects, and we built those projects in accordance
23  with designs that were handed to us.  We had no responsibility
24  in architectural design and no control over that design.

25        So, the case is brought against us for having
0008
1  constructed projects in strict accordance with the contract
2  obligations we signed onto.  That is the basis for their
3  Complaint against us.  We don't own, operate, or lease any of
4  those properties.  We didn't design any of the properties.  We
5  finished the properties, we left the project, and we moved on.

6        THE COURT:  And I tell you that that sounds to me like
7  an argument in opposition to a Motion to Dismiss a cross-claim
8  that your client may have brought already but will bring if you
9  stay in the case.  Even on those two, you're going to bring a
10  cross-claim for the reasons you just stated.

11        MR. MOORE:  In fact, Your Honor, we already have
12  brought a cross-claim.

13        THE COURT:  Okay.  Exactly.

14        MR. MOORE:  This argument goes to our statute of
                                Page 6

ARCHSTON

15  limitations defense.  The Fair Housing Act has a two-year

16  statute of limitations, and we completed three of these five

17  projects outside of that limitation period.  They have admitted

18  that.  But their argument --

19          THE COURT:  I don't know if they have admitted it, but

20  certainly for purposes of the motion, I think we are assuming

21  that's so.

22          MR. MOORE:  Well, the relevance of the argument is

23  that, Your Honor, they try to salvage their claim as to those

24  three projects by arguing continuing violation.  The argument

25  is, Your Honor, that there is no continuing violation here.
0009
1  Even the cases they cite do not support the continuing

2  violation theory being applied back to separate and independent

3  contracts.

4          The case law shows that in order to take advantage of

5  this continuing violations theory and reach back to actions

6  outside of the limitation period, they have to show a linkage

7  or a nexus between those early projects and the later ones.

8  That's why this becomes important, Your Honor.

9          We built these projects in accordance with separate

10  contracts with the owner.  We were given separate sets of

11  architectural designs that were project-specific.  The projects

12  were built on different parcels of property in two different

13  states.

14          There is no nexus or linkage between our construction

15  of XYZ project that was completed in March of 2001 and our

16  completion of ABC project that was completed in 2005 under a

17  complete, separate, distinct architectural design.  There is no

18  linkage.  There is no relationship.

19          Your Honor, they site as support for their continuing

20  violation theory several cases.  Baltimore Neighborhoods Two,

Page 7

ARCHSTON

21 which provides no support because that was a single project,

22 not multiple projects built by a builder in accordance with

23 separate contract documents and designs.

24          They also cite Silver State Fair Housing Council, Inc

25 ., a 2005 decision from the federal court in Nevada.  In that

0010

1 case, the court did say that with regard to two separate

2 projects, one completed outside of the limitation period and

3 one completed inside the limitation period, that the continuing

4 violation doctrine applies.

5          The court held even though the first project was a

6 separate project and was completed outside the limitation

7 period, I am going to apply the continuing violation theory to

8 that set of facts.  But the court only did that after making

9 three specific findings.

10          One, the completion of the first project outside of

11 the limitation period and the beginning of the second project

12 was seamless in time.  In other words, the defendant there, who

13 was the owner and developer, not the contractor, but that owner

14 went from one project directly to the next.

15          The second finding was that this owner, this

16 developer, only developed those two projects.

17          The third finding was that there were similar FHA

18 violations in both projects.  Only on those findings of facts,

19 Your Honor, did the court find that the continuing violation

20 theory would apply here to these separate projects.

21          In other words, there has to be a nexus.  There has to

22 be a linkage between the old project and the new for the old

23 projects to have any affect on the statute of limitations

24 analysis.

25          In fact, Your Honor, there's another case they cite, Y

0011

1 onkers Board of Education, which involved violations of Equal

2 Educational Opportunity Acts.  The court said, the continuing

Page 8

ARCHSTON

3  violation theory is applicable when a claim is based not on a

4  single discreet incident, but the plaintiffs must show a nexus

5  between the violations outside of the limitation period and the

6  violations inside the limitation period.

7          The case is similar, also, to your decision in Brian v

8  . Lucent Technologies, a 2004 decision that Your Honor wrote.

9  It involved gender discrimination and retaliation claims in

10  violation of Title VII.

11          There, this court held that incidents outside of the

12  limitation period are time-barred unless the plaintiffs can

13  show that they are related to an incident within the limitation

14  period as one or more in a series of separate but related acts

15  amounting to a unitary violation.

16          That is why these facts are very key, Your Honor.  It

17  doesn't go to my cross-claim, and it doesn't go to the Motion

18  to Compel they will file later on.

19          Our completion of three of these projects outside of

20  the limitation period are unrelated -- our work on those

21  projects is unrelated, unlinked, and there is no nexus between

22  those projects and the two projects within the limitation

23  period.

24          For that reason, the two-year statute of limitation

25  applies.  They cannot salvage those claims by use of this
0012
1  continuing violation theory, and those three cases get

2  excluded.

3          I will fight the battle later on under the Fair

4  Housing Act as to whether or not our construction of those

5  projects in accordance with the design given to me by the owner

6  and the architects on those projects has any relation to my

7  work on the two projects that are within the limitation period,

8  but for purposes of the statute of limitations argument, Your

Page 9

ARCHSTON

9  Honor, there is no nexus among or between these five projects

10 and, therefore, the two-year limitation should be imposed,

11 three projects should be dismissed.

12        THE COURT:  I see that argument.

13        MR. MOORE:  Let me just point out, Your Honor, that

14 the argument they make on the continuing violation theory would

15 do away with the statute of limitations.  They would have the

16 narrow exception of the continuing violation theory swallow the

17 rule.  Their analysis would preclude any argument based on a

18 statute of limitations.  In effect, they could reach back to

19 the year 1965 if they could.

20        THE COURT:  I don't understand that to be the case at

21 all.  Judge Leese's long decision is very clear.  If you had

22 only those three involved in this case, then Judge Leese

23 reasoning would say, you're out of here.

24        MR. MOORE:  I agree, Your Honor.

25        THE COURT:  We don't have that here.  It is not the
0013
1  case that simply invocation of the continuing violation theory

2  eviscerates the limitations that Congress has mandated.

3        MR. MOORE:  Taking an example, suppose we had

4  completed an Archstone project in 1965.  They would be arguing

5  here the continuing violation theory allows them to bring a

6  claim against Clark, the builder, based on that project because

7  you also completed two Archstone projects within the two-year

8  limitation period.

9        THE COURT:  I don't think they are making that

10 contention.

11        MR. MOORE:  Well, Your Honor, let me point out this is

12 not a situation where the result we seek, which is summary

13 judgment as to the three projects based on the statute of

14 limitations, causes any surprise or prejudice to the plaintiff.

15 This is not a situation where they even allege that they only

Page 10

ARCHSTON

16 discovered these violations within the two-year limitation
17 period.  Instead, they have admitted the opposite in their
18 Complaint.
19        Their Complaint actually says that as early as the
20 year 2000, they tested various Archstone properties to
21 determine whether they complied with the ADA or the FHA.
22        Their Complaint further admits that as early as March
23 of 2002, one of the plaintiffs held an educational workshop to
24 discuss the results of the testing and purportedly learned at
25 that workshop that it was known that these Archstone projects
0014
1 were not generally accessible to people with disabilities.
2        Now, instead of filing suit based on that testing,
3 that investigation, that workshop, in which case I wouldn't be
4 here arguing statute of limitations because all the projects
5 would have fallen within the limitation period, they sat on
6 their purported rights and did not file suit for another two
7 and a half years.  They didn't file suit until December of
8 2004, Your Honor.  For that reason, three of the projects are
9 outside of the two-year limitation period.
10        This is not a case where they are arguing their
11 inability or their failure to discover the problems.  It's a
12 situation where they sat on the rights until too late, and
13 three projects should be dismissed from this lawsuit as a
14 result.
15        THE COURT:  Okay.  Thank you, Mr. Moore.
16        Do you want to go on to your other issue?
17        MR. MOORE:  If you would like me to, Your Honor.
18        THE COURT:  Yes.
19        MR. MOORE:  We also move for summary judgment as to
20 all of the ADA claims they assert in Count II of their
21 Complaint.  Section 302 of the ADA sets forth the general rule

ARCHSTON

22  of liability.  Section 302 identifies any person who may be

23  liable under the Act as those who own, lease, or operate these

24  properties.  Clark does not and never has owned, operated, or

25  leased any of the five properties and, therefore, we have no

0015

1   potential liability under Section 302 of the ADA.

2         Now, Section 303 of the ADA, the new construction

3   provision of the ADA, refers back to 302.  It says, as applied

4   to public accommodations and commercial facilities,

5   discrimination for purposes of section 302(a) includes a

6   failure to design and construct facilities in a proper fashion.

7         Your Honor, 303 of this act refers back to 302 to make

8   clear that the same universe of defendants apply to both

9   provisions.

10        Again, 303 says, for purposes of 302(a),

11  discrimination includes a failure to design and construct.  If

12  Congress had intended to expand the universe of

13  potentially-liable parties under section 303, it could have

14  done so.  But it did not.  That's the analysis by the federal

15  court in United States v. Days Inn of America, a 1998 Eastern

16  District of Kentucky case.

17        Your Honor, that was also the analysis by the Ninth

18  Circuit in the Lonberg v. Sanborn Theaters case, a 2001

19  decision.  The court analyzed, interpreted the statutory

20  language.  The court decided that the parallel interpretation

21  of 302 and 303 was the proper interpretation of that statute.

22  It was the clear and proper interpretation of the statute.

23        Now, the court in Lonberg did point out that there is

24  this other line of cases out there that go the other way and

25  they attempt to expand or reach potentially liable parties

0016

1   beyond those who own, operate, or lease the properties.  That

2   is the line of cases these plaintiffs ask this Court to adopt,

3   Your Honor.

Page 12

ARCHSTON

4        The Lonberg court actually referred to that other
5    approach as the significant degree of control approach.  But if
6    you look at those cases, if you look at the cases that the
7    plaintiffs rely on for purposes of their interpretation of the
8    ADA, you will see that Clark does not even fall within that
9    interpretation.

10        Their key case that they rely on, Your Honor, is Unite
11   d States v. Days Inn of America, the Eighth Circuit decision
12   from 1998.  In that case, the court found that the franchisor,
13   Days Inn of America, was not the owner, operator, lessor, or
14   lessee of the property at issue, but they still found liability
15   on the part of that franchisor despite the fact that it did not
16   own, lease, or operate the property.

17        Well, the question is how the Court reached that
18   decision.  That's what is key.

19        The court in the Eighth Circuit found liability on the
20   part of the franchisor because it found that that franchisor
21   had significant control over both the design and the
22   construction of these facilities.

23        As the franchisor, it could review and approve the
24   designs and the construction of the facilities.  It was the
25   significant control that that one entity had, the franchisor,
0017
1    over both the design and the construction that led the Court to
2    find that even though the franchisor is not an owner, a lessee,
3    a lessor, or an operator, it has liability under section 303 of
4    the statute.  That is not the case with Clark in this case, and
5    it is undisputed.

6        Clark had no control whatsoever over the architectural
7    design of any of these projects.  Clark's sole responsibility
8    on all of these projects was to build the project in accordance
9    with the design that was handed to it by the owner and the

Page 13

ARCHSTON

10 architects.  Therefore, Clark does not even fall within the

11 broadened definition of those liable under 303 that the

12 plaintiff advocates.

13        They seem to advocate something even broader.  They

14 seem to advocate the position that any entity who has any

15 involvement whatsoever in the design or any involvement

16 whatsoever in the construction has liability under the ADA.

17        Under that interpretation, every subcontractor Clark

18 used on any of these projects would be liable under the ADA,

19 based on their interpretation.  Every sub-subcontractor would

20 have liability under the ADA.  Every supplier who provided

21 material or equipment would have liability.  I respectfully

22 suggest that was not the intent of this statute.

23        THE COURT:  I don't think simply being joined as a

24 defendant means "you have liability."  We are at the pleading

25 stage here.  We're not talking about who is liable and who is
0018
1 not.  The question here is, against what entities may a

2 plaintiff proceed?

3        MR. MOORE:  I agree with that, Your Honor.  My

4 position is that as a matter of law, which is why we are here

5 on this Motion for Summary Judgment, based on the facts set

6 forth in our affidavit, that there is no potential liability on

7 the part of Clark under the ADA.

8        THE COURT:  So, you reject the canon, which I would

9 have thought is clearly uncontroversial, that civil rights

10 litigation should be given an expansive interpretation by

11 courts consistent with Congress' remedial purpose.

12        MR. MOORE:  I don't reject that at all.

13        THE COURT:  I don't see how that is consistent with

14 your argument.

15        MR. MOORE:  I don't think what that means is that

16 plaintiffs can sue anybody, any time, anywhere and not be

ARCHSTON

17  subject to the court's decision on a Motion for Partial Summary
18  Judgment where the facts related to the motion are not in
19  dispute.
20      THE COURT:  If you had the Ma and Pa Drywall Company
21  in here as a defendant, I thing your argument would have more
22  power, but we are talking about Clark.
23      MR. MOORE:  In my view, Your Honor, analytically there
24  is absolutely no difference between Clark and Ma and Pa
25  Drywall.  Neither one of them was an owner, operator, lessor,
0019
1  or lessee of the properties, and neither one of them has any
2  control or had any control over the design, the architectural
3  design of these projects.  So, analytically, they are exactly
4  the same.
5      Under the statute and under the interpretation this
6  Court has to make, they are exactly the same.  The fact that
7  this is Clark doesn't make us a proper defendant and does not
8  impose on us a higher burden of proving to you that we
9  shouldn't be in this lawsuit as --
10      THE COURT:  My guess is that Congress did want
11  multi-billion-dollar construction firms involved in nationwide
12  construction contracts to have something to say about the
13  enforcement of these remedial statutes.
14      MR. MOORE:  Well, let me then address the alternative
15  argument, Your Honor, because we also contend that their Count
16  II ADA claims are subject to a statute of limitations defense,
17  also.
18      THE COURT:  Let me ask you about that.  I didn't take
19  the time to check, but I don't think anybody here has mentioned
20  that new federal statute of limitations that Congress adopted
21  just a couple of years ago.  Do you know what I am referring
22  to?

ARCHSTON

23          MR. MOORE:  I do not know what you are referring to,

24   Your Honor.

25          THE COURT:  Congress adopted -- is it six or four?
0020
1          MR. SELLERS:  Four.

2          THE COURT:  Congress adopted a four-year statute of

3   limitations for what I sort of impressionistically recall for

4   essentially all claims asserted under federal statutes of a

5   civil rights nature.  But I don't think that has been briefed

6   here.

7          MR. MOORE:  It has not been briefed by me, Your Honor.

8          THE COURT:  It hasn't caught much notice among the

9   courts.  People are still saying, borrow the three-year statute

10   of limitations of Maryland, or whatever it may be.  But we

11   don't do that anymore for that class of litigation.

12          We now have a federal statute of limitations of four

13   years for 1981 and similar statutes.  I just wonder, since

14   there's no limitations under the ADA, the -- it seems to me

15   that applies.

16          MR. MOORE:  Well, there is no limitation under the

17   ADA.

18          THE COURT:  Right.  Within the statute.

19          MR. MOORE:  I did not brief that, and I did not see

20   any response by the plaintiffs to that.  I have read the

21   pleadings in the Bazudo litigation in this court, also, and

22   didn't see that issue.

23          THE COURT:  Mr. Sellers seemed to have at least some

24   recognition of what I was referring to.

25          MR. SELLERS:  Yes.
0021
1          THE COURT:  Just a moment, Mr. Moore, if you don't

2   mind.

3          MR. MOORE:  Sure.

4          THE COURT:  Does it not apply to the ADA claim?
                              Page 16

ARCHSTON

5          MR. SELLERS:  Your Honor, it's a four-year limitations
6   period.  I believe it applies to any statutes that were enacted
7   or amended as of 1991.
8          THE COURT:  That's right.  So, it wouldn't apply here
9   because these two statutes --
10          MR. SELLERS:  The ADA was, of course, enacted in 1990.
11          THE COURT:  Right.  So, it wouldn't --
12          MR. SELLERS:  I don't think it applies in this
13   situation.
14          THE COURT:  Right.  So, that's the answer.  Thank you.
15          Okay.  So, we have a three-year statute of
16   limitations.
17          MR. MOORE:  I feel better about not briefing that
18   issue, Your Honor.
19          (Laughter.)
20          THE COURT:  I knew there was a good reason.
21          MR. MOORE:  Although it was dumb luck.
22          (Laughter.)
23          MR. MOORE:  Your Honor, the question is what
24   limitation period you have.  I mean, the federal court here has
25   held that the general three-year limitation does apply.  As we
0022
1   stated in our motion, we think the two-year limitation from
2   Article 49(b) of the Maryland Code is more applicable, more
3   relevant.
4          It's a two-year limitation.  It's derived from 49(b)
5   of the Maryland Code.  That statute, like the ADA, prohibits
6   discrimination on the basis of disability with regard to
7   residential housing.
8          THE COURT:  But that doesn't create a private cause of
9   action.
10          MR. MOORE:  But I think the nature of the statute

Page 17

ARCHSTON

11  itself, the nature of the wrong that that statute addresses, is

12  more analogous to the ADA than the general three-year

13  limitation provision that this court has previously applied.

14          My view is the two-year limitation is the applicable,

15  or the most analogous limitation period.  Based on that

16  two-year limitation period, the same three projects are subject

17  to summary judgment at this stage.  Based on the three-year

18  limitation period, Your Honor, two of the five projects are

19  subject to the limitation period and should be dismissed.

20          THE COURT:  Okay.

21          MR. MOORE:  Let me address my last point, Your Honor.

22          THE COURT:  Certainly.

23          MR. MOORE:  That's the issue of the consent decree

24  that was entered in this case.  I do admit that I am an

25  outsider, and I simply read that document, and I read the

0023

1  description --

2          THE COURT:  They are no outsiders in this courtroom

3  Mr. Moore, I assure you.

4          MR. MOORE:  Well, let me just say this.  That consent

5  decree that the plaintiffs asked this Court to ratify, and the

6  Court did ratify, describes projects that they said were

7  properly dismissed from this action.  That's their language.

8  They did not say that there were certain properties that were

9  not subject to the consent decree or not subject to the

10  settlement with Archstone.

11          They said there are certain properties that are

12  properly dismissed from this action, and they attached a list

13  to that consent decree of properties that were not dismissed

14  from this action.

15          If you look at that list, there is only one Clark

16  project on that list.  That project was completed in 2001 and

17  is subject to my summary judgment motion based on the Fair

Page 18

ARCHSTON

18  Housing Act and ADA statute of limitations.

19          The plaintiffs in their surreply have tried to explain

20  why it is that the consent decree was written that way and what

21  it means.

22          For example, they said that in these negotiations with

23  Archstone, it was discovered that Archstone was not the owner

24  of certain of these properties when they were built, therefore,

25  Archstone didn't have design and construction responsibility

0024

1  and, therefore, those projects were properly not included in

2  the list and were dismissed from the action.

3          Well, Your Honor, in our affidavit we submitted with

4  our original motion, we provided the Court with the contract or

5  relevant portions of the contract on each of our five projects.

6  On three of the four projects that sort of dropped out of this

7  case in that consent decree, Archstone is named as the owner.

8  So, Archstone was the owner when we signed a contract to build

9  the project in accordance with their design.

10          THE COURT:  So, Mr. Sellers got snookered?

11          MR. MOORE:  Well, there may be some reason why these

12  projects were described in that consent decree as properly

13  dismissed in this case, but that is not it.  So, Your Honor, I

14  am looking at the language of the consent decree standing

15  alone, and, in my view, it's clear and it's unambiguous and

16  it's their language.

17          THE COURT:  When you say that's not it, I'm not sure

18  what you mean by that, because that is what you are being told

19  by officers of the Court, that that's the reason.  You are not

20  suggesting, of course, that somebody is misrepresenting --

21          MR. MOORE:  No.  What I am saying is that three of the

22  four Clark projects that were not on the list, Archstone was

23  the owner when we signed the contract to build the project.

Page 19

ARCHSTON

24  There may be another reason, but I don't think that is

25  accurate.  That is not the reason they were not included on the
0025

1  list as far I am concerned from my reading of the documents.

2        THE COURT:  Well, the accuracy of the underlying fact

3  is different from the reason they were dropped, accepting your

4  characterization they were dropped.

5        MR. MOORE:  That's right.

6        THE COURT:  All right.  Thank you very much Mr. Moore.

7  Again, to come back to where I sort of started, I have to say

8  it's not clear to me that Rule 56 is best applied as sort of a

9  cherry-picking machine.  What I mean by that is I have never

10  thought it appropriate, rarely thought it appropriate, to go

11  through a Complaint such as the one we have here, because this

12  is one case.  Earlier in your argument, you alluded to, or I

13  thought you did, to the properties as involving separate cases.

14  This is one case.  I just don't see the practical wisdom in me

15  going through at this stage and saying, well, okay, this

16  property is out, that property is out.  Because, as I said,

17  discovery hasn't taken place yet, and I really, despite what I

18  said, am not ruling on any Motions to Compel or for a

19  Protective Order, but I am willing, and it seems to me I have

20  to, not because I am willing, to give the plaintiff their due.

21        Plaintiff is alleging a pattern and practice by these

22  defendants of willful, reckless violations of these two

23  statutes.  How novel the theory is I am not prepared yet to

24  say, but it seems to me that there is nothing spurious or

25  fantastic in the plaintiffs' approach to the case.
0026

1        I don't think you would argue at all that if

2  preliminary injunctive relief were sought against a builder, an

3  architect, and an owner on a property that was under way, that

4  that claim would be laughed out of court.  It would be a

5  serious claim.  I don't know how many such claims are brought.

ARCHSTON

 6  I suspect not many in terms of resource allocation and that
 7  kind of thing.
 8        So, it seems to me that the case stands on a much
 9  different footing as the plaintiffs have alleged the case from
10  the case that you would construct for purposes of your motion.
11  That is not criticism.  Actually, I think it is excellent
12  advocacy on your part.  But I am not prepared, I don't think,
13  to take so crabbed a view of the case, as I say, to sort of
14  view this as 111 cases all cobbled together in some
15  inappropriate way.  This is a pattern and practice case.
16        MR. MOORE:  I agree that this is one case, Your Honor,
17  and I didn't mean to say they were separate cases.  Let me make
18  one final statement and request.
19        THE COURT:  Okay.
20        MR. MOORE:  When you put pen to paper, you think about
21  the difference between Clark the builder and the owner who went
22  out and procured architectural designs for a series of
23  projects, or the architects who designed the projects in terms
24  of this pattern and practice, and then consider:  Does it make
25  sense?  Can a builder who signs separate contracts for separate
0027
 1  projects to build in accordance with separate designs, can that
 2  possibly even be a pattern and practice?
 3        It may make sense with regard to an owner/developer
 4  who builds a series of projects all over the country.  It may
 5  make some sense with regard to an architect who designs a
 6  series of covered properties such as we are dealing with here.
 7  But when you are talking about somebody who puts brick and
 8  mortar in the ground in accordance with the designed drawing
 9  unique to that project, I don't think that makes sense, and
10  that's the basis for our statute of limitations --
11        THE COURT:  I understand that, but Congress used the
                            Page 21

ARCHSTON

12 word construct.  We can't get that out of the statute.  They

13 put it there.  It means something.  Who constructs?  Builders

14 construct.

15        MR. MOORE:  Right.

16        THE COURT:  I just don't see a basis for saying, oh,

17 Congress didn't want concerns, you know, -- I just don't know

18 any other way to put it.

19        MR. MOORE:  Let me renege on my last statement and

20 make one last statement.

21        THE COURT:  Okay.

22        MR. MOORE:  Plaintiffs have not pointed to a single

23 case, not one, where a court held that a contractor, with no

24 ownership or operation control and no control over the

25 architectural design, like my client is here, it's undisputed

0028

1 on the affidavit, have not pointed to one case where that

2 contractor has been held to have liability under the ADA.

3        THE COURT:  You know the answer to that.  There's

4 always a first time.

5        MR. MOORE:  Thank you, Your Honor.

6        THE COURT:  Thank you, Mr. Moore, very much.

7        Rather than jump over to the plaintiff, I think I'd

8 rather hear all the defense arguments if that is acceptable,

9 Mr. Sellers.

10        MR. SELLERS:  That's fine.

11        MR. DRAZIN:  Again, Your Honor, my name is Russell

12 Drazin from Jackson and Campbell.  I am here for defendant

13 Niles Bolton Associates.

14        Your Honor, Niles Bolton was the architect for some of

15 the projects that are at issue in this case, and my co-counsel

16 here for Clark has addressed one of the issues that we raised

17 in our motion to dismiss the Complaint, and I am not going to

18 go back over that, that was the design and construct argument.

Page 22

ARCHSTON

19          I will address, Your Honor, briefly, because as Your

20   Honor pointed out, it was briefed in the papers extensively,

21   the issue of standing of these plaintiffs to bring this case.

22   The first issue that we raise is with respect to the

23   plaintiffs' standing to sue in that they have not alleged a

24   cognizable injury in fact to confer Article 3 standing in that

25   what they have alleged is a self-inflicted injury upon

0029

1    themselves that they undertook to go out and do testing and

2    investigation.

3          Your Honor, that is a self-inflicted injury that

4    courts such as the case we cited in this court in Buchanan

5    against Consolidated Stores Corporation decided in 2001, that

6    that kind of cognizable injury, and that case, Your Honor, did

7    involve Equal Rights Center, is not sufficient to confer

8    Article 3 standing.  They were dismissed from that case.  I

9    think that the same principles that were at play there are at

10   play here.

11          Your Honor, the second standing argument goes more

12   towards the other two plaintiffs, which are AAPD and United

13   Spinal.  Those two have alleged some injury to their members.

14   They are contending that they have associational standing based

15   upon injury to their members.

16          Your Honor, in order to do that, they have to allege

17   that their members visited the properties, that they had some

18   expectation that they were going to return to the properties.

19   In order to allege that type of standing, and they have not

20   done that, all they have alleged in general, you know, our

21   members have suffered discrimination as a result of these

22   practices.  That, Your Honor, under the cases that we have

23   cited in our briefs, is not enough under the statutes to confer

24   standing upon these plaintiffs.

Page 23

ARCHSTON

25
0030
1    For those reasons, Your Honor, these plaintiffs don't
     have standing, and this case should be dismissed.

2         THE COURT:  Isn't Buchanan different?

3         MR. DRAZIN:  Well, it is different, Your Honor, in
4    that it's not an FHA case, it's not an ADA case, but I think,
5    Your Honor, that the principles underlying Buchanan are the
6    same.  I realize, Your Honor, that there are other cases, and
7    they were cited by the plaintiffs, ADA and FHA cases, where
8    this type of injury perhaps might be enough.

9         I do think, Your Honor, that the reasoning of Buchanan
10   is applicable here.  It should not be good enough under Article
11   3 just to allege a self-inflicted injury upon yourself and then
12   go forward and say that that confers standing, because you had
13   to spend money to bring this suit and investigate these
14   defendants to make your claims.  That should not be enough,
15   Your Honor.  It's not enough for Article 3 standing.

16        THE COURT:  Okay.  Thank you very much, Mr. Drazin.

17        MR. DRAZIN:  Thank you.

18        THE COURT:  Now, I take it Archstone is here to defend
19   against the Motion to Dismiss the Cross-claim.

20        MR. BEN-VENISTE:  You are correct, Your Honor.

21        THE COURT:  Did you want to be heard on that now, Mr.
22   Ben-Veniste?

23        MR. BEN-VENISTE:  Well, we are responding to the
24   Motion to Dismiss.  If Your Honor wants to hear us first or
25   hear the proponent to the motion first, that's up to you.
0031
1         MR. DRAZIN:  It's my motion, Your Honor.

2         THE COURT:  Yes.  Mr. Drazin, did you want to address
3    that?

4         MR. DRAZIN:  I will.  Thank you, Your Honor.

5         Your Honor, Archstone has filed a cross-claim against
6    my client, Niles Bolton Associates, seeking four counts --

Page 24

ARCHSTON

7  express indemnity, implied indemnity, breach of contract, and
8  negligence.

9          The express indemnity, Your Honor, under the case
10 law, -- this is a Motion to Dismiss, and I realize that, but
11 under the case law, they have to allege some actual loss that
12 they have suffered.  I know that in the cross-claim, they do
13 allege that.  But to the extent that they do not, I think that
14 claim ought to be dismissed.

15         Your Honor, the implied indemnity claim is defective
16 in that they settled with the plaintiffs in this case and now
17 they are seeking to recover against us upon a theory of implied
18 indemnity.  Under the cases that we've cited in our brief, they
19 are not able to do that, Your Honor.

20         THE COURT:  And why not?  Mr. Moore is interested in
21 this argument as well.

22         MR. DRAZIN:  Just a moment, Your Honor.

23         (Pause in the proceeding.)

24         THE COURT:  By the way, Clark has not cross-claimed
25 against Niles?
0032
1          MR. MOORE:  No, Your Honor.  We cross-claimed against
2  Archstone.

3          THE COURT:  Archstone only.

4          MR. MOORE:  That's right.  Our contract was with them.
5  They gave us the design that they had procured from a third
6  party.  We had no contract with any architect.

7          THE COURT:  Do you not anticipate an implied indemnity
8  claim against --

9          MR. MOORE:  Not at this point, Your Honor.

10         THE COURT:  Not at this point.  Okay.

11         MR. BEN-VENISTE:  We have by agreement stayed any
12 proceeding on that, Your Honor.

Page 25

ARCHSTON

13          THE COURT:  Yes.  Okay.

14          MR. DRAZIN:  Your Honor, let me move on for just a

15  moment to the other two and then return back.

16          THE COURT:  That's fine.

17          MR. DRAZIN:  The breach of contract count, Your Honor,

18  they have not alleged in that specific breach of any contracts.

19  They just alleged --

20          THE COURT:  What element in a breach of contract claim

21  is missing?

22          MR. DRAZIN:  Well, Your Honor, that there was a breach

23  of some specific provision, that there was some provision in

24  the contracts that we did not live up to, that we did not

25  comply with.
0033

1          THE COURT:  In accordance with law.

2          MR. DRAZIN:  I don't think their allegations are

3  specific enough in order to allege a breach of contract claim.

4  I think they have to point to certain provisions that they

5  contend we did not comply with, you know, that we did not meet

6  our burden of performing.

7          THE COURT:  Well, the cross-claim has to be read in

8  the light of the Complaint.  Isn't it perfectly clear that your

9  failure alleged by Archstone is that you didn't comply with

10  these statutes in the design services you provided?  Under a

11  notice-pleading regime, I just don't see what else they can

12  say.

13          MR. DRAZIN:  Well, they could have, Your Honor,

14  attached the contracts or cited to specific provisions within

15  the contracts and then allege that we had not complied with

16  certain of those provisions.  They have not done that.

17          THE COURT:  Okay.

18          MR. DRAZIN:  Your Honor, the final count is

19  negligence.  In this one, they have alleged negligence against

Page 26

ARCHSTON

20 us, although they have contended, and they are correct, that we
21 had written contracts with them to provide architectural design
22 services for them.

23        Your Honor, under the case law, you cannot allege a
24 negligence claim unless you can point to a duty that is
25 independent of the duty that you would have under a contract
0034
1 claim.

2        THE COURT:  Long-settled Maryland law, assuming for
3 the sake of this discussion that Maryland law would apply.  I
4 don't know that there is much of a difference around the
5 states.  You don't deny that your client had an independent
6 duty at law to comport with the standard of care for
7 architects, so you?

8        MR. DRAZIN:  Well, Your Honor, in this case, just like
9 in other cases, when you have a contract, that duty arises out
10 of the written contracts that we had with Archstone.  There was
11 no independent separate duty that we owed to them other than
12 the duty to provide services in accordance with the contract.

13        THE COURT:  No, I think that is absolutely wrong.  As
14 a professional calling, you have an independent duty,
15 recognized at law, and again I am talking about the law of
16 Maryland, doctors, accounts, lawyers, architects have a duty to
17 provide services consistent with the standard of care of the
18 calling, of the profession.

19        MR. DRAZIN:  Your Honor, when you have a duty and it
20 arises out of the contract, though, you can't point to -- there
21 is no separate duty here.  There is no separate duty that they
22 can point to.  These two parties separately owed no duties to
23 each other.  The duties only arise out of the contracts.

24        THE COURT:  But the duty arises out of the
25 undertaking.  If an architect says, I will build you a
0035

Page 27

ARCHSTON

1  building, even if they do it for free, --

2          MR. DRAZIN:  If they did it for free, Your Honor,

3  there would be a contract.

4          THE COURT:  Well, maybe, maybe not, but the point is

5  there wouldn't have to be one for your client to have a duty

6  recognized at law.  That is what it means to be a member of a

7  professional calling.

8          MR. DRAZIN:  Well, Your Honor, I think the --

9          THE COURT:  Even a doctor walking down the street

10 encountering an accident, you know, has a duty to exercise

11 reasonable care.  Obviously, there are statutory provisions

12 that protect good Samaritans and that kind of thing, but a

13 doctor couldn't butcher her efforts to save the life with

14 impunity.  Obviously, an architect is not going to be walking

15 down the street and suddenly design a building.

16         MR. DRAZIN:  We hope not, Your Honor.

17         THE COURT:  We hope not, although who knows.  You get

18 the spirit sometimes.  You're sitting in a restaurant and you

19 pull out a napkin and, you know, --

20         (Laughter.)

21         THE COURT:  But that duty is there, and I think the

22 law recognizes that duty.

23         MR. DRAZIN:  But that duty always -- in the case of an

24 architect and an owner of properties, that duty always flows

25 from a contract.  If they can't point to, and they can't in
0036
1  this case, a separate duty, then as a matter of law, they can't

2  state a negligence claim.

3          We have contracts.  The parties have contracted with

4  each other.  They understand what their respective obligations

5  are.  They understand what the terms and provisions are.  When

6  you have a situation like that, unless you can point to an

7  independent duty, and I don't think as a matter of law they can

Page 28

ARCHSTON

8   in this case, then you can't sue in negligence.  That is not a

9   tort claim.  This is a contract case, and it ought to remain a

10  contract case.

11        THE COURT:  What you can't do is rely on an alleged

12  breach of contract to impose liability on a negligence theory.

13  And, most importantly of all, you don't get a tort measure of

14  recovery if all you've got is a breach of contract.

15        It seems to me perfectly clear under Maryland law that

16  a professional calling does indeed carry with it an independent

17  duty recognized at law for which there might be recovery for

18  the negligent performance of a duty.

19        In other words, I'm agreeing with you so far as you

20  go, but my view is that you're cutting off the analysis too

21  early.

22        MR. DRAZIN:  Okay.

23        THE COURT:  Okay.

24        MR. DRAZIN:  Your Honor, the last point, going back to

25  implied indemnity, --
0037
1         THE COURT:  Yes.

2         MR. DRAZIN:  -- they need to establish actual

3   liability.  That is what the case law says, the Blockston v. Un

4   ited States case that we cite.  They can't do so pointing to

5   the consent decree.  They can't establish that we have actual

6   liability to them or to the plaintiffs just viewing the consent

7   decree.  On that basis, Your Honor, we would ask that the

8   implied indemnity claim also be dismissed

9         THE COURT:  Okay.  Thank you very much.

10        MR. DRAZIN:  Thank you, Your Honor.

11        THE COURT:  Mr. Ben-Veniste.

12        MR. BEN-VENISTE:  If I may, Your Honor, I'll

13  address --

Page 29

ARCHSTON

14          THE COURT:  Would you move to the lectern, please.

15          MR. BEN-VENISTE:  I would be happy to, Your Honor.

16          Fair notice requirements, Your Honor, have been

17  pointed out by the Court, and I won't go beyond that.  With

18  respect to issues of negligence, Your Honor is correct, there

19  are other, as we get into this case, there are other choice of

20  law provisions that are specified.

21          In the contracts here, there are 17 contracts, and 25

22  percent roughly of the properties which are the subject of the

23  consent decree were designed by Niles Bolton.  They implicate

24  the law of Georgia, Virginia, and North Carolina.  Each of

25  those jurisdictions recognizes a separate duty of care for
0038
1  architects which stands alone and beyond any contractual

2  agreements.

3          I think there is confusion by my friend in connection

4  with the proof and pleading, so unless Your Honor has any

5  questions, I don't think I will elaborate on that.

6          THE COURT:  I don't.  I think Rule 13 is a very

7  forgiving requirement, and the early stage in litigation is not

8  the time to be parsing and figuring out who is liable for what

9  and for how much.

10          MR. BEN-VENISTE:  I would only add, Your Honor, that

11  we did take care in our cross-claim to set out, not relying

12  exclusively on the underlying Complaint, but to set out our

13  theory in the areas in which Niles Bolton designed, in our

14  view, insufficiently with insufficient attention to the

15  requirements of ADA and FHA.

16          THE COURT:  Thank you very much, Mr. Ben-Veniste.

17          MR. BEN-VENISTE:  Thank you, sir.

18          THE COURT:  Mr. Sellers.

19          MR. SELLERS:  Good morning, Your Honor.

20          I am inclined, given the Court's questions, to try to

ARCHSTON

21  just address the points that were raised, rather than

22  delivering a prepared argument.

23          THE COURT:  That would be most helpful.  Thank you.

24          MR. SELLERS:  Okay.  Your Honor, let me start with the

25  continuing violation theory question that Clark has challenged.

0039

1   We, of course, recognize that the Supreme Court in the Havens

2   case recognized many years ago that the continuing violation

3   doctrine was available under the Fair Housing Act.

4           Clark seems to regard itself as something of a passive

5   player in the construction business.  I assume discovery will

6   tell us its proper role, but clearly the Fair Housing Act

7   places some responsibility for compliance with the statute on

8   builders.

9           As the Court recognized, the term construct is a term

10  that would normally apply to builders.  I doubt very much that

11  Clark would, for instance, just build any building if it had

12  been furnished plans that were in some way grossly deficient.

13          I would be surprised if Clark would simply conclude,

14  well, we are going to follow the plans regardless of what they

15  dictate, and I would be surprised likewise if discovery would

16  not disclose that Clark has a set of internal policies and

17  procedures that govern how it is going to handle designs that

18  are provided and how it is going to undertake its construction.

19          I suspect that when we get to discovery, there will

20  be reason to conclude --

21          THE COURT:  It would be shocking if they didn't.

22          MR. SELLERS:  Right.  Therefore, there is a good deal

23  that potentially connects the construction of these five

24  properties.  I think if we draw any lessons from the cases, the

25  jurisprudence in this area, and there is a good deal of it as

0040

1   the Court is aware, on an application of the continuing

Page 31

ARCHSTON

2  violation doctrine as it applies to the Fair Housing Act, it
3  appears that there are really three principles that can be
4  derived.  One is you have the same builder involved in the
5  various properties.  We have that here.

6          The second is that there is some proximity in time.
7  The assertion that we could lay a claim going back to 1965,
8  unless there was continuous construction along the way that was
9  deficient and a statute that applied at the time, I think is
10 ludicrous.

11          But we have here the construction of five properties
12 in quick succession -- completion dates in 2001 for two
13 properties, 2002 for one property, 2003 for one property, and
14 2004 for one property.  That is a series that is close in
15 proximity in time.

16          The third is that there are similar types of
17 violations.  We have evidence here for some of those properties
18 of similar types of violations, but for purposes of its Motion
19 for Summary Judgment, Clark in its papers is prepared to
20 concede that the properties at issue are in violation of the
21 Fair Housing Act and the ADA.

22          So, Your Honor, we don't have to really worry about
23 that third issue.  I think the case law generally supports the
24 proposition that in these circumstances, the continuing
25 violation doctrine would apply.  And, as the Court recognizes,
0041
1  unlike the Mesecky (sp?) decision, we do have two properties
2  that are plainly within the limitations period.  I don't think
3  there is any dispute about that.

4          I think that Clark gives itself too little credit with
5  respect to the way it undertakes construction to disclaim any
6  responsibility for the manner in which it constructs buildings
7  and any responsibility for ensuring that the buildings it
8  constructs comply with the disability laws.
                        Page 32

ARCHSTON

9          Indeed, if that is really its position, then that may
10  be another cause for concern by us.  It has advocated its
11  responsibility under the Fair Housing Act and the ADA for
12  ensuring that the construction complies with those laws.

13          So, we think we have satisfied the requirements with
14  respect to the application of the continuing violation
15  doctrine.  The fact that these are separate independent
16  contracts, again, we have a single builder.  It is not simply
17  an agent that ignores, I would hope, its responsibilities under
18  law.  It is a single builder that has been engaged in the
19  construction in quick succession of five properties.  We submit
20  that the overwhelming body of authorities supports the
21  application of the continuing violation doctrine here.

22          THE COURT:  Mr. Sellers, what have you uncovered, if
23  anything, in the way of adjudicated claims against builders
24  around the country?

25          MR. SELLERS:  I don't know that there has been a lot
0042
1   of recorded decisions of that sort.  I suspect that a lot of
2   these cases end up getting resolved after the initial
3   skirmishing is completed.

4          THE COURT:  Sure.

5          MR. SELLERS:  This may be one of the first, Your
6   Honor.  We'll see.

7          I submit that a fair interpretation of the Fair
8   Housing Act and the ADA is that there is responsibility that
9   Congress has placed on builders that is not simply a
10  responsibility they can advocate by claiming, we had no control
11  over this.

12          Indeed, on that issue, the -- I guess I would say one
13  other thing, although counsel have not mentioned it.  Given
14  that the Amicus mentioned the Morgan case in the Supreme Court,

Page 33

ARCHSTON

15  I feel compelled at least to point out for purposes of the
16  record that the only case that has been reported to date,
17  considering the application of the Morgan decision to the Fair
18  Housing Act, has concluded that it did not preclude the
19  application of the continuing violation doctrine.

20        If I might just give you the cite, Your Honor, because
21  we didn't have a chance to file a responding brief on that.

22        THE COURT:  You can, sure.

23        MR. SELLERS:  It's the Wallace v. Chicago case, and it
24  is found at 298 F.Supp. 2d, page 710.  It's a Northern District
25  of Illinois case from the year 2003.
0043
1        Interestingly, Amicus cited it, but for a different
2  proposition.  It's striking that the Court in that case
3  initially concluded the continuing violation doctrine did not
4  apply in light of Morgan.  On reconsideration, considering the
5  Havens decision and its impact, the Supreme Court's decision,
6  and recognizing the difference in the structure of Title VII
7  and the Fair Housing Act, it concluded that the Morgan case did
8  not dictate a different result, that the continuing violation
9  doctrine still applied.

10        So, for purposes of the record, since that brief was
11  filed recently, I guess yesterday or the day before, we wanted
12  to make sure we had put that on the record.

13        If I may, unless the Court has questions, I am happy
14  to turn now to the ADA claim.

15        THE COURT:  Well, you know, I don't -- maybe it's
16  because we are in the Fourth Circuit, but Morgan was not a
17  surprise to me at all.  My understanding of the proper
18  interpretation and application of continuing violation doctrine
19  was, I thought, exactly what Justice Thomas wrote in Morgan.

20        In the employment context, you know, you can fire
21  somebody, you can not give them a promotion, you can suspend

ARCHSTON

22  them.  What the plaintiffs' bar, understandably, has been doing

23  more and more and more over the years, is trying to cobble

24  those clearly discreet acts of discrimination together

25  involving a single plaintiff, a single employer, in an effort
0044
1   to get around the various limitations periods.

2         MR. SELLERS:  Yes.

3         THE COURT:  I have never understood it that way.  I

4   don't think the Fourth Circuit has ever understood it that way.

5              Continuing violation applied mostly to so-called

6   sexual harassment, or racial harassment, or hostile environment

7   types of claims.  To be sure, a denial of a promotion can be

8   part of a regime of harassment, you know.  But, by and large, a

9   denial of a promotion is a denial of a promotion.  You didn't

10  get the job.  You didn't get the promotion.

11        MR. SELLERS:  Right.

12        THE COURT:  I don't see any conflict between Morgan

13  and Havens.  Certainly Mr. Moore is right, there has to be a

14  nexus, there has to be a relationship.  And as you just pointed

15  out, here, we have spatial relationship, nationwide, we have

16  temporal relationship, we have the same builder, we have

17  essentially the same owner.  What else do you need?

18        MR. SELLERS:  Right.  Certainly at this juncture of

19  the case, that ought to suffice.

20        THE COURT:  That's the way it seems to me.

21        MR. SELLERS:  And if Clark wants to raise new issues

22  at trial with respect to this, we will address them at that

23  point.

24        THE COURT:  Since I asked Mr. Moore, what about this

25  discovery issue?  Do you really think you could be precluded?
0045
1   Particularly, now that you have reminded the Court, 2001, 2002,

2   2003, why on earth would a court preclude you from taking

Page 35

ARCHSTON

3  discovery and -- by the way, I don't think this is alleged,

4  it's not alleged and I don't think it's in the briefing, but

5  what was the range of these contracts with Clark?

6          MR. SELLERS:  I'm sorry.  Do you mean --

7          THE COURT:  The construction contracts.  What amounts

8  are we talking about here?

9          MR. SELLERS:  Oh.  I'm sorry, Your Honor, I don't know

10  the answer to that.

11          THE COURT:  Okay.  That will be found in discovery.

12          MR. SELLERS:  Right.

13          THE COURT:  But surely we're talking about --

14          MR. SELLERS:  Very large amounts of money.

15          THE COURT:  Right, $40 million, $30 million, $60

16  million.  I mean, this isn't track housing.  This is not a

17  $20,000 garage.

18          MR. SELLERS:  Right.  And this is not a mom and pop

19  builder.  This is very sophisticated, one of the leading

20  builders in our area.  I have no doubt they have the resources

21  to be able to -- they do have internal protocols for how they

22  are going to undertake their construction.

23          In response to the Court's question about discovery, I

24  don't think there is any question that we will want to conduct

25  discovery that will not be limited temporally by whatever they

0046

1  may contend is the earlier period.  Even if the Court were to

2  conclude that the three properties prior to the two-year

3  limitations period were not actionable, the --

4          THE COURT:  You mean in the sense of, you get no

5  relief as to those.

6          MR. SELLERS:  Right, that's correct.  But the Supreme

7  Court has made clear in the United Airlines v. Evans case in

8  connection with Title VII cases, and equally applicable here,

9  that you can conduct discovery and, indeed, evidence of prior

Page 36

ARCHSTON

10  violations is relevant in connection with proving liability
11  within the limitations period.
12          THE COURT:  Absolutely.  In other words, in this case,
13  you could have a situation where -- let's just say
14  hypothetically Clark became aware of complaints about one of
15  the properties outside the limitations period, from members of
16  the disabled community.  That would be relevant on their
17  willfulness in going forward with construction on a later
18  property.
19          MR. SELLERS:  Right.
20          THE COURT:  I can't imagine that I would preclude
21  discovery.  And, as you say, Evans and a whole host of
22  cases, -- frankly, there's some dicta in Morgan that says you
23  can go outside limitations to use evidence of barred claims to
24  litigate non-barred claims.
25          MR. SELLERS:  Yes.  In fact, Morgan cites the Evans
0047
1   case in the Supreme Court.
2           I think regardless of at what point you determine that
3   the limitations period starts running, whether it's at the end
4   of the construction, the last nonconforming property, or it's
5   at the point of remediation, as some courts have held, it's not
6   until the property owner has actually remediated the
7   noncompliant portions of the property.
8           Either way, Your Honor, we have satisfied our ability
9   to show what is necessary to show that the continuing violation
10  doctrine should apply here.
11          THE COURT:  Okay.  What did you want to say about --
12          MR. SELLERS:  The ADA claim I am happy to discuss more
13  generally.  It is not by any means a model of clarity in
14  draftsmanship.  I think anybody who contends that this is a
15  clearly-written provision is engaged in wishful thinking.

Page 37

ARCHSTON

16          But it's for that reason, indeed, that looking to the

17  Justice Department's interpretation is important, and they have

18  interpreted it in a way that is consistent with our position.

19          I might add -- because counsel made a point of noting

20  the Days Inn case from the Eighth Circuit, I just want to quote

21  from a portion of that because I think it's instructive.  Not

22  only did the court there conclude that to exclude commercial

23  facilities from coverage would be to erect, it would create an

24  enormous gap in coverage.  Indeed, it would exclude 99 percent

25  of all the office buildings in this country from coverage under

0048

1  the Fair Housing Act.  I mean the American Disabilities Act.

2          Significantly, Your Honor, counsel attaches great

3  significance to the phrasing about there being control, that,

4  therefore, as a builder, it does not have control.

5          What the language says is:

6  A party must possess a significant degree of

7  control over the final design or construction of

8  a facility.

9          I'm reading from volume 151 of F.3d at page 826.

10          Well, I think it's hard to conceive that Clark did not

11  have a significant degree of control over the construction of

12  the building it was building.  It's just strains credulity to

13  contend that, well, we just put together the lumber and the

14  bricks, we don't have any control over it.

15          THE COURT:  Well, that flies in the face of everything

16  we know to be true.  A builder would no more ignore, knowingly

17  I would assume, knowingly ignore federal legislation in the

18  antidiscrimination area than it would a fire code or a building

19  code.

20          MR. SELLERS:  Right.  At least it shouldn't.

21          THE COURT:  You could get anything you want from an

22  architect, but a builder is not going to say, okay, do you want

Page 38

ARCHSTON

23  to save $20,000 on --

24          MR. SELLERS:  Right.  We don't put in fire escapes.

25          THE COURT:  Right.  We won't put in smoke detectors.
0049
1  You don't want smoke detectors in here?  All right.  It's not

2  on us.

3          That's not going to happen.

4          MR. SELLERS:  Right.  I don't think Congress intended

5  that.  I think that's why Congress had the construct and design

6  provision in there.

7          I think their attempt as well to argue that the term

8  "and" therefore means you have to engage in construction and

9  design is likewise a self-serving interpretation.  I understand

10  why they seek to persuade the Court, but --

11          THE COURT:  Well, it's a great piece of drafting,

12  isn't it?  I mean, the cases go back -- I think you cite a case

13  from 1865.

14          MR. SELLERS:  Right, 1865.

15          THE COURT:  And you could probably find Blackstone

16  talking about that "and" means "or" and "or" means "and".  It's

17  one of the things that lay people, when they talk about we

18  lawyers and judges, just scratch their head and say, my

19  goodness, you would think they could get "and" and "or" right.

20  Only lawyers could make "and" mean "or" and "or" mean "and".

21          MR. SELLERS:  Right.  And unfortunately it's Congress

22  drafting, and often the drafting is by negotiation.

23          In any event, I think what is clear is, once again,

24  the interpretation that construes "and" to only be in the

25  conjunctive is one that would likewise exclude the -- that
0050
1  would require that a builder or a designer be engaged in both

2  practices.

3          As we well know, in the modern day and certainly at

Page 39

ARCHSTON

4  the time that the ADA was enacted, companies like Niles Bolton,

5  which are specialists in drafting and design and architecture,

6  engage in a unique craft.  They don't engage in building.

7        Likewise, Clark engages in construction.  It is not a

8  designer.  That does not mean it doesn't have responsibility to

9  build a dwelling that is compliant.

10        To read this phrase "and" as conjunctive only would

11  exclude all the large builders and designers in the country,

12  all of whom specialize in their discreet craft, and leave only

13  the mom and pop designers that happen to do building on the

14  side or builders that happen to do designing on the side.

15        Your Honor, that could not be what Congress had in

16  mind.  It is like the exclusion of the commercial facilities.

17        THE COURT:  To say nothing of -- again, I am not

18  taking judicial notice here, but as a practical matter we know

19  that in the course of the construction of a huge project like

20  this, builders and architects and owners kibbutz all the time.

21        MR. SELLERS:  Right.

22        THE COURT:  I mean, every day they are talking about,

23  you know, how do we bring this off?

24        MR. SELLERS:  Right.  It should be an interactive

25  process.
0051
1        THE COURT:  Of course it is.

2        MR. SELLERS:  It's not a process where we hand you the

3  plans and you say, thank you very much, we won't look at them

4  carefully, we will just build whatever you tell us to build.

5        I think discovery will show that, Your Honor, and

6  that's what we wish to pursue.

7        THE COURT:  Chief Judge Hogan is certainly one of the

8  finest, frankly one of the most brilliant, judges in America.

9  He is about to become, by the way, the Chair of the Executive

10  Committee at the Judicial Conference.
                              Page 40

ARCHSTON

11          MR. SELLERS:  I know.

12          THE COURT:  He's great.

13          But we all have a bad day.

14          MR. SELLERS:  Right.  Everybody gets to get it wrong

15  once in awhile.

16          THE COURT:  That's right.

17          MR. SELLERS:  I am happy to now turn, if the Court

18  would like, to the standing issues, unless the Court has other

19  questions about the ADA.

20          THE COURT:  Yes, standing.

21          MR. SELLERS:  Let me turn to that.  With respect to

22  the ERC, --

23          THE COURT:  By the way, we have three plaintiffs.  As

24  a practical matter, it doesn't matter whether all three have

25  standing, two have standing, or one has standing.
0052
1          MR. SELLERS:  That's correct.  The case will continue

2  regardless, as we view it.

3          Let me turn to the ERC first.  First of all, Niles

4  Bolton seizes upon the Buchanan decision.  With all due respect

5  to the judge in that case, --

6          THE COURT:  Judge Chasnow.

7          MR. SELLERS:  Righy.

8          THE COURT:  By the way, tonight she will be

9  introducing Justice O'Connor at the Women's Bar function, and I

10  hope all of you are attending.

11          MR. SELLERS:  Thank you.  That's quite an honor.

12          THE COURT:  You can't get a ticket, though.  They are

13  sold out.

14          MR. SELLERS:  With all due respect to Judge Chasnow's

15  reading of the law there, that was a decision which failed to

16  cite the Williams v. Paretsky decision, a Judge Blake decision

Page 41

ARCHSTON

17  several years earlier, which held the exact opposite way from

18  this court and, of course, failed to discuss the Mesecky (sp?)

19  decision, this very thoughtful reasoned decision of Judge Lee,

20  who canvassed all the Circuits and then concluded that the

21  better course to give effect to the remedial purpose of the

22  Fair Housing Act, as the Supreme Court has instructed in Haven

23  s, is to recognize, and we submit here this Court should

24  recognize, that with respect to the claim that there is a

25  diversion of resources that gives rise to standing, the
0053
1  undertaking of testing, independent of litigation, it may be

2  used for litigation but there is no claim here that this was

3  testing undertaken in connection with the litigation, is an

4  independent basis on which to claim a diversion of resources

5  from other legitimate activities serving an organization's

6  purpose.  That is one of the two grounds on which the ERC

7  claims standing.

8          We submit that notwithstanding Judge Chasnow's

9  decision, Your Honor, Judge Blake's decision, Judge Lee's

10  decision, there are a host of others in other courts around the

11  country, including the Havens court, by the way, which

12  recognizes that diversion of resources is a legitimate basis

13  for standing, support the proposition that this is not the

14  self-inflicted wound that the D.C. Circuit characterized it to

15  be.

16          If it were simply a matter of, you can change your

17  position because you can avoid testing, then organizations like

18  the Equal Rights Center would go out of business.  They exist

19  to, among other things, conduct investigations through testing

20  of properties around the metropolitan area and around the

21  country.

22          If the Court were to conclude that they could have

23  refrained from undertaking the testing and to do so would have

Page 42

ARCHSTON

24  permitted them to avoid the so-called self-inflicted wound,

25  then they would be avoiding one of the central purposes of the
0054
1  organization.

2          THE COURT:  It would gut the notion of private

3  attorneys general enforcement of civil rights litigation.

4          MR. SELLERS:  That's correct, Your Honor.

5          And, by the way, Your Honor, the ERC also asserted a

6  second ground for standing, that is the frustration of its

7  mission.  Unlike the nature of the allegations that Judge

8  Chasnow faulted in the Buchanan case and that area as being too

9  abstract is simply being about seeking to end discrimination.

10          The ERC actually made very specific allegations in

11  this area with respect to --

12          THE COURT:  You are actually trying to get people into

13  buildings and homes and residences.

14          MR. SELLERS:  That's correct.

15          Also, just to point out, in the Complaint, the ERC

16  alleged that that would frustrate its mission in its ability to

17  educate the public.

18          THE COURT:  What paragraph are you on?

19          MR. SELLERS:  I'm sorry.  This is all in paragraphs 55

20  through 57 of the Complaint.

21          THE COURT:  Okay.

22          MR. SELLERS:

23  To educate the public about fair housing rights

24  and requirements, educating and working with

25  industry groups in Fair Housing compliance, and
0055
1  providing counseling services to persons either

2  looking for housing or affected by

3  discriminatory housing practices.

4  I'm quoting from sections of those two paragraphs.

Page 43

ARCHSTON

5       That is much more concrete than what Judge Chasnow

6   faulted the Complaint in the Buchanan case, and we submit is

7   yet another basis to support standing for the ERC.

8       We submit that the better-reasoned cases would permit

9   standing under both, the diversion of resources and the

10  frustration of mission.  But the Complaint in this case is

11  apparently very different than the one filed in the Buchanan

12  case, at least as Judge Chasnow has characterized it.

13      To fault the ERC for undertaking investigational

14  testing as a self-inflicting wound would gut its purpose and

15  ultimately preclude its ability to service a private Attorney

16  General.

17      So, Your Honor, with respect to the ERC, we submit

18  that the standing I think rests on very well-established

19  ground.

20      Let me turn now to the other two plaintiffs, the

21  American Association of Persons with Disabilities and United

22  Spinal.  They both seek associational standing on behalf of

23  their members.  They have pled, as notice pleading requires,

24  satisfaction of the requirements of the Washington State Apple

25  Advertising case, the Hunt case in the Supreme Court, that

0056

1   their members would have standing on their own, that the

2   interest it seeks to protect are relevant to its organizational

3   purpose, and that none of its members must participate

4   individually in the litigation.

5       We submit that that is sufficient at the pleading

6   stage and was sufficient to permit the Court to conclude that

7   they have standing.

8       There is no question that we will need to in the

9   course of discovery demonstrate to survive a Motion for Summary

10  Judgment that there has been more activity by members of those

11  very large organizations.  The American Association of People

Page 44

ARCHSTON

12  with Disabilities has nearly 100,000 members around the

13  country.  We will undoubtedly need to make some showing that

14  some of those members have either attempted to go to some of

15  the facilities at issue or that they recognized, as we assert

16  in our papers, that it would have been futile to do so.  We

17  submit that the futility doctrine does apply equally to the

18  Fair Housing area, as it does to the employment area.

19        We submit that we have made a sufficient showing, have

20  pled sufficient allegations in the Complaint to satisfy the

21  standing requirement at this stage.

22        We recognize we would have to do more at summary

23  judgment.  If the Court concludes that more needs to be pled,

24  we would ask for leave to re-plead the particular allegations

25  as to those plaintiffs to satisfy any additional detail the
0057
1  Court believes is necessary.

2        THE COURT:  Well, it certainly seems to me that on the

3  last two, the -- of course, every challenge to an affirmative

4  action program, for example, brought by a contractor's

5  association, in those cases, clearly, standing is satisfied

6  under Washington State and Northeastern Contractors.  It seems

7  to me the principle applies clearly here.

8        MR. SELLERS:  Right.  I have nothing else unless the

9  Court has questions.

10        THE COURT:  I don't.  Thank you, Mr. Sellers.

11        I will hear Mr. Moore and Mr. Drazin in rebuttal.

12        MR. MOORE:  I will try to be very brief, Your Honor.

13        As to the continuing violation theory, I believe the

14  Court recognizes that a nexus has to be shown between actions

15  taken outside of the limitation period and actions within the

16  limitation period.

17        Counsel for the plaintiff says we've got similar types

Page 45

ARCHSTON

18  of violations on these projects, and he said Clark even admits

19  for purposes of this motion that there were Fair Housing Act

20  and ADA violations.

21       It's true. We will concede that for purposes of this

22  motion. But there is no allegation that the specific

23  violations of the Fair Housing Act or the ADA are similar on

24  the five Clark projects. There is nothing regarding any

25  specific violations on the five Clark projects.
0058

1       In fact, if you look at the Complaint, Your Honor, you

2  will see numerous paragraphs. From paragraph 35 through

3  paragraph 53 of the Complaint, they lay out their story of how

4  there are similar FHA and ADA violations on these projects, and

5  they refer to specific projects. There's not one reference to

6  any of the five Clark projects.

7       So, there is nothing in the record about similarity

8  among specific violations of the FHA or the ADA among any of

9  the Clark projects.

10       The Court said there is a spatial nexus, we're

11  nationwide. Your Honor, it is true that the 111 projects that

12  Archstone built and that are referenced in the Complaint are

13  nationwide, 18 states and the District of Columbia. Clark was

14  only involved in two states, Virginia and Maryland. We were

15  not involved in constructing these projects on a nationwide

16  basis.

17       THE COURT: That actually hurts you.

18       MR. SELLERS: Right.

19       MR. MOORE: No, Your Honor, because you also said you

20  have the same builder on all these projects. There may be a

21  nexus if Clark had built 111 of these projects.

22       THE COURT: No, no. I meant the same builder on the

23  five Clark projects.

24       MR. MOORE: We are the same builder on the five Clark

ARCHSTON

25  projects, but this is not a situation where Clark is the
0059
1   captive builder going around the country building projects that

2   are noncompliant.  We built five distinct projects and only

3   five projects.

4          Their statement was that, you know, Clark can't just

5   go out and intentionally ignore statutes and regulations and

6   fire codes and things like that.  I agree with that.  That's

7   not my position.  But, Your Honor, what's in the record is that

8   Clark built these projects in accordance with the designs

9   provided to it, inspections were passed, and these projects

10  were turned over to the owners.  So, the record shows Clark did

11  not do the kinds of things that you hypothesized about

12  fire-code violations and that sort of thing.

13         We submitted affidavits that say we built in

14  accordance with the plans and specifications.  There is no

15  allegation in a counter-affidavit and no statement by the

16  plaintiff that they need discovery to access whether or not we

17  built these projects in accordance with the designs and plans

18  given to us.  And there is no cross-claim by any defendant

19  against Clark saying, you didn't do what you said you were

20  going to do under the contract, which was to build these

21  projects in accordance with the design.

22         In short, the evidentiary record does not support the

23  contention that, you know, Clark just went out willy-nilly and

24  built according to the plans, knowing that there were some

25  statutory violations.  It's not in the record.  To the
0060
1   contrary, we built in accordance with the plans and specs.

2          THE COURT:  By the way, just to be clear, I don't

3   think the -- the summary judgment record does not address

4   change orders and modifications or any of that; right?

5          MR. MOORE:  None of that, Your Honor.

Page 47

ARCHSTON

6        THE COURT:  Okay

7        MR. MOORE:  As far as I am concerned, it's not an

8   issue.  We completed the projects, they were inspected and

9   turned over, and we left those projects.  That's in the record.

10        THE COURT:  Okay.

11        MR. MOORE:  With regard to the ADA argument and this

12  parallel interpretation that sections 302 and 303 would leave a

13  gap, that commercial facilities would be excluded, I disagree

14  with that.

15        The Ninth Circuit in Longberg disagreed with that.

16  The Ninth Circuit said clearly that Congress intended

17  commercial facilities to be covered by section 303.  It is

18  covered by section 303.

19        But, more importantly, Your Honor, that's not even an

20  issue here today.  We are not dealing with any commercial

21  properties in this litigation.  That is simply not an issue

22  before the Court.

23        With that, Your Honor, I will answer any further

24  questions you might have.  All I can say is that on the

25  evidentiary record, summary judgment as to three of these
0061
1   projects under the Fair Housing Act count is warranted.

2   Whether they can get discovery under those later on or not,

3   summary judgment as to the cause of action seeking damages

4   against Clark based on three projects finished outside of the

5   limitations period is warranted, and summary judgment on the

6   ADA claim is warranted.

7        The argument is made that to design and construct is

8   an inherently ambiguous term because no builder does the

9   designing and no architect does the constructing.  It's

10  factually incorrect.

11        First of all, there is nothing in the record on this,

12  but let me just say that a lot of contracts these days are

Page 48

ARCHSTON

13  issued and ordered on a design/build basis.  There are
14  contracts out there, contractors who both design and build.
15  Somebody who did have control over both the design and
16  construction may have liability under section 303 of the ADA
17  based on the rationale of the Days Inn decision, the Eighth
18  Circuit decision.  They said, if you have significant control
19  over design and construction, you have liability under section
20  303.

21         Now, there is also no gap here because owners do have
22  significant control over design and construction.  They enter
23  into contracts with designers.  They enter into contracts with
24  contractors to build.  It's not as if nobody is going to have
25  liability if you adopt the conjunctive interpretation of that
0062
1  term.

2         Owners have the right and the ability to control both
3  the design and the construction.  Franchisors, like the Days
4  Inn of America who review and approve design and construction,
5  have control over design and construction.  Design/build
6  contractors have control over both the design and the
7  construction.  Any of those three entities would have liability
8  under section 303.

9         THE COURT:  And any of those three entities can file
10  bankruptcy.

11         MR. MOORE:  That's true, Your Honor.

12         THE COURT:  I hear you.  I understand what you're
13  saying.  But I don't understand Congress' intent to be to
14  narrow the class of defendants in remedial civil rights
15  litigation.

16         MR. MOORE:  I don't think Congress intended to narrow
17  the class of potentially-liable parties.

18         THE COURT:  That's your argument.

Page 49

ARCHSTON

19          MR. MOORE:  No.  My argument is Congress adopted the

20  same class of potentially-liable parties that they had included

21  in section 302, the general rule of liability.  Congress said

22  that for purposes of liability under 302(a) discrimination

23  includes designing and constructing noncompliant facilities.

24  They adopted the same class.  They didn't narrow it, but they

25  didn't expand it, and that's what you won't see in the
0063
1  language.

2          Thank you, Your Honor.

3          THE COURT:  Thank you, Mr. Moore.

4          Mr. Drazin.

5          MR. DRAZIN:  Your Honor, just one quick point about

6  associational standing.  I think Mr. Sellers said that on

7  summary judgment, he realized you have a higher burden, you

8  have to come forward and show that members of the AAPD and the

9  United Spinal visited the properties and made some effort and,

10  you know, the sort of things that they have to plead now and

11  they have not pled that in the Complaint.

12          So, it's not enough just to say that their members

13  have been discriminated against.  If they have a good-faith

14  basis to make the allegations that their members have visited

15  the properties and were unable to access the properties, then

16  that's what they have to plead now.  It's not enough at this

17  stage to say, oh, well, we will address that at summary

18  judgment.  They have to be able to come forward now in the

19  Complaint and make those allegations.

20          Thank you, Your Honor.

21          THE COURT:  Thank you, Mr. Drazin.

22          Well, counsel, I thank you all very much for your

23  excellent arguments and your excellent written arguments.

24          I am prepared to rule.  I don't find the issues,

25  frankly, close at all.  That is not to say that I don't

ARCHSTON

0064
1  recognize, because I do, that clearly there are splits of
2  authority out there.  But by my lights, the splits of authority
3  fit comfortably into what I view as majority rules and
4  reasoning and really what I view as a small minority of cases
5  that take, as I suggested, a rather crabbed, narrow
6  interpretation construction of these statutory provisions.

7       As counsel have pointed out in your arguments both
8  oral and written, the facts matter a lot in these cases.  But I
9  am satisfied that the motions must be denied.

10      On standing, it's clear to me that the plaintiffs have
11 standing for the reasons stated by the plaintiffs.

12      I take Mr. Sellers' last point, which was addressed by
13 Mr. Drazin in rebuttal, really to be what we all know, and that
14 is the question of standing itself in an appropriate case can
15 be and sometimes is put off, despite the constitutional
16 imperative, of a case of controversy.  Courts sometimes put off
17 final resolution of a question of standing until the facts of
18 the case are more fully developed.  The pleading burden on
19 standing is really de minimis.  It really is de minimis,
20 particularly, one would say, in the context of remedial civil
21 rights litigation.

22      I don't think it is close here.  I think both the
23 Equal Rights Center as well as the two associations, for the
24 reasons stated, clearly have standing.  Whether later on one or
25 more defendants might be able to undermine the assertion of
0065
1  standing through an absence of evidence sufficient to support
2  the allegations is a different matter.

3       With respect to the cross-claim, again, I don't view
4  it as close.  As I think Mr. Ben-Veniste correctly pointed out,
5  questions of pleading are different from questions of proof.
6  The notice pleading under the federal rules applies equally to

Page 51

ARCHSTON

7   cross-claims and counter-claims as they apply to original

8   claims.

9        I find no legal infirmity in any of the theories

10  relied on by Archstone in its cross-claim.  Express or implied

11  indemnity have been pled sufficiently.

12       For the reasons in my colloquy with Mr. Drazin, I

13  think it's clear my judgment is that both the breach of

14  contract, limiting myself for now to the Maryland law, the

15  negligence claim, the professional malpractice claim, as it

16  were, which is one of the theories supporting the cross-claim,

17  are more than adequately pled in light of the standards of Rule

18  8(a) of the Federal Rules of Civil Procedure.

19       On limitations, again, it seems to me Judge Lee has

20  got it right.  Another case that I looked at -- well, I looked

21  at all the cases, but it seems to me the better-reasoned cases

22  point ineluctably to the conclusion that the continuing

23  violation theory recognized in Havens does and should apply

24  under these two statutes.

25       The devil is in the details, of course.  Mr. Moore is

0066

1   to be commended for I think a very forceful argument in support

2   of the effort to disaggregate plaintiffs' claims with respect

3   to the five Clark properties.  But I am satisfied that at the

4   pleading stage, the plaintiff has alleged enough, bearing in

5   mind, as I agree, there must be a nexus, there must be some

6   connection between the barred and nonbarred claims to permit

7   plaintiff to proceed past the Motion to Dismiss, Motion for

8   Summary Judgment, and I am satisfied that here the plaintiff

9   has done that.

10       Without improperly taking judicial notice or reading

11  too much into the Complaint, it absolutely flies in the face of

12  common knowledge and common understanding to suggest that five

13  contracts, over a limited period of time, in a limited

Page 52

ARCHSTON

14  geographical area, with the same builder of similar projects
15  that are touched by these statutes, give rise to a claim that
16  Clark has recklessly or willfully acted in violation of
17  congressional intent in going forward with plans to build
18  properties that, according to the allegations in the Complaint,
19  taken as true and the inferences therefrom, violate these
20  statutes.

21         As a practical matter, as I began, it just doesn't
22  make any difference at this stage.  Without prejudging Motions
23  to Compel or Motions for Protective Order, it is perfectly
24  clear to me that plaintiff is entitled to significant discovery
25  from Clark on its practices and policies, not just the narrow
0067
1  contractual documents in the course of dealing related to the
2  two projects as to which there is no challenge, but to take a
3  look, a fair look at Clark's policies and practices, the
4  negotiations leading up to the contracts, the execution of the
5  contracts, any change-orders for all the contracts, what
6  discussions were held, e-mails.  Discovery is going to be very
7  formidable in this case.

8         Whether Clark gets out at the end of the day, of
9  course, is not at all a question before the Court today.  Clark
10  may well get out.  Clark may well be absolved of any
11  responsibility as a matter of the substance of the plaintiffs'
12  claims.  But that is not the question before the Court.

13         So, the Motion for Partial Summary Judgment with
14  respect to the three earlier projects is denied.

15         Finally, as I suggested, in my judgment, this is
16  clearly one of those instances where Congress used "and".  But
17  any rational interpretation of the statutory scheme, bearing in
18  mind the Department of Justice's well-considered view on the
19  question, "and" has to be read as "or", because otherwise you

Page 53

ARCHSTON

20  absolutely gut the statute of significant meaning, you

21  frustrate Congress' intention, and those limited number of

22  courts that have taken this sort of literalist approach to the

23  way section 303 and in the ADA are phrased simply doesn't make

24  sense.

25          I follow my colleague Judge Black and the many other
0068
1  cases, Judge Gotschall in the Northern District of Illinois,

2  who wrote a very thoughtful critique of Judge Hogan's approach,

3  as well as the many other cases that have given the, it seems

4  to me, properly-expansive interpretation of this remedial

5  legislation so as to better achieve Congress' purpose in

6  eradicating these barriers once and for all.

7          So, the Court will enter an Order consistent with this

8  oral ruling, denying the Motion for Partial Summary Judgment,

9  denying the Motion to Dismiss, and denying the Motion to

10  Dismiss the Cross-claim, while reserving, of course, the right

11  to write a fuller explication of its reasoning and conclusions

12  should that prove to be desirable.

13          Again, I thank counsel for your arguments and for

14  educating the Court.

15          I invite you to take several weeks to confer and see

16  if you can't settle on a case management order.  I will be

17  happy to enter as a court's order any reasonable proposal that

18  you all submit.

19          Thank you all very much.

20          COUNSEL:  Thank you, Your Honor.

21          THE COURT:  We are in recess.

22          Oh.  Just a moment.

23          Was there a Motion for Leave to File the Amicus

24  Memorandum?  I don't think so.  I don't mean this to be undue

25  criticism.  Of course, I think judges want all the help we can
0069
1  get all the time, but really the proper procedure would have
                           Page 54

ARCHSTON

2  been to file a motion for leave to file an amicus brief, and

3  you could accompany the motion with the amicus brief.

4          So, just for what it's worth, in the future -- I did

5  look at that material and, frankly, I thank you for it, but

6  procedurally it would have been more proper to seek the Court's

7  leave rather than treating yourself as an uninvited intervener.

8  But I appreciate the efforts that went into that.

9          Thank you.

10         (The proceeding was then concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
0070
1

2

3

4                          INDEX
                        Volume 1 of 1
5                       Motions Hearing
                      November 17, 2005
6

7                                    Page Numbers

                         Page 55

ARCHSTON

8
    COMMENCEMENT OF HEARING       2
9
10
    COLLOQUY                     2 -- 4
11
12
    MR. MOORE                 4 -- 28
13
    MR. DRAZIN               28 -- 37
14
15
    MR. BEN-VENISTE        37 -- 38
16
    MR. SELLERS            38 -- 57
17
18
    MR. MOORE              57 -- 63
19
    MR. DRAZIN               63
20
    THE COURT              63 -- 69
21
22
    CONCLUSION OF HEARING       69
23
24
25

0071
1
2
3
4
5
6
7
8
9            C E R T I F I C A T I O N
10
11       I, Sharon Cook, hereby certify that I was the
12  Official Court Reporter present during the foregoing proceeding
13  and that this verbatim transcript is true and accurate.  The
14  proceeding was taken by me in machine shorthand, and this

Page 56

ARCHSTON

15  verbatim transcript was subsequently prepared by me utilizing

16  the XSCRIBE Computer-Aided Transcription system.

17

18

19                                    Sharon Cook
                                      Official Court Reporter
20                                    7522 United States Courthouse
                                      101 West Lombard Street
21                                    Baltimore, Maryland      21201

22                                    Telephone No.:  (410) 837-2343

23

24

25

Page 57